IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK & CO., INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | C. A. No. 04-1313 (GMS) |
| DR. REDDY'S LABORATORIES, LTD. and | ) | |
| DR. REDDY'S LABORATORIES, INC., | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

## DRL'S OPENING CLAIM CONSTRUCTION BRIEF

Of Counsel:

Bruce D. Radin
Stuart D. Sender
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
CN 1000
Short Hills, NJ 07078
(973) 379-4800

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants/Counterclaim Plaintiffs*

Dated: July 25, 2005

## TABLE OF CONTENTS

I. BACKGROUND ............................................................................................................. 1

II. THE '957 PATENT ........................................................................................................ 2

    A. The '957 Patent Claims ..................................................................................... 2

    B. The '957 Patent Specification ............................................................................ 3

    C. Prosecution History of the '957 Patent ............................................................. 4

III. THE LAW OF CLAIM CONSTRUCTION ................................................................... 6

IV. THE DISPUTED CLAIM TERM REQUIRING "HAIRCOUNT ANALYSIS" MUST BE AN OBJECTIVE COUNT ......................................... 8

    A. The Claims Require a Haircount Analysis ........................................................ 9

    B. The '957 Patent Specification and Prosecution History Clearly Show That Haircount Analysis is an Objective Term Requiring Photographic Analysis ................................................................ 10

V. CONCLUSION ............................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

Cardinal Chem. Co. v. Morton Int'l.,
    508 U.S. 83, 113 S.Ct. 1967 (1993).................................................................13

Fonar Corp. v. Johnson & Johnson,
    821 F.2d 627 (Fed. Cir. 1987).........................................................................13

Kinik Co. v. Int'l Trade Comm'n,
    370 F.3d 1354 (Fed. Cir. 2004).......................................................................10

MultiForm Desiccants, Inc. v. Medzam, Ltd.,
    133 F.3d 1473 (Fed. Cir. 1998).........................................................................7

Phillips v. AW Corp., et al,
    No. 03-1269, -1286, slip op., 2005 WL 1620331
    (Fed. Cir. July 12, 2005) ........................................................................ passim

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,
242 F.3d 1337 (Fed Cir. 2001).............................................................................13

Snow v. Lake Shore & M.S. Ry. Co.,
    121 U.S. 617 (1887)........................................................................................13

Spectra-Physics, Inc. v. Coherent, Inc.,
    827 F.2d 1524 (Fed. Cir. 1987).......................................................................12

**Statutes**

35 U.S.C. §112..........................................................................................................4

35 U.S.C. § 271(e)(2)(A) ..........................................................................................1

`Pursuant to the Court's Scheduling Order, Defendants and Counterclaim Plaintiffs Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively "DRL") hereby submit their opening claim construction brief. The only claim construction issue the Court needs to decide is the meaning in the claims of United States Patent No. 5,547,957 ("the '957 patent," Exhibit 1) of the claim element "at least until growth of hair can be detected in the balding area by haircount analysis of the balding area." As set forth more fully below, DRL respectfully submits that the intrinsic evidence -- the claims, patent specification and prosecution history -- clearly shows that the haircount analysis must be construed to mean at least until growth can be detected by an objective haircount analysis utilizing photography to detect hair growth.

## I. BACKGROUND

Merck & Co., Inc. ("Merck") is the owner of the two patents-in-suit, the '957 patent and United Sates Patent No. 5,571,817 ("the '817 patent"). The '957 patent relates to a method of treating male pattern baldness by orally administering finasteride until hair growth can be detected by a haircount analysis. The '817 patent relates to a method of treating androgenic alopecia, i.e., male pattern baldness, comprising orally administering finasteride in a therapeutically effective amount.

On June 19, 2002, DRL filed its Abbreviated New Drug Application ("ANDA") with the FDA seeking approval to sell its finasteride 1 mg tablets prior to expiration of the '957 and '817 patents. Over two years later, Merck sued DRL for infringement of the '957 and '817 patents pursuant to 35 U.S.C. § 271(e)(2)(A).

## II. THE '957 PATENT

### A. The '957 Patent Claims

The '957 patent issued with 7 claims, 2 independent and 5 dependent claims.

Independent claim 1 reads:

> A method of treating male pattern baldness comprising orally administering to a male person having a balding area 17β-(N-tert-butylcarbamoyl)-4-aza-5α-androst-1-ene-3-one in a dosage amount from 0.05 to 3.0 mgs/day at least until growth of hair can be detected in the balding area by haircount analysis of the balding area.

Claims 2-4 depend from independent claim 1 and require varying dosage amounts.

Independent claim 5 reads:

> A method of arresting and reversing male pattern baldness comprising orally administering to a bald or balding male person having a balding area 17β-(N-tert-butylcarbamoyl)-4-aza-2α-androst-1-ene-3-one in a dosage amount from 0.05 to 3.0 mgs/day at least until growth of hair can be detected in the balding area by haircount analysis of the balding area.

Claims 6-7 depend from independent claim 5 and require varying dosage amounts.

The only issue for the Court to decide is the meaning in all of the claims of the claim element:

> at least until growth of hair can be detected in the balding area by haircount analysis of the balding area.

The key component of this claim element is what is meant by a "haircount analysis."

2

B.  **The '957 Patent Specification**

Example 4 (Col. 7, ln. 52-col. 8, ln. 63) exemplifies what the inventors meant by haircount analysis.[1] In particular, the patent discloses two photographic procedures for counting hairs, macrophotography and global photography. Both procedures provide an objective criteria for counting hairs, comparing a baseline picture with pictures taken at later intervals of time.

First, the patent describes the macrophotographic procedure. Exhibit 1, '957 patent at col. 7, ln. 59-col. 8, ln. 30. In this procedure, baseline photographs are taken to capture the number of hairs before administration of finasteride. Photographs are again taken at 6 and 12 month intervals. The haircount analysis is made by counting hairs, based on the photographs, and comparing the amount of hairs present at 6 and 12 months with the amount of hairs in the baseline.

Second, the patent describes a global photographic procedure. Exhibit 1, '957 patent at Col. 8, lns. 34-63. Here again, magnified photographs are taken allowing a "before and after" haircount analysis.

The '957 patent also states (col. 8, lns. 31-33) that a methodology for detection of hair growth is described in Olsen, E.A. and DeLong, E., *J. American Academy of Dermatology*, Vol. 23, p. 470 (1990) ("Olsen," Exhibit 2). Olsen shows that hair growth can be assessed <u>subjectively</u> by the patient and investigators and <u>objectively</u> through haircounts from macrophotographs of the target area. However, Olsen teaches that <u>all haircounts</u> were made using an objective criteria, i.e., directly from photographs, which

---

[1] Example 4 is the only example, as well as only discussion, in the '957 patent describing haircount analysis. The other examples describe methods for making finasteride and methods of using finasteride at certain dosages.

3

allows "a permanent record and comparison of two different counters." Exhibit 2, at 471, 472. According to Olsen, use of this photographic procedure was an improvement which would help standardize future studies of hair growth procedures in androgenic alopecia. Id at 472. The article illustrates the unreliability of subjective evaluation of hair growth, particularly by the patient.

### C.    Prosecution History of the '957 Patent

The claims of the '957 patent as originally filed **did not** include the claim element presently in dispute.

On December 6, 1994, the Examiner rejected pending claims 1-27 because, inter alia, the specification failed to provide an enabling disclosure or a best mode under 35 U.S.C. § 112. Exhibit 3 at 5-6. In this regard, the Examiner noted that the Patent Office required convincing statistically significant clinical evidence of utility/operability for use as asserted and claimed. Exhibit 4 at 6. The Examiner also rejected claims 1-27 under 35 U.S.C. § 101 because there was no statistically significant clinical evidence of record establishing baldness. Exhibit 3 at 14.

Merck filed an Amendment, dated May 1, 1995, (Exhibit 4), and a Declaration under 37 C.F.R. § 1.132 by Keith Kaufman. ("First Kaufman Decl.," Exhibit 5). In the Amendment, Merck amended the claims to refer to finasteride and specific dosages. These amendments did not contain the disputed claim element presently at issue.

In response to the Examiner's rejections," Merck submitted the First Kaufman Decl. providing results from clinical trials which purported to demonstrate the invention did indeed treat baldness. Exhibit 4 at 6. In particular, paragraphs 11 and 12 of the First Kaufman Decl. discussed both the macrophotographic haircount and global photographic

4

haircount analysis, performed at 3 and 6 months intervals. Exhibit 5 at 4. Paragraph 13 discussed a self-administered questionnaire showing only about half of the patients believing that the finasteride was efficacious in producing a better appearance of their hair. Id. Nothing in this paragraph mentioned an actual count of hair.

On August 4, 1995, the Examiner issued a final office action, again rejecting the pending claims. In particular, the Examiner asked:

> Is Example 4, pages 12 to 14, "prophetic and speculative," (?) it seems to be a protocol to be followed.

Exhibit 6 at 2.

Merck filed an Amendment Under 37 C.F.R. § 1.116, dated November 13, 1995 (Exhibit 7), and a second Declaration by Keith Kaufman ("Second Kaufman Decl.," Exhibit 8). In response to the Examiner's inquiry regarding Example 4, Merck stated:

> The Examiner queried whether Example 4, pages 12 to 14 is "prophetic and speculative." Applicants provided Example 4 in the present application to show one of ordinary skill in the art how to use macrophotography and global photography to detect the effect of the present invention, hair growth, in patients suffering from androgenic alopecia. Exhibit 8 at 3.

In the Second Kaufman Decl., Merck presented evidence in an attempt to show it was surprisingly found that finasteride was as clinically efficacious at 1 mg as it was at 5 mg in the treatment of male pattern baldness. Exhibit 7 at 5. To show hair growth, the Second Kaufman Decl. reported a Net Haircount Change from Baseline for 5 mg and 1 mg finasteride. Exhibit 8, paragraph 6 at 3. In this study, haircount analysis was performed using macrophotographs taken at a baseline and 6 and 12 month intervals. Id.

5

In response to Merck's submission, the Examiner issued an Advisory Action, dated 12/7/95. Exhibit 9. In the Advisory Action, the Examiner stated that in light of the Second Kaufman Decl., the claims would be allowed if, inter alia, Merck amended the claims at the end to include "at least until growth of hair can be detected in the bald spot or bald area by haircount analysis of said bald spot or area -- as elected." Id.

In an Amendment Under 37 C.F.R. § 1.116, dated December 22, 1995 (but seemingly not submitted until January 2005), Merck acquiesced to the Examiner's requirement and amended what have become issued claims 1 and 5 to add the claim language at issue here -- "at least until growth of hair can be detected in the balding area by haircount analysis of the balding area." Exhibit 10 at 2. Merck told the Examiner that the "amendment places the claims in conformance with the elected species and the statistically significant hair growth findings of the Kaufman Declaration submitted with the November 14, 1995 response." Exhibit 10 at 3. Merck further stated

> [the] claims have further been amended to specify that the method be employed at least until the growth of hair can be detected in the balding area by hair count analysis of the balding area. Support for this amendment is found in the specification in Example 4 on pages 12 to 14.

Exhibit 10 at 3-4.

In view of this amendment, the Examiner allowed the claims to issue. Exhibit 11.

## III.  THE LAW OF CLAIM CONSTRUCTION

On July 12, 2005, the Federal Circuit handed down the latest word in claim construction, its en banc decision in Phillips v. AWH Corp., et al, No. 03-1269, -1286, slip op., 2005 WL 1620331 (Fed. Cir. July 12, 2005) (Exhibit 12).

6

As stated in Phillips, claim interpretation begins by an inquiry into how a person of ordinary skill in the art understands a claim term. slip op. at 9. The sources available to understand disputed claim language include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence, including relevant scientific principles, the meaning of technical terms, and the state of the art. slip op. at 11.

First, the claims themselves are reviewed, including the context in which the disputed term is used. This includes review of all claims, both asserted and unasserted. slip op. at 12-13.

Second, the claims must be read in view of the specification. slip op. at 13. Indeed, "[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." slip op. at 14, quoting MultiForm Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998). "It is therefore entirely appropriate for a court, when conducting claim construction to rely heavily on the [specification] for guidance as to the meaning of the claims." slip op. at 16.

In reviewing the specification, however, a court must avoid reading limitations from the specification into the claims, a task that can be difficult to apply in practice. slip op. at 28. The key to making this determination is to keep in mind that "the purposes of the specification are to teach and enable those of skill in the art to make and use the invention." slip op. at 29. "One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that

7

context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee intends for the claims and the embodiments in the specification to be strictly coextensive." slip op. at 29-30.

Third, the patent's prosecution history should also be consulted in construing the claims as it was created by the patentee in attempting to explain and obtain the patent. slip op. at 17. "[T]he prosecution history can often inform the meaning to the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." slip op. at 17-18.

Finally, extrinsic evidence, although less reliable, may be used to determine how to read claim terms. Such extrinsic evidence may include expert testimony, dictionaries and learned treatises. slip op. at 18. However, such extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of intrinsic evidence." slip op. at 21.

IV. **THE DISPUTED CLAIM TERM REQUIRING "HAIRCOUNT ANALYSIS" MUST BE AN OBJECTIVE COUNT**

DRL contends that the disputed claim term must be construed to mean at least until growth of hair can be detected by a haircount analysis utilizing photographs to detect hair growth – in other words, an objective count. DRL's construction provides just such an objective analysis, supported by the '957 patent specification and prosecution history, which allows one skilled in the art to clearly ascertain whether hair growth has actually occurred.

Merck, on the other hand, suggests that the claim element be construed to mean "at least until visually detectable hair growth occurs in the balding area (i.e., hair growth

8

that is noticeable by count and/or appearance)". Merck's proposal is too indefinite and subjective, and it is not supported by either the patent specification or prosecution history. For example, Merck's claim construction says nothing about (1) "how much hair must be detected?" or (2) "what does the hair growth look like?" (i.e., does thickening of a single hair count as hair growth or must there be a new hair) or (3) "how long must one wait to measure the hair growth?" Merck's claim construction would allow any visual detection, both subjective and objective, even a visual detection by a patient. This truly subjective criteria does not and cannot show one of ordinary skill in the art whether hair growth is detected as required by the claims. Patients want to think they are growing hair, even if they are not. The subjective belief of a patient, therefore, does not provide a basis for actually counting hairs as the plain meaning of the term "haircount" clearly requires.

In short, Merck's proposed claim construction allows subjective methods, and provides no procedure as to how to actually count hairs as required by the claims and taught in the '957 patent specification and as argued to the Examiner during the prosecution history.

To the contrary, as shown below, the '957 patent specification and file history support DRL's claim construction to the disputed claim term.

A.  **The Claims Require a Haircount Analysis**

In construing the disputed claim element, one must first look at the words of the claim. Here, the disputed claim element requires a haircount analysis. The ordinary and customary meaning of this term means to count hairs. How that "count" is made, however, is ambiguous, requiring resort to the '957 patent specification and prosecution

9

history.

### B. The '957 Patent Specification and Prosecution History Clearly Show That Haircount Analysis is an Objective Term Requiring Photographic Analysis

"The words of patent claims have the meaning and scope with which they are used in the specification and prosecution history." <u>Kinik Co. v. Int'l Trade Comm'n</u>, 362 F.3d 1359, 1365 (Fed. Cir. 2004). Here, the '957 patent specification and prosecution history clearly teach one of ordinary skill in the art that measuring hair growth by a haircount analysis requires an objective method using photographic means.

For example, Example 4 of the '957 patent specification discloses two methodologies for haircount analysis, a macrophotographic procedure and a global photographic procedure. In each of these procedures, magnified photographs were taken in order to make an actual count of hairs grown by comparing the number of hairs in a baseline picture to those from a picture taken at a later date. The '957 patent specification also refers to Olsen (Exhibit 2) as describing a methodology for detection of hair growth. Exhibit 1, 957 patent, col. 8, lns 31-33. Olsen specifically states that <u>all</u> haircount analyses was performed using photographs and that such photographs helped provide a standard to which haircount analysis could be performed. Exhibit 2 at 471, 472. These clear statements teach one of ordinary skill in the art that haircount analysis according to the '957 patent specification requires an objective assessment of hair growth using before and after photographs.

The '957 patent prosecution history supports this conclusion. In particular, in rejecting the claims, the Examiner required statistically significant clinical evidence that oral administration of finasteride did indeed promote hair growth. Exhibit 3 at 6, 14. In

10

response, Merck provided the two Kaufman declarations. In these declarations, Merck used an objective photographic procedure to show growth of hair[2]. (Exhibit 5 at 4, Exhibit 8 at 3).

Importantly, the Examiner further asked whether Example 4 was prophetic and speculative, illustrating the Examiner's view that there must be some real showing of hair growth for the claims to be allowed. (Exhibit 6 at 2). Moreover, the Examiner believed that the Example was "the protocol to be followed". Id. Merck replied by stating Example 4 was not prophetic and speculative, and showed one of ordinary skill in the art how to use macrophotography and global photography to detect the effect of the present invention, hair growth, in patients suffering from androgenic alopecia. (Exhibit 7 at 3). Accordingly, Merck clearly acknowledged that the patent taught one of ordinary skill in the art is taught to follow an objective protocol - - photograph means - - to determine hair growth.

In view of these statements, the Examiner specifically required Merck to add the disputed claim element. Exhibit 9. Merck acquiesced and amended the claims accordingly. Exhibit 10.

It is thus abundantly clear that during the prosecution of the '957 patent, Merck argued that the invention required an objective haircount analysis using photographic means. Phillips, slip op. at 17-18 ("the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and

---

[2] In the First Kaufman Decl., there was a showing that a self-administered questionnaire was used. (Exhibit 5 at 4, paragraph 13). However, this subjective showing does not indicate at all whether or not hair growth actually occurred, only whether the patients thought it occurred.

11

whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be").

In sum, the clear teaching in the '957 patent specification and prosecution history to one of ordinary skill is that haircount analysis requires an objective method to actually count hairs, the only such method being photographic means that allows a comparison of the actual number of hairs before and after finasteride is administered.

Merck undoubtedly will argue that by limiting the haircount analysis to an objective photographic standard DRL is impermissibly reading a limitation from the specification into the claims. This is not so. As the Phillips court recognized, the "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." slip op. at 28. Phillips, slip op. at 29-30, provided further guidance on this point:

> To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. See Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1533 (Fed. Cir. 1987). One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. See SciMed Life Systems, Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001). The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent. See Snow v. Lake Shore & M.S. Ry.

12

> Co., 121 U.S. 617, 630 (1887) (it was clear from the specification that there was "nothing in the context to indicate that the patentee contemplated any alternative" embodiment to the one presented).

Here, the **only way** to practice the invention is using an objective photographic haircount analysis. This provides a set standard or protocol, taking a before and after picture, to actually count hairs to determine whether hair growth occurred. Any other subjective method, i.e., a visual inspection by a patient or investigator, is impracticable to show whether hair growth **actually took place.** In fact, any subjective criteria would be totally speculative, which the Examiner stated could not be part of any allowed claim. Merck itself took great pains to ensure the Examiner that the photographic examples in the patent <u>were not speculative</u>, teaching one of ordinary skill in the art that the objective photographic criteria was the only way to determine hair growth.

<u>Fonar Corp. v. Johnson & Johnson</u>, 821 F. 2d 627 (Fed. Cir. 1987), <u>overruled-in-part on other grounds by</u> <u>Cardinal Chem. Co. v. Morton Int'l.</u>, 508 U.S. 83, 113 S.Ct. 1967 (1993), is instructive. The claims in <u>Fonar</u> were directed to a method for detecting cancer comprising, <u>inter alia</u>, measuring and establishing standard NMR times. The patent specification disclosed how standard NMR times were computed and set forth the data in reference tables. However, in interpreting the disputed claim element, the patentee argued that the "standard" was measured subjectively using the experiences and images carried in the minds of doctors. <u>Id</u>, 821 F. 2d at 630. The Federal Circuit rejected this interpretation as the patent specification provided no support for this theory. Instead, the only "standards" disclosed in the patent specification, to the objective reference tables, provided the only clear interpretation as to the meaning of the claims. <u>Id</u> at 632.

13

Similarly, the '957 patent specification, as well as the prosecution history, provides no basis to construe the disputed claim element to permit any subjective measurement. Only objective means are taught -- an objective photographic methodology using an actual haircount analysis.

## V. CONCLUSION

For the reasons set forth above, DRL respectfully submits that the claim element "at least until growth of hair can be detected in the balding area by haircount analysis of the balding area" should be construed in an objective manner to mean at least what growth of hair can be detected by haircount analysis utilizing photography to detect hair growth.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _____
Richard L. Horwitz
David E. Moore
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants/Counterclaim Plaintiffs*

Of Counsel:

Bruce D. Radin
Stuart D. Sender
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
CN 1000
Short Hills, NJ 07078
(973) 379-4800

Dated: July 25, 2005

691996 / 28527

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on July 25, 2005, the attached document was served via hand delivery and electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Mary B. Graham
James W. Parrett, Jr.
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347


I hereby certify that on July 25, 2005, I have Federal Expressed the documents to the following non-registered participants:

Robert L. Baechtold
Henry J. Renk
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, NY 10112

By: _____
Richard L. Horwitz
David E. Moore
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672977