IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK & CO., INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| v. | ) | C.A. No. 04-1313 (GMS) |
| | ) | |
| DR. REDDY'S LABORATORIES, LTD. | ) | |
| and DR. REDDY'S LABORATORIES, | ) | |
| INC., | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |
| | ) | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

*Attorneys for Plaintiff Merck & Co., Inc.*

OF COUNSEL:

Robert L. Baechtold
Henry J. Renk
Ryan J. Cudnik
FITZPATRICK, CELLA, HARPER
   & SCINTO
30 Rockefeller Plaza
New York, New York 10112-3800
(212) 218-2100

Dated: July 25, 2005

## TABLE OF CONTENTS

                                                                                    Page

TABLE OF CITATIONS                                                                  ii

NATURE AND STAGE OF THE PROCEEDINGS                                                 1

SUMMARY OF ARGUMENT                                                                 2

STATEMENT OF FACTS                                                                  4

    A.    Male Pattern Baldness And Its Treatment With Finasteride        4

    B.    The '957 Patent                                                 6

    C.    The Prosecution History Of The '957 Patent                      9

ARGUMENT                                                                            12

I.    THE LAW OF CLAIM CONSTRUCTION                                             12

II.    BOTH THE INTRINSIC AND THE EXTRINSIC EVIDENCE SUPPORT MERCK'S PROPOSED CONSTRUCTION    14

    A.    The Person Of Ordinary Skill In The Art                         15

    B.    The '957 Patent Specification Makes Clear That Hair Growth Can Be Detected By Both Objective Haircount Analysis And Subjective Appearance Assessment                16

    C.    During Prosecution Of The '957 Patent, Merck Presented Evidence Of Finasteride's Utility In Growing Hair In Terms Of Both Objective Haircount And Subjective Appearance Assessment          17

CONCLUSION                                                                          19

ii.

## TABLE OF CITATIONS

Page(s)

Cases

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381
    F.3d 1111, 1116 (Fed. Cir. 2004)                 13

*Kumar v. Ovonic Battery Co.*
    351 F.3d 1364 (Fed. Cir. 2003)                 13

*Phillips v. AWH Corp.*
    Nos. 03-1269 and 03-1286 (Fed. Cir. July 12, 2005)    12, 13, 14

Statutes

35 U.S.C. § 271(e)(2)(A)                   1

## NATURE AND STAGE OF THE PROCEEDINGS

This is an action for infringement of Merck's U.S. Patent Nos. 5,547,957 ("the '957 patent") and 5,571,817 ("the '817 patent") (Exhibits A and B, respectively).[1] The '957 and '817 patents relate to methods for treating baldness using a pharmaceutical compound known as "finasteride."

Merck is the owner of New Drug Application ("NDA") No. 20-788 approved by the United States Food and Drug Administration ("FDA"). Pursuant to that approved NDA, Merck markets in the United States a drug known as PROPECIA®, whose active ingredient is finasteride. PROPECIA® is indicated for treating baldness in men. Pursuant to FDA requirements, Merck listed the '957 and '817 patents in the FDA's "Orange Book" as covering its branded drug PROPECIA®.

Defendants, Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively "Dr. Reddy's") have filed with the FDA an Abbreviated New Drug Application ("ANDA") No. 76-436, seeking approval to commercially market 1 mg finasteride tablets for treating baldness prior to the expiration of Merck's '957 and '817 patents. Pursuant to 35 U.S.C. § 271(e)(2)(A), Dr. Reddy's filing of its ANDA constitutes an act of patent infringement.

There is no dispute about the construction of the claims of the '817 patent, or about most of the language in the claims of the '957 patent. (*See* Joint Claim

---

[1] The exhibits referred to herein, unless otherwise indicated, are attached to the accompanying Declaration of Ryan J. Cudnik, Esq. Also submitted in support of Merck's proposed claim construction is the accompanying Declaration of Dr. David Whiting ("Whiting Decl.").

Construction Chart, D.I. 32). The sole claim construction dispute presently in this case is

with respect to the following language appearing in the claims of the '957 patent:

> at least until growth of hair can be detected in the balding
> area by haircount analysis of the balding area.

(Exhibit A at col. 9, lns. 8-10 and col. 10, lns. 6-8).[2]

This brief sets forth Merck's position as to the proper construction of that

claim language.

## SUMMARY OF ARGUMENT

Merck submits that the disputed language in the claims of the '957 patent:

> at least until hair growth can be detected in the balding area
> by

properly should be construed to mean:

> at least until hair growth can be detected in the balding area
> by visually assessing the change in appearance of the
> balding area.

That construction -- which is how a person of ordinary skill in the art would understand

the claim language -- is consistent with all of the intrinsic and extrinsic evidence.[3]

---

[2]    Dr. Reddy's, to date, has not asserted any non-infringement or invalidity defense
that depends on the construction of any claim term whose meaning is undisputed.
Therefore, Merck submits that presently there is no need for the Court to construe
those terms. However, Dr. Reddy's has asserted (see footnotes in the Joint Claim
Construction Chart) that the claim terms are found in the prior art, apparently
reserving the right in the future to assert such a defense that may implicate the
construction of such terms. Despite Merck's requests for Dr. Reddy's to explain
their contention about the claim terms being in the prior art, so that any claim
construction issue can be dealt with now, Dr. Reddy's has refused meaningfully to
do so. (See Exhibit C).

[3]    For clarity purposes, the construction set forth in the text above is a refinement of
the construction in the Joint Claim Construction Chart that eliminates the

(Continued . . .)

First, the claim language says "can be" detected by haircount analysis; it does not say haircount analysis "must be" used or otherwise limit detection of hair growth to only that technique.  Second, because haircount analysis involves assessing the change in appearance of the balding area by counting visible hairs, Merck's proposed construction reflects that technique.  Third, the specification of the '957 patent makes clear that changes in the appearance of a balding area also can be detected, or assessed, using other conventional techniques that, like haircount analysis, measure hair growth by visible changes in appearance.  Fourth, during the prosecution of the '957 patent in the United States Patent and Trademark Office ("USPTO"), Merck submitted statistically significant evidence that finasteride actually did grow hair when assessed both by haircount analysis and by other methods that measure visible changes in appearance.  In response, the USPTO examiner agreed to allow the claims if certain language was inserted, including the disputed language.

Under the circumstances, Merck submits that a person of ordinary skill in the art would understand the claims to mean that finasteride is administered for a period of time which is at least until hair growth can be detected in the balding area by visually assessing the change in appearance of the balding area.  Merck submits that the detection of hair growth can be by any conventional technique.

---

(. . . continued)
somewhat awkward wording.  The parties will be submitting a revised Joint Claim Construction Chart.

## STATEMENT OF FACTS

**A.     Male Pattern Baldness And Its Treatment With Finasteride**

Male pattern baldness is a general term for scalp baldness that occurs in genetically-predisposed males, usually, although not always, beginning at the top of the back of the head (the "vertex" region).  It is the result of the miniaturization of the hair follicles in that area, rendering them smaller, shorter and less visible over time. Miniaturized hair is sometimes referred to as "vellus" hair.  Regular, thick, non-miniaturized (or "terminal") hair follicles are pigmented and normally easily visible to the naked eye.  In male pattern baldness, the amount of vellus hair, relative to the amount of terminal hair, increases over time, thus giving the appearance of baldness.  (Whiting Decl. ¶ 9).

Treatment of male pattern baldness with finasteride tends to reverse the miniaturization process.  As a result, the vellus hair becomes longer, thicker and more pigmented, and thus visible.  Unfortunately, as persons skilled in the art know, if finasteride administration is stopped after some period of time, the hairs will revert to vellus status.  Thus, doctors practicing in the field know that finasteride must be administered indefinitely to be continually effective.  (Whiting Decl. ¶ 10).

There are a number of techniques that can be used to measure or assess the effectiveness of finasteride treatment for male pattern baldness.  For example, a macrophotographic procedure can be employed to actually count the visible hairs on the scalp.  An increase in the number of visible hairs occurring over the course of finasteride administration is an objective indicator of hair growth.  Typically, such a procedure involves photographing a closely-clipped balding area of the scalp and counting the

number of visible hairs in a defined, small portion of that area. The photographic conditions are selected so as to reasonably exclude the possibility of counting the vellus hairs in that small area. A typical macrophotographic procedure is described in the first part of Example 4 of the '957 patent. (Whiting Decl. ¶ 11).

Another typical hair growth assessment technique is a global photographic procedure, in which the same area of a balding scalp is photographed at different times during the course of finasteride treatment. Apparatus is employed to secure the patient's head so that the exact same portion of the scalp is photographed each time. In this technique, unlike in the haircount analysis, the hair is not clipped before being photographed, but, instead, is combed or arranged the same way each time to assure consistency. Then, typically, several trained technicians compare each photograph taken during the course of treatment to a baseline photograph ("before" treatment starts), and visually evaluate any change in hair growth, using a rating scale that usually ranges from "greatly decreased" through "no change" to "greatly increased." Thus, global photography evaluates hair growth by visually rating the appearance of hair growth changes over the course of treatment. Although each such evaluation is a subjective rating by the observer, overall global photography provides a fairly reliable assessment of hair growth during treatment because of the precautions taken that tend to assure that the same area is photographed each time and the fact that multiple comparative evaluations are made of each photograph by trained observers. A typical global photographic technique is described in Example 4 of the '957 patent. (Whiting Decl. ¶ 12).

Two other hair growth assessment techniques include a patient self-assessment (in which the patient is asked to rate his own status of hair growth during the

course of treatment), and an assessment made by a clinical investigator during the course of a treatment trial (in which the investigator, typically a trained physician, may use the same multi-point rating scale employed in the global photographic procedure). Such assessments are described in a 1990 paper by Olsen and DeLong in the Journal of the American Academy of Dermatology. (Exhibit D; also attached as Exhibit E to Whiting Declaration). That paper is cited in Example 4 of the '957 patent. (Whiting Decl. ¶ 13).

When a physician prescribes finasteride for male pattern baldness, he or she will monitor the patient's progress principally by the change in appearance of hair growth over time, and also by asking the patient to self-assess how his hair growth has changed during the course of treatment. Occasionally, physicians will take baseline photographs at the start of treatment, for comparison with photographs taken later during treatment, in order to have a record of hair growth improvement. Physicians sometimes also periodically measure the size of a patient's bald spot as another assessment of hair growth during treatment. (Whiting Decl. ¶ 15).

## B.    The '957 Patent

The '957 patent issued on August 20, 1996 based on an application filed in the USPTO on March 17, 1994 ("the 1994 application"), which, in turn, was a continuation-in-part of an earlier application filed in the USPTO on October 15, 1993 ("the 1993 application").

The '957 patent relates to a method of treating baldness, including baldness in men called male pattern baldness, by administering low dosages of a compound called finasteride.[4]  For example, claim 1 of the '957 patent states as follows:

> A method of treating male pattern baldness comprising orally administering to a male person having a balding area [finasteride] in a dosage amount from 0.05 to 3.0 mgs/day *at least until growth of hair can be detected in the balding area by haircount analysis of the balding area.*

(Exhibit A at col. 9, lns. 5-10, emphasis added).  The same emphasized language also appears in claim 5 of the '957 patent.  (Exhibit A at col. 10, lns. 6-9).  Because claims 1 and 5 are independent claims, and all other claims of the '957 patent are dependent upon either claim 1 or claim 5, the same emphasized language appears in all claims of the '957 patent.

Example 4 of the '957 patent illustrates a number of techniques for detecting hair growth, by visually assessing changes in appearance as a result of administration of the drug.  (Whiting Decl. ¶¶ 11-14).  Two of the disclosed techniques involve photographing the bald area at the beginning of treatment and at various times during treatment.  In one of these photographic techniques (a "macrophotographic" procedure), each visible hair on the photographs is actually counted.  An increase in haircount gives an objective indication of hair growth over time.  (Exhibit A at col. 7, ln. 59-col. 8, ln. 30; Whiting Decl. ¶ 11).  In the other photographic technique (a "global photographic" procedure), hair growth is assessed subjectively by visually evaluating its

---

[4]     Finasteride is one of the so-called $5\alpha$-reductase 2 inhibitors disclosed in the '957 patent.  It is the common name of a compound whose formal chemical name is $17\beta$-(N-tert-butylcarbamoyl)-4-aza-$5\alpha$-androst-1-ene-3-one.   (See '957 patent, Exhibit A, at col. 1, 1ns. 50-51).

change in appearance in the different photographs.  (Exhibit A at col. 8, lns. 33-66; Whiting Decl. ¶ 12).

> Example 4 also states as follows (Exibit. A at col. 8, lns. 31-38):
>
> Methodology for detection of hair growth is also described in Olsen, E.A. and DeLong, E., *J. American Academy of Dermatology*, Vol. 23, p. 470 (1990).

The cited Olsen and DeLong publication ("the Olsen paper") (Exhibit D) describes three techniques for visually assessing hair growth after treatment with a potential drug for treating baldness: a macrophotographic procedure where hair growth was evaluated by a haircount, and patient self-assessment and investigator assessment which assessed hair growth subjectively by changes in appearance over time.  (Exhibit D at 470-71; Whiting Decl. ¶ 13).

> Example 4 concludes with the following statement:
>
> Using the above-described methodology, it can be shown that administration of ... finasteride, in dosages below 5 mg/day per patient, for example, 1 mg/day or 0.2 mg/day, are useful in the treatment of androgenic alopecia, and promote hair growth in patients with this condition.

(Exhibit A at col. 8, lns. 57-62).[5]  One of ordinary skill in the art would understand that this disclosure is saying that any conventional hair growth assessment technique, such as any of the four techniques illustrated in Example 4, may be employed to measure or assess hair growth during finasteride treatment.  (Whiting Decl. ¶ 14).

---

[5]     In the '957 patent, the term "androgenic alopecia" is defined as including male pattern baldness.  (Exhibit A at col. 1, lns. 64-65).

C.     The Prosecution History Of The '957 Patent

The 1994 application as filed in the USPTO contained 27 claims, including the following claims 1 and 21:

> 1.     A method of treating androgenic alopecia comprising administering to a person in need of such treatment a 5α-reductase 2 inhibitor in a dosage amount under 5.0 mgs/day.

> 21.     A method of arresting and reversing androgenic alopecia comprising administering to a person in need of such treatment a 5α-reductase 2 inhibitor in a dosage amount under 5.0 mgs/day.

(Exhibit E at 15, 18).

> In a communication (an "Office Action") mailed December 8, 1994, the USPTO examiner stated that the claims were "generic" to a plurality of disclosed patentably distinct species, and required applicants to elect one species for purposes of prosecution.  Merck elected the species where the active ingredient is finasteride, the route of administration is oral, the type of alopecia is male pattern baldness, and the sex of the patient is male.  (Exhibit F at 2-4).  In the same Office Action, the USPTO examiner also rejected the claims under 35 U.S.C. § 101 allegedly "because there is no statistically significant clinical evidence of record establishing baldness treating usefulness of all encompassed species of '5α-reductase 2 inhibitors.'" (Exhibit F at 14).

Merck responded to that Office Action in an "Amendment" dated May 1, 1995.  (Exhibit G).  Claims 1 and 21 were amended by limiting the 5α-reductase 2 inhibitor to finasteride, and the dosage to a range of from 0.05 to 3.0 mgs/day.   In particular, claims 1 and 21 were amended as follows (with the bracketed material being deleted and the underscored material being added):

> 1.     (Amended)     A method of treating androgenic alopecia comprising administering to a person in need of such treatment [a 5α-reductase 2 inhibitor] 17β-(N-tert-

butylcarbamoyl)-4-aza- 5α-androst-1-ene-3-one in a dosage amount [under 5.0] from 0.05 to 3.0 mgs/day.

21.    (Amended)   A method of arresting and reversing androgenic alopecia comprising administering to a person in need of such treatment [a 5α-reductase 2 inhibitor] 17β-(N-tert-butylcarbamoyl)-4-aza-5α-androst- 1-ene-3-one in a dosage amount [under 5.0] from 0.05 to 3.0 mgs/day.

(Exhibit G at 2).

Submitted with the Amendment was a Declaration of one of the inventors, Dr. Keith Kaufman ("Kaufman Declaration") (Exhibit H), which described the results of a hair growth clinical trial run by Merck with finasteride.  Four methods were used in the trial to detect hair growth: macrophotographic haircount analysis, global photographic assessment, patient self-assessment, and clinical investigator assessment.  (Exhibit H at ¶ 10).  The protocols used in those detection methods were described in Exhibits 2-4 to the Kaufman Declaration.  In both the global photographic assessment and the clinical investigator assessment, the observers visually rated the change in appearance of hair growth.  (*See* Exs. 3 and 4 to the Kaufman Declaration, Exhibit H).  The patient self-assessment was based on the patient's visual assessment of the change in appearance of their hair after the same time intervals.  (See Kaufman Declaration, Exhibit H, at ¶ 13 and its Exhibit 4).  All four assessment methodologies indicated, by visible changes in appearance, improved hair growth after treatment with finasteride.  (Exhibit H at ¶¶ 11-14).

The USPTO examiner, in the next Office Action mailed August 14, 1995, did not repeat the lack of utility rejection made in the previous Office Action.  In addition, he asked whether Example 4 was "prophetic and speculative", noting "it seems to be a protocol to be followed."  The examiner also commented that the Kaufman

Declaration "may or may not ... show statistical significance, its hard to say one way or another ...." (Exhibit I at 2-3).

In a responsive Amendment dated on November 13, 1995, Merck stated that Example 4 was provided:

> to show one of ordinary skill in the art how to use macrophotography and global photography to detect the effect of the present invention, hair growth, in patients suffering from androgenic alopecia.

(Exhibit J at 3). In addition, Merck stated that, as described in the previously-filed Kaufman Declaration, all four assessment methodologies demonstrated, by statistically significant results, that finasteride improved the appearance of the patients' hair. (Exhibit J at 4).

Merck submitted a new Kaufman Declaration with the November 13, 1995 Amendment. ("New Kaufman Declaration") (Exhibit K). In the new declaration, Dr. Kaufman described data that, when assessed by haircount analysis, demonstrated that 1 mg of finasteride was surprisingly as efficacious in growing hair as a 5 mg dose. (Exhibit K at ¶¶ 6-11).

The USPTO examiner, in an Advisory Action mailed December 7, 1995, agreed to allow the claims if certain amendments were made to them. In particular, the examiner stated:

> In view of Dr. Keith Kaufman's new Rule 132 declaration establishing statistical significance claims to the elected species could be found patentable if claims 1 and 21 were amended to recite ... at the claim end -- at least until growth of hair can be detected in the bald spot or bald area by haircount analysis of said bald spot or area -- ....

(Exhibit L).

In response, Merck made the following amendments to claims 1 and 21:

1.     (Twice Amended) A method of treating [androgenic alopecia] male pattern baldness comprising orally administering to a [person in need of such treatment] male person having a balding area 17β-(N-tert-butylcarbamoyl)-4-aza-5α-androst-1-ene-3-one in a dosage amount from 0.05 to 3.0 mgs/day at least until growth of hair can be detected in the balding area by haircount analysis of the balding area.

21.     (Twice Amended) A method of arresting and reversing [androgenic alopecia] male pattern baldness comprising orally administering to a [person in need of such treatment] bald or balding male person having a balding area 17β-(N-tert-butylcarbamoyl)-4-aza-5α-androst-1-ene-3-one in a dosage amount from 0.05 to 3.0 mgs/day at least until growth of hair can be detected in the balding area by haircount analysis of the balding area.

(Exhibit M at 2).  Merck stated in its remarks that claims 1 and 21 had been amended:

to specify that the method be employed at least until the growth of hair can be detected in the balding area by haircount analysis of the balding area.  Support for this amendment is found in the specification in Example 4 ....

(Exhibit M at 3-4).  The USPTO then allowed the claims (Exhibit N), and pending claims 1 and 21 became claims 1 and 5, respectively, in the issued '957 patent.

## ARGUMENT

### I.     The Law Of Claim Construction

Very recently, in its *en banc* decision in *Phillips v. AWH Corp.*, Nos. 03-1269 and 03-1286 (Fed. Cir. July 12, 2005) (attached hereto as Exhibit 1), the Court of Appeals for the Federal Circuit reaffirmed the principles of patent claim construction stated in previous opinions of the Court.  *Phillips*, slip. op. at 7-8.

The "objective baseline" or "starting point" from which to begin construction of a patent claim term is its ordinary and customary meaning; that is, the meaning that the term would have to a person of ordinary skill in the relevant art at the

time of the invention.  *Id.* at 9-10, 25.[6]  The skilled person is deemed to read and understand a patent claim term, not in a vacuum, but in the context of the entire patent, including its specification and its prosecution history in the USPTO.  *Id.* at 10.

To ascertain the meaning of a claim term as understood by the skilled person, the court should look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Phillips*, slip. op. at 11, quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  As stated by the Federal Circuit:

> Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."

*Phillips*, slip. op. at 11, quoting *Innova*, 381 F.3d at 1116, other citations omitted.[7]  Prior art of record in a patent, such as the Olsen paper, is considered to be part of the intrinsic evidence.  *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

The Federal Circuit, in *Phillips*, further recognized the importance of the prosecution history in understanding a claim term, when it stated as follows:

> Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent.

---

[6]    The time of the invention is the effective filing date of the patent; here, the October 15, 1993 filing date of the 1993 application.  *Phillips*, Slip. Op. at 10.

[7]    The "intrinsic" evidence includes the patent and its prosecution history, while the "extrinsic" evidence consists of all evidence external to such intrinsic evidence, such as expert testimony and learned treatises.  Phillips, slip. op. at 18.

*Id.* at 17.   Thus, how and why a claim term is added during prosecution may help understand the meaning to be ascribed to the term.

The Federal Circuit, in *Phillips*, also reaffirmed the usefulness to the district courts in claim construction of expert testimony that, consistent with the intrinsic evidence, provides background on the technology at issue or establishes how a person of ordinary skill in the art would understand a particular claim term.  *Id.* at 19-21, 30-31**.**  Thus, the accompanying Whiting Declaration can be considered by the Court in arriving at a claim construction.

## II.     Both The Intrinsic And The Extrinsic Evidence Support Merck's Proposed Construction

Applying the claim construction principles reaffirmed in *Phillips*, Merck submits that its proposed construction of the disputed language makes sense, and is fully supported by both the intrinsic evidence (the patent specification and prosecution history, and the prior art of record therein) as well as the extrinsic evidence (the testimony of an expert, Dr. Whiting).  Both sources of evidence indicate that the claims of the '957 patent would have been understood by a skilled person to mean that finasteride is administered to the patient for a period of time defined as at least until hair growth can be detected in the balding area by visually assessing the change in the appearance of that area.  The claims, Merck submits, should not be limited to detection of hair growth only by haircount analysis using the particular macrophotographic procedure set forth in Example 4, as Dr. Reddy's asserts.  (*See* Joint Claim Construction Chart, D.I. 32).

First of all, the claims say "can be" detected by haircount analysis; they do not say "must be" detected by haircount analysis.  Second, the patent specification and the prosecution history both make clear that efficacy in terms of hair growth may be

assessed both by objective haircount analysis and subjective analysis by appearance. Third, all of the hair growth assessment techniques described in the patent, or referred to during prosecution, involve assessing hair growth by visual changes in appearance. Thus, Merck's proposed construction does not read out any words of the claims; instead, it agrees with how a person of ordinary skill in the art would understand the claims.

Moreover, a person of ordinary skill in the art would know that, if hair growth "can be" detected during treatment by objective haircount analysis, it also can be detected by visually observing its change in appearance, such as by using global photography or patient self-assessment. (Whiting Decl. ¶ 16). Thus, when the '957 patent says, in the claims, that finasteride is administered "at least until growth of hair can be detected in the balding area by haircount analysis of the balding area," a person of ordinary skill in the art would understand that to mean until hair growth can be detected in that area by visually assessing the change in appearance of the balding area using any conventional hair growth assessment technique. (*See* Whiting Decl. ¶ 16).

### A.    The Person Of Ordinary Skill In The Art

The art of the '957 patent is the treatment of the medical condition known as androgenic alopecia; in men, it is more generally known as male pattern baldness, or common baldness in men. A person of ordinary skill in that art, as of about October 1993, would have been a medical doctor with a specialty in dermatology, or similar field, having a few years of experience as a physician. Some of such doctors would have been familiar with the literature in the field, including the various techniques that may be employed to measure or assess the amount of hair growth that occurs when male pattern baldness is treated using drug therapy. (*See* Whiting Decl. ¶ 7).

**B.      The '957 Patent Specification Makes Clear That HairGrowth Can Be Detected By Both Objective Haircount Analysis And Subjective Appearance Assessment**

Example 4 of the '957 patent illustrates a macrophotographic technique, including a haircount analysis based on counting visual hairs, for objectively assessing hair growth after administration of finasteride.  That example (either explicitly or through its citation of the Olsen paper) also illustrates several other techniques for subjectively assessing hair growth based on change in appearance -- the global photographic technique, patient self-assessment and investigator assessment.  (*See* discussion above, at 8-9).  The '957 patent nowhere says that only a haircount analysis can be used to detect hair growth.

To the contrary, a skilled person reading the '957 patent would have understood that *any* of those techniques could be used to assess the efficacy of the finasteride treatment -- *i.e.*, detect hair growth.  Thus, the '957 patent explicitly states, at the end of Example 4, that using "the above-described methodology" of the example -- which includes both the objective haircount analysis and the subjective assessment by appearance -- "it can be shown that administration of ... finasteride [in low dosages is] useful in the treatment of androgenic alopecia, and promote[s] hair growth ...."  (Exhibit A at col. 8, lns. 57-62).  The '957 patent specification clearly contemplates the use of any of those techniques for assessing hair growth after administration of finasteride.  (*See* Whiting Decl. ¶ 14).

**C.    During Prosecution Of The '957 Patent, Merck Presented Evidence Of Finasteride's Utility In Growing Hair In Terms Of Both Objective Haircount And Subjective Appearance Assessment**

During the prosecution of the '957 patent, in response to the examiner's rejection for lack of utility, Merck submitted the first Kaufman Declaration.  That declaration described the results of a clinical trial with finasteride, in which the efficacy of the compound in growing hair was measured by both objective haircount and subjective appearance (global photographic procedure, patient self-assessment, and investigator assessment).  Dr. Kaufman's opinion was that the results of both kinds of assessments demonstrated that finasteride "is useful for the treatment of androgenetic alopecia in humans."  (Exhibit H at ¶ 14).  Similarly, in the accompanying Amendment, Merck argued that all four assessments "demonstrate that ... finasteride ... is useful in growing hair on bald heads at low dosages."  (Exhibit G at 7).  The examiner, in response, dropped his utility rejection, apparently convinced that the evidence submitted by Merck demonstrated the usefulness of finasteride in growing hair when measured by both haircount and subjective appearance.

In his next Office Action, the examiner questioned the purpose of Example 4, and wondered whether the data in the first Kaufman Declaration was statistically significant.  Merck responded that Example 4 was provided to "show one of ordinary skill in the art how to use [both haircount] and [subjective appearance] to detect ... hair growth", and that both haircount and subjective assessments of hair growth demonstrated, by statistically significant results, that finasteride grew hair.  (Exhibit J at 2, 4).  Thus, Merck told the examiner that both haircount as well as subjective appearance can be used to detect hair growth and demonstrate the efficacy of finasteride.

18.

When Merck submitted another Kaufman Declaration, using only haircount to measure efficacy, the examiner agreed to allow the claims if the disputed language was inserted.  (*See* discussion, above, at 12).  Although that language refers to "haircount analysis," Merck submits that the entire history of the claims in the USPTO reflects an intention of Merck, and the agreement of the examiner, to define the period of time of administration of finasteride as at least until hair growth "can be detected" by visual techniques, including both haircount and other, subjective appearance assessments. (*See* Whiting Decl. ¶¶ 16-17).

## CONCLUSION

Based on the foregoing, Merck submits that the disputed language in the claims of the '957 patent means that finasteride is administered for a period of time that is at least until hair growth can be detected in the balding area by visually assessing the change in appearance of the balding area.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ James W. Parrett, Jr.*

---

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200

*Attorneys for Plaintiff Merck & Co., Inc.*

OF COUNSEL:

Robert L. Baechtold
Henry J. Renk
Ryan J. Cudnik
FITZPATRICK, CELLA, HARPER &
    SCINTO
30 Rockefeller Plaza
New York, NY  10112
(212) 218-2100

Dated:  July 25, 2005

475824

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2005, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Richard L. Horwitz, Esquire
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE  19899-1951

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on July 25, 2005 upon the following individuals in the manner indicated:

| **BY HAND DELIVERY** | **BY FIRST CLASS MAIL** |
|---|---|
| Richard L. Horwitz, Esquire | Bruce D. Radin |
| POTTER ANDERSON & CORROON LLP | BUDD LARNER, P.C. |
| Hercules Plaza | 150 John F. Kennedy Parkway |
| 1313 North Market Street | CN 1000 |
| P.O. Box 951 | Short Hills, NJ  07078-0999 |
| Wilmington, DE  19899-1951 | |

*/s/ James W. Parrett, Jr.*

James W. Parrett, Jr. (#4292)