# EXHIBIT E




08/214905

-1-

191091A

MAIL ROOM
MAR 17 1994
73
PAT. & TRADEMARK OF.

## TITLE OF THE INVENTION
## METHOD OF TREATING ANDROGENIC ALOPECIA WITH 5-ALPHA REDUCTASE INHIBITORS

The present invention is concerned with the treatment of androgenic alopecia, including male pattern baldness, with compounds that are 5-alpha reductase isozyme 2 inhibitors.

This application is a continuation-in-part of S.N. 08/138,520 filed October 15, 1993, now abandoned.

## BACKGROUND OF THE INVENTION

Certain undesirable physiological manifestations, such as acne vulgaris, seborrhea, female hirsutism, androgenic alopecia which includes female and male pattern baldness, and benign prostatic hyperplasia, are the result of hyperandrogenic stimulation caused by an excessive accumulation of testosterone ("T") or similar androgenic hormones in the metabolic system. Early attempts to provide a chemotherapeutic agent to counter the undesirable results of hyperandrogenicity resulted in the discovery of several steroidal antiandrogens having undesirable hormonal activities of their own. The estrogens, for example, not only counteract the effect of the androgens but have a feminizing effect as well. Non-steroidal antiandrogens have also been developed, for example, 4'-nitro-3'-trifluoromethyl-isobutyranilide. See Neri, et al., *Endocrinol.* 1972, *91* (2). However, these products, though devoid of hormonal effects, compete with all natural androgens for receptor sites, and hence have a tendency to feminize a male host or the male fetus of a female host and/or initiate feed-back effects which would cause hyperstimulation of the testes.

The principal mediator of androgenic activity in some target organs, e.g. the prostate, is 5α-dihydrotestosterone ("DHT"), formed locally in the target organ by the action of testosterone-5α-reductase. Inhibitors of testosterone-5α-reductase will serve to prevent or lessen symptoms of hyperandrogenic stimulation in these organs. See

especially United States Patent No. 4,377,584 assigned to Merck & Co., Inc., issued March 22, 1983. It is now known that a second $5\alpha$-reductase isozyme exists, which interacts with skin tissues, especially in scalp tissues. See, e.g., G. Harris, et al., Proc. Natl. Acad. Sci. USA, Vol. 89, pp. 10787-10791 (Nov. 1992). The isozyme that principally interacts in skin tissues is conventionally designated as $5\alpha$-reductase 1 (or $5\alpha$-reductase type 1), while the isozyme that principally interacts within the prostatic tissues is designated as $5\alpha$-reductase 2 (or $5\alpha$-reductase type 2).

Finasteride ($17\beta$-(N-tert-butylcarbamoyl)-4-aza-$5\alpha$-androst-1-ene-3-one), which is marketed by Merck & Co., Inc. under the tradename PROSCAR®, is an inhibitor of $5\alpha$-reductase 2 and is known to be useful for the treatment of hyperandrogenic conditions. See e.g., U.S. Patent No. 4,760,071. Finasteride is currently marketed in the United States and worldwide for the treatment of benign prostatic hyperplasia. Finasteride's utility in the treatment of androgenic alopecia and prostatic carcinoma is also disclosed in the following documents: EP 0 285,382, published 5 October 1988; EP 0 285 383, published 5 October 1988; Canadian Patent no. 1,302,277; and Canadian Patent no. 1,302,276. The specific dosages exemplified in the above-noted disclosures varied from 5 to 2000 mg per patient per day.

In the treatment of androgenic alopecia, which includes both female and male pattern baldness, and other hyperandrogenic conditions, it would be desirable to administer the lowest dosage possible of a pharmaceutical compound to a patient and still maintain therapeutic efficacy. Applicants have surprisingly and unexpectedly discovered that a low daily dosage of a $5\alpha$-reductase 2 inhibitor is particularly useful in the treatment of androgenic alopecia. Furthermore, a low daily dosage of a $5\alpha$-reductase 2 inhibitor may also be particularly useful in the treatment of the hyperandrogenic conditions of acne vulgaris, seborrhea, female hirsutism, and polycystic ovary syndrome.

-3-                                    19109IA

## DETAILED DESCRIPTION OF THE INVENTION

The instant invention involves a method of treating and/or reversing androgenic alopecia and promoting hair growth, and methods of treating acne vulgaris, seborrhea, and female hirsutism, which comprises administering to a patient in need of such treatment a $5\alpha$-reductase 2 inhibitor in a dosage amount under 5 mgs/day. In one embodiment of this invention, the $5\alpha$-reductase 2 inhibitor is administered in a dosage amount of from 0.01 to 3.0 mgs/day. In one class of this embodiment, the $5\alpha$-reductase 2 inhibitor is administered in a dosage amount of from 0.05 to 1.0 mg/day, and in a sub-class of this embodiment, the $5\alpha$-reductase 2 inhibitor is administered in dosage amounts of about 0.05 to 0.2 mg/day. Illustrating this subclass are dosage amounts of about 0.05, 0.1, 0.15 and 0.2 mg/day. Exemplifying the sub-class are dosages of 0.05 and 0.2 mg/day. Compounds which are inhibitors of $5\alpha$-reductase 2 can be determined by employing the assay described below in Example 3.

In a second embodiment of this invention, the method of treating androgenic alopecia comprises administration of $5\alpha$-reductase 2 inhibitor compounds which have the structural formula I



or a pharmaceutically acceptable salt thereof wherein:

$R^1$ is hydrogen, methyl or ethyl;

$R^2$ is a hydrocarbon radical selected from straight and branched chain alkyl of from 1-12 carbons or monocyclic aryl optionally containing 1 or more lower alkyl substituents of from 1-2 carbon atoms and/or 1 or more halogen (Cl, F or Br) substituents;

-4-                                    19109IA

R' is hydrogen or methyl;

R" is hydrogen or β-methyl; and

R'" is hydrogen, α-methyl or β-methyl.

5          In one class of this second embodiment, the 5α-reductase 2 inhibitor compounds have the structural formula II



10

T50X

15                                          II

or a pharmaceutically acceptable salt thereof wherein

$R^1$ is hydrogen, or methyl; and

20   $R^3$ is branched chain alkyl of from 4-8 carbons.

          Representative compounds that may be employed in the present invention include the following:

17β-(N-tert-butylcarbamoyl)-4-aza-5-α-androst-1-en-3-one,

17β-(N-isobutylcarbamoyl)-4-aza-5-α-androst-1-en-3-one,

25   17β-(N-tert-octylcarbamoyl)-4-aza-5α-androst-1-en-3-one,

17β-(N-octylcarbamoyl)-4-aza-5α-androst-1-en-3-one,

17β-(N-1,1-diethylbutylcarbamoyl)-4-aza-5-α-androst-1-en-3-one,

17β-(N-neopentylcarbamoyl)-4-aza-5α-androst-1-en-3-one,

17β-(N-tert-amylcarbamoyl)-4-aza-5α-androst-1-en-3-one, and

30   17β-(N-tert-hexylcarbamoyl)-4-aza-5α-androst-1-en-3-one;

and the corresponding compounds wherein the 4-nitrogen is substituted in each of the above named compounds by a methyl or an ethyl radical.

          Also included as representative compounds are any of the above indicated compounds having the N-branched chain alkyl substituent replaced by a methyl, ethyl, propyl, i-propyl, butyl, phenyl;

5

2, 3 or 4 tolyl, xylyl, 2-bromo or 2-chlorophenyl, 2-6-dichloro, or a 2,6-dibromophenyl substituent.

The compounds of formula I and II described above can be synthesized according to procedures well known in the art, and which are described, for example, in U.S. Patent No. 4,760,071, EP 0 285,382 and EP 0 285 383. The compound finasteride is currently available as a prescription pharmaceutical from Merck & Co, Inc. The synthesis of finasteride is described in US Patent 4,760,071. A further synthesis of finasteride is described in Synthetic Communications, 30 (17), p. 2683-2690 (1990).

The present invention has the objective of providing methods of treating the hyperandrogenic conditions of androgenic alopecia, including male pattern baldness and female pattern baldness, acne vulgaris, seborrhea, female hirsutism, and polycystic ovary syndrome by systemic, oral, parenteral or topical administration of a $5\alpha$-reductase 2 inhibitor in a dosage amount under 5 mg/day, and particularly, from about 0.01 mg/day to 3.0 mg/day, and more particularly 0.05 to 1 mg/day. The invention is further illustrated by dosages of about 0.05 to 0.2 mg/day and specifically dosages of about 0.05, 0.1, 0.15 and 0.2 mg/day. Exemplifying the invention are dosages of 0.05 and 0.2 mg/day. The term "treating androgenic alopecia" is intended to include the arresting and/or reversing of androgenic alopecia, and the promotion of hair growth. Also, a $5\alpha$-reductase 2 inhibitor, e.g. finasteride, at a dosage under 5 mgs/day can be used in combination with a potassium channel opener, such as minoxidil or a pharmaceutically acceptable salt thereof, for the treatment of androgenic alopecia, including male pattern baldness. The $5\alpha$-reductase 2 inhibitor and the potassium channel opener may both be applied topically, or each agent can be given via different administration routes; for example, the $5\alpha$-reductase 2 inhibitor may be administered orally while the potassium channel opener may be administered topically.

The present invention also has the objective of providing suitable systemic, oral, parenteral and topical pharmaceutical formulations for use in the novel methods of treatment of the present

-6-                                        19109IA

invention. The compositions containing 5α-reductase 2 inhibitor compounds as the active ingredient for use in the treatment of the above-noted hyperandrogenic conditions can be administered in a wide variety of therapeutic dosage forms in conventional vehicles for systemic administration. For example, the compounds can be administered in such oral dosage forms as tablets, capsules (each including timed release and sustained release formulations), pills, powders, granules, elixirs, tinctures, solutions, suspensions, syrups and emulsions. Likewise, they may also be administered in intravenous (both bolus and infusion), intraperitoneal, subcutaneous, topical with or without occlusion, or intramuscular form, all using forms well known to those of ordinary skill in the pharmaceutical arts. For oral administration, for example, the compositions can be provided in the form of scored or unscored tablets containing 0.01, 0.05, 0.1, 0.2, 1.0, 2.0 and 3.0 milligrams of the active ingredient for the symptomatic adjustment of the dosage to the patient to be treated.

For the treatment of androgenic alopecia including male pattern baldness, acne vulgaris, seborrhea, and female hirsutism, the 5α-reductase 2 inhibitor compounds may be administered in a pharmaceutical composition comprising the active compound in combination with a pharmaceutically acceptable carrier adapted for topical administration. Topical pharmaceutical compositions may be, e.g., in the form of a solution, cream, ointment, gel, lotion, shampoo or aerosol formulation adapted for application to the skin. Topical pharmaceutical compositions useful in the method of treatment of the present invention may include about 0.001% to 0.1% of the active compound in admixture with a pharmaceutically acceptable carrier.

Advantageously, compounds of the present invention may be administered in a single daily dose, or the total daily dosage may be administered in divided doses of two, three or four times daily. The compounds for the present invention can be administered in intranasal form via topical use of suitable intranasal vehicles, or via transdermal routes, using those forms of transdermal skin patches well known to those of ordinary skill in that art. To be administered in the form of a

19109IA

transdermal delivery system, the dosage administration will, of course, be continuous rather than intermittent throughout the dosage regimen. Compounds of the present invention may also be delivered as a suppository employing bases such as cocoa butter, glycerinated gelatin, hydrogenated vegetable oils, mixtures of polyethylene glycols of various molecular weights and fatty acid esters of polyethylene glycol.

The dosage regimen utilizing the compounds of the present invention is selected in accordance with a variety of factors including type, species, age, weight, sex and medical condition of the patient; the severity of the condition to be treated; the route of administration; the renal and hepatic function of the patient; and the particular compound thereof employed. A physician or veterinarian of ordinary skill can readily determine and prescribe the effective amount of the drug required to prevent, counter, arrest or reverse the progress of the condition. Optimal precision in achieving concentration of drug within the range that yields efficacy without toxicity requires a regimen based on the kinetics of the drug's availability to target sites. This involves a consideration of the distribution, equilibrium, and elimination of a drug.

In the methods of the present invention, the 5α-reductase 2 inhibitor compounds herein described in detail can form the active ingredient, and are typically administered in admixture with suitable pharmaceutical diluents, excipients or carriers (collectively referred to herein as "carrier" materials) suitably selected with respect to the intended form of administration, that is, oral tablets, capsules, elixirs, syrups and the like, and consistent with conventional pharmaceutical practices.

For instance, for oral administration in the form of a tablet or capsule, the active drug component can be combined with an oral, non-toxic pharmaceutically acceptable inert carrier such as ethanol, glycerol, water and the like. Capsules containing the product of this invention can be prepared by mixing an active compound of the present invention with lactose and magnesium stearate, calcium stearate, starch, talc, or other carriers, and placing the mixture in gelatin capsule.

-8-                                   19109IA

Tablets may be prepared by mixing the active ingredient with conventional tableting ingredients such as calcium phosphate, lactose, corn starch or magnesium stearate. Moreover, when desired or necessary, suitable binders, lubricants, disintegrating agents and coloring agents can also be incorporated into the mixture. Suitable binders include starch, gelatin, natural sugars such as glucose or beta-lactose, corn sweeteners, natural and synthetic gums such as acacia, tragacanth or sodium alginate, carboxymethylcellulose, polyethylene glycol, waxes and the like. Lubricants used in these dosage forms include sodium oleate, sodium stearate, magnesium stearate, sodium benzoate, sodium acetate, sodium chloride and the like. Disintegrators include, without limitation, starch, methyl cellulose, agar, bentonite, xanthan gum and the like.

The liquid forms in suitably flavored suspending or dispersing agents such as the synthetic and natural gums, for example, tragacanth, acacia, methyl-cellulose and the like. Other dispersing agents which may be employed include glycerin and the like. For parenteral administration, sterile suspensions and solutions are desired. Isotonic preparations which generally contain suitable preservatives are employed when intravenous administration is desired.

Topical preparations containing the active drug component can be admixed with a variety of carrier materials well known in the art, such as, e.g., alcohols, aloe vera gel, allantoin, glycerine, vitamin A and E oils, mineral oil, propylene glycol, PPG2 myristyl propionate, and the like, to form, e.g., alcoholic solutions, topical cleansers, cleansing creams, skin gels, skin lotions, and shampoos in cream or gel formulations. See, e.g., EP 0 285 382.

The compounds of the present invention can also be administered in the form of liposome delivery systems, such as small unilamellar vesicles, large unilamellar vesicles and multilamellar vesicles. Liposomes can be formed from a variety of phospholipids, such as cholesterol, stearylamine or phosphatidylcholines.

Compounds of the present invention may also be delivered by the use of monoclonal antibodies as individual carriers to which the

compound molecules are coupled.  The compounds of the present invention may also be coupled with soluble polymers as targetable drug carriers.  Such polymers can include polyvinylpyrrolidone, pyran copolymer, polyhydroxypropylmethacrylamidephenol, polyhydroxy-ethylaspartamidephenol, or polyethyleneoxidepolylysine substituted with palmitoyl residues.  Furthermore, the compounds of the present invention may be coupled to a class of biodegradable polymers useful in achieving controlled release of a drug, for example, polylactic acid, polyepsilon caprolactone, polyhydroxy butyric acid, polyorthoesters, polyacetals, polydihydropyrans, polycyanoacrylates and cross-linked or amphipathic block copolymers of hydrogels.

The following example illustrates the present invention and as such are not to be considered as limiting the invention set forth in the claims appended hereto.

## EXAMPLE 1

Finasteride is known to occur in two distinct polymorphic crystal forms, termed "form 1" and "form II".  Form I is the marketed form of finasteride as a 5 mg tablet (PROSCAR®).

Finasteride Form I can be prepared by dissolving finasteride in glacial acetic acid (ca. 100 mg/ml) and adding water with stirring until the weight % of water equals or exceeds 84%. The resulting solid phase is collected by filtration and dried under vacuum and at about 50°C.  The resulting Form I is characterized by a differential scanning calorimetry (DSC) curve, at heating rate of 20°C/min and in a closed cup, exhibiting a minor endotherm with a peak temperature of about 232°C, an extrapolated onset temperature of about 223°C with an associated heat of about 11 joules/gm and by a major melting endotherm with a peak temperature of about of 261°C, an extrapolated onset temperature of about 258°C with an associated heat of about 89 J/gm.  The x- ray powder diffraction pattern is characterized by d-spacings of 6.44, 5.69, 5.36, 4.89, 4.55, 4.31, 3.85, 3.59 and 3.14 .  The FT-IR spectrum shows bands at 3431, 3237, 1692,

-10-                    191091A

1666, 1602 and 688 cm-1. The solubilities in water and cyclohexane at 25°C are 0.05+0.02 and 0.27+0.05 mg/gm respectively. In addition, Form I of finasteride can be prepared by recrystallization from dry (H2O <1mg/ml) ethyl acetate and isopropyl acetate. The isolated solids are dried under vacuum at about 50°C and have the same physical characterization data as given above.

## EXAMPLE 2

Form II of finasteride can be prepared by dissolving finasteride in glacial acetic acid (ca. 100 mg/ml) and adding water with stirring until the weight % of water equals about 75% but not in excess of 80%. The resulting solid phase is collected by filtration and dried under vacuum and at about 100°C. The resulting Form II is characterized by a DSC curve, at heating rate of 20°C/min and in a closed cup, exhibiting a single melting endotherm with a peak temperature of about 261°C, an extrapolated onset temperature of about 258°C with an associated heat of about 89 J/gm. The x-ray powder diffraction pattern is characterized by d-spacings of 14.09, 10.36, 7.92, 7.18, 6.40, 5.93, 5.66, 5.31, 4.68, 3.90, 3.60 and 3.25. The FT-IR spectrum shows bands at 3441, 3215, 1678, 1654, 1597, 1476 and 752 cm-1. The solubilities in water and cyclohexane at 25°C are 0.16+0.02 and 0.42+0.05 mg/gm respectively. In addition, Form II of finasteride can be prepared by recrystallization from ethyl acetate containing between 2 to 30 mg/ml of water and isopropyl acetate containing between 2 to 15 mg/ml of water. The isolated solids are dried under vacuum at about 80°C and have the same physical characterization data as given above. Form II can also be prepared by heating Form I up to about 150°C, holding for about one hour and cooling back to room temperature. The Form II prepared in this manner has the same physical characterization data as given above.

-11-                     19109IA

## EXAMPLE 3

### Preparation of Human prostatic 5α-reductase.

Samples of human tissue were pulverized using a freezer
mill and homogenized in 40 mM potassium phosphate, pH 6.5, 5 mM
magnesium sulfate, 25 mM potassium chloride, 1 mM phenylmethyl-
sulfonyl fluoride, 1 mM dithiothreitol (DTT) containing 0.25 M sucrose
using a Potter-Elvehjem homogenizer. A crude nuclear pellet was
prepared by centrifugation of the homogenate at 1,500xg for 15 min.
The crude nuclear pellet was washed two times and resuspended in two
volumes of buffer. Glycerol was added to the resuspended pellet to
a final concentration of 20%. The enzyme suspension was frozen in
aliquots at -80°C. The prostatic reductases were stable for
at least 4 months when stored under these conditions.

### 5α-reductase assay

The reaction mixture for the type 2 5α-reductase contained
40 mM sodium citrate, pH 5.5, 0.3 μM [7-$^3$H]-testosterone, 1 mM
dithiothreitol and 500 μM NADPH in a final volume of 100 μl.
Typically, the assay was initiated by the addition of 50-100 μg prostatic
homogenate and incubated at 37°C. After 10-50 min the reaction was
quenched by extraction with 250 μl of a mixture of 70% cyclohexane:
30% ethyl acetate containing 10 μg each DHT and T. The aqueous and
organic layers were separated by centrifugation at 14,000 rpm in an
Eppendorf microfuge. The organic layer was subjected to normal phase
HPLC (10 cm Whatman partisil 5 silica column equilibrated in 1 ml/min
70% cyclohexane: 30% ethyl acetate; retention times: DHT, 6.8-7.2
min; androstanediol, 7.6-8.0 min; T, 9.1-9.7 min). The HPLC system
consisted of a Waters Model 680 Gradient System equipped with a
Hitachi Model 655A autosampler, Applied Biosystems Model 757
variable UV detector, and a Radiomatic Model A120 radioactivity
analyzer. The conversion of T to DHT was monitored using the
radioactivity flow detector by mixing the HPLC effluent with one
volume of Flo Scint 1 (Radiomatic). Under the conditions described,

-12-                              19109IA

the production of DHT was linear for at least 25 min. The only steroids observed with the human prostate preparation were T, DHT and androstanediol.

5  Inhibition studies

Compounds were dissolved in 100% ethanol. $IC_{50}$ values represent the concentration of inhibitor required to decrease enzyme activity to 50% of the control. $IC_{50}$ values were determined using a 6 point titration where the concentration of the inhibitor was varied from
10  0.1 to 1000 nM.

## EXAMPLE 4

15  MACROPHOTOGRAPHY AND GLOBAL PHOTOGRAPHY
PROCEDURE FOR DETECTION OF HAIR GROWTH

A. Macrophotographic Procedure

Location:    ID card

Haircount target area

Equipment: Film: Kodak-T-max 24 exposure each of same emulsion lot
20                          number

Camera:    Nikon N-6000

Lens:       Nikkor 60 mm f2.8

Flashes:   Nikon SB-21B Macroflash

Device:     registration device
25

Photographic Procedure:

In these clinical photographs, the only variable allowed is the haircount. Film emulsion, lighting, framing, exposure, and reproduction ratios are held constant.
30

1.    The haircount area on the patient is prepared as follows:
A small (~1mm) dot tattoo is placed at the beginning of the study at the leading edge of the bald area directly anterior to the center of the vertex bald spot, using a commercial

13

tattooing machine or manually (needle and ink). An area approximately one square inch in size, centered at the tattoo at the leading edge of the balding area, is clipped short (~2mm). Cut hairs are removed from the area to be photographed, using tape. Compressed air and/or ethanol wipes may also be used to facilitate removal of cut hairs.

2.   Magnification: Each lens supplied has a fixed reproduction ratio of 1:1.2.
Aperture: Every photograph is taken at f/22.
Film: T-Max 100 (24 exposure) is used.

3.   Patient's haircount target area. Three exposures (-2/3, 0, and +2/3 f-stop).

A trained technician places a transparency over the photographic print and, using a felt tip pen, places a black dot over each visible hair. The dot map transparency is then counted using image analysis with computer assistance.

Photographs are coded with a random number corresponding to study site, visit number and patient allocation number to insure blinding to time. At Month 6, baseline and Month 6 photographs are counted and data analyzed for interim analysis. At Month 12, baseline, Month 6 and Month 12 photographs are counted and data analyzed for the primary endpoint.

Methodology for detection of hair growth is also described in Olsen, E.A. and DeLong, E., J. American Academy of Dermatology, Vol. 23, p. 470 (1990).

B. Global Photographic Procedure
Locations: Color card/patient Id
Global photograph

-14-                         19109IA

Equipment: Film: Kodachrome KR-64 24 exposure each of same
                    emulsion lot number
Camera:      Nikon N-6000
Lens:        Nikkor 60 mm f2.8
Flashes:     Nikon SB-23

<u>Photographic Procedure</u>

  In these clinical photographs, the only variable allowed is the global area's appearance. Anything extraneous to the area (clothing, furniture, walls, etc.) is eliminated from the fields to be photographed.

  1. Patients will have global photographs taken prior to hair clipping with the head in a fixed position (determined by the supplied stereotactic device). Hair on the patient's head is positioned consistently so as to not obscure the bald area.

  2. Magnification: Each lens supplied has a fixed reproduction ratio of 1:6.
   Aperture: Every photograph will be taken at f/11.
   Film: Kodachrome (24 exposure) is used.

  3. Patient's global photographs. Three exposures at zero compensation.

  Using the above-described methodology, it can be shown that administration of 5α-reductase 2 inhibitors, including finasteride, in dosages below 5 mg/day per patient, for example, 1 mg/day or 0.2 mg/day, are useful in the treatment of androgenic alopecia, and promote hair growth in patients with this condition.

<u>EXAMPLE 5</u>

  In another test, finasteride was orally administered for 6 weeks to men with male pattern baldness at doses of 0.2 mg/day, 1.0 mg/day and 5.0 mgs/day. The results of this test showed a significant reduction in DHT content in scalp tissue of the test participants.

-15-                              19109IA

## WHAT IS CLAIMED IS:



1.    A method of treating androgenic alopecia comprising administering to a person in need of such treatment a 5α-reductase 2 inhibitor in a dosage amount under 5.0 mgs/day.

2.    The method of Claim 1 wherein the dosage amount is from about 0.01 to 3.0 mgs/day.

3.    The method of Claim 1 wherein the dosage amount is from about 0.05 to 1.0 mg/day.

4.    The method of Claim 1 wherein the dosage amount is about 0.05 mg/day.

5.    The method of Claim 1 wherein the dosage amount is about 0.2 mgs/day.

6.    The method of Claim 1 wherein the androgenic alopecia is male pattern baldness.

7.    The method of Claim 1 wherein the 5α-reductase 2 inhibitor is administered orally.

8.    The method of Claim 1 wherein the 5α-reductase 2 inhibitor is administered topically.

9.    The method of Claim 1 wherein the 5α-reductase 2 inhibitor has the structural formula I

-16-                    19109IA



I

or a pharmaceutically acceptable salt thereof wherein:

$R^1$ is hydrogen, methyl or ethyl;

$R^2$ is a hydrocarbon radical selected from straight and branched chain alkyl of from 1-12 carbons or monocyclic aryl optionally containing 1 or more lower alkyl substituents of from 1-2 carbon atoms and/or 1 or more halogen (Cl, F or Br) substituents;

R' is hydrogen or methyl;

R" is hydrogen or β-methyl; and

R''' is hydrogen, α-methyl or β-methyl.

10.    The method of Claim 1 wherein the 5α-reductase 2 inhibitor has the structural formula II



II

or a pharmaceutically acceptable salt thereof wherein

$R^1$ is hydrogen or methyl; and

$R^3$ is branched chain alkyl of from 4-8 carbons.

-17-                                    19109IA

11.    A method of treating androgenic alopecia comprising
administering to a person in need of such treatment 17β-(N-tert-
butylcarbamoyl)-4-aza-5α-androst-1-ene-3-one in a dosage amount
under 5.0 mgs/day.

12.    The method of Claim 11 wherein the androgenic
alopecia is male pattern baldness.

13.    The method of Claim 11 wherein the dosage amount
is from about 0.01 to 3.0 mgs/day.

14.    The method of Claim 11 wherein the dosage amount
is from about 0.05 to 1.0 mg/day.

15.    The method of Claim 11 wherein the dosage amount
is about 0.05 mg/day.

16.    The method of Claim 11 wherein the dosage amount
is about 0.2 mg/day.

17.    The method of Claim 11 wherein the 17β-(N-tert-
butylcarbamoyl)-4-aza-5α-androst-1-ene-3-one is administered
topically.

18.    The method of Claim 11 wherein the 17β-(N-tert-
butylcarbamoyl)-4-aza-5α-androst-1-ene-3-one is administered orally.

19.    The method of Claim 18 wherein the dosage amount
is about 0.2 mg/day.

20.    The method of Claim 18 wherein the dosage amount
it about 0.05 mg/day.

-18-                                        19109IA

21.   A method of arresting and reversing androgenic alopecia comprising administering to a person in need of such treatment a 5α-reductase 2 inhibitor in a dosage amount under 5.0 mgs/day.

5

22.   A method of lowering the level of 5α-dihydrotestosterone in human scalp comprising administering to a person in need of such treatment a 5α-reductase 2 inhibitor in a dosage amount under 5.0 mgs/day.

10

23.   The method of Claim 22 wherein the dosage amount is from about 0.01 to 3.0 mgs/day.

24.   The method of Claim 22 wherein the dosage amount is from about 0.05 to 1.0 mg/day.

15

25.   The method of Claim 22 wherein the dosage amount is about 0.05 mg/day.

20

26.   The method of Claim 22 wherein the dosage amount is about 0.2 mg/day.

27.   The method of Claim 22 wherein the dosage amount is about 1.0 mg/day.

25

30

# EXHIBIT F



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/214,905 | 03/17/94 | GURLEY | | |

ROSE,S

12M2/1208

CAROL S. QUAGLIATO
PATENT DEPARTMENT
MERCK & CO., INC.
P.O. BOX 2000
RAHWAY, NJ 07065-0907

| | EXAMINER |
|---|---|

1205

| ART UNIT | PAPER NUMBER |
|---|---|
| 17/09/94 | |

DATE MAILED:   # 5

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined    ☐ Responsive to communication filed on _____    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire ___3___ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I    **THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.    2. ☐ Notice re Patent Drawing, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.    4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.    6. ☐ _____

Part II    **SUMMARY OF ACTION**

1. ☒ Claims _____1 & 27_____ are pending in the application.

    Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _____1 & 27_____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
    are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the
    examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed on _____, has been ☐ approved. ☐ disapproved (see explanation).

12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received.
    ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

Serial No. 08/214,905               -2-

Art Unit    1205

This application currently names joint inventors.  In considering patentability of the claims under 35 U.S.C. § 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary.  Applicant is advised of the obligation under 37 C.F.R. § 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. § 102(f) or (g) prior art under 35 U.S.C. § 103.

Claims 1 to 27 are generic to a plurality of disclosed patentably distinct species comprising per MPEP 809.02(D), 803, one species each of (a) active agent (b) route of administration and (c)(d) alopecia and sex of person. Applicants have been required under 35 U.S.C. § 121 to elect a single disclosed species, even though this requirement is traversed.

Serial No. 08/214,905                    -3-

Art Unit   1205

Should applicant traverse on the ground that the species are not patentably distinct, applicant should submit evidence or identify such evidence now of record showing the species to be obvious variants or clearly admit on the record that this is the case.  In either instance, if the examiner finds one of the inventions unpatentable over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C. § 103 of the other invention.

Applicants' parent case response has been carefully considered, it fails

to assert that the encompassed species are or would be recognized as

"obvious variants", one from another, or admit that this is the case.  The

remarks state:

The claims were subject to an election of species between: A) active

agent (B) route of administration, C-D) alopecia and sex of person.

Applicants elect the following without traverse:

A)  Active ingredient is finasteride (17β-(N-tert-butylcarbamonyl)-4-

aza-5α-androst-1-ene-3-one) specifically claimed in Claim 10;

B)  route of administration is oral, specifically claimed in Claim 6;

C) type of alopecia is male pattern baldness, specifically claimed in

Claim 5;

D) sex of patient is male.

Serial No. 08/214,905                    -4-

Art Unit  1205

Applicants' attorney, Carol Quagliato, ~~Kog.~~ herein has re-elected the same subject matter elected in the parent application, as noted above.

The September 8, 1994 parent case response, in addition to amendment of the remaining claims to recite an under 5mg lessened dosage of from 0.01 to 3.0 mgs.1 day, to treat "androgenic alopecia" in "a person in need of such treatment", includes an election (w/trav.) of (a) finasteride active agent, as in claim 10; (B) oral route of administration , as in claim 6; (C) male pattern baldness, as in claim 5; and (D) male sex patient.  the disclosure, in addition to antecedent basis for this election, Example 5, page 14, wherein" a significant reduction in DHT content in scalp tissue" was shown in (D) men test participates, with (C) male pattern baldness, dosed orally (B) with (A) finasteride, at does of 0.2MG/day, 1.0mg/day, as well as at 5.0 mg/day (note within the scope of the claims as presently amended), for 6 weeks.  The scope of the parent case claims, as presently amended, (and herein) encompasses (A) 5a-reductase 2 inhibitors, other than finasteride, (B) routes of administration , other than oral, including topical, intravesal, transdermal, at sites remote from the scalp, (C) alopecia other than male pattern baldness,

Serial No. 08/214,905                    -5-

Art Unit  1205

including female hirsutism, seborrhea, and acne vulgaris, and (D) in females

as well as in males, and "treating (such) androgenic alopecia in "persons in

need", etc.

In order to expedite the prosecution to a more timely issue, it is

suggested that the claim language be changed from "treating androgenic

alopecia" to --significantly reducing DHT content in scalps of men with male

pattern baldness--.

The following is a quotation of the first paragraph of 35 U.S.C. § 112:

The specification shall contain a written description of the invention,
and of the manner and process of making and using it, in such full,
clear, concise, and exact terms as to enable any person skilled in the art
to which it pertains, or with which it is most nearly connected, to make
and use the same and shall set forth the best mode contemplated by the
inventor of carrying out his invention.

The specification is objected to under 35 U.S.C. § 112, first paragraph,

as failing to provide an enabling disclosure and failing to present a best mode

of carrying out the invention for treating all encompassed species of

androgenic alopecia beyond male pattern baldness in balding male humans

caused by an interaction with scalp tissues of the isozyme 5a-reductase 1 (or

Serial No. 08/214,905                    -6-

Art Unit   1205

type 1), with all encompassed species of 5a-reductase 2 inhibitors, beyond finasteride ("Proscar") (claims 10 to 17), and at all encompassed dosage amounts under 5MG/day, and by all encompassed routes of administration. It has been consistently held by the USPTO and its Board of Appeals, that treatment of baldness is an "incredible utility", one that person of ordinary skill in the art would not necessarily accept without convincing statistically significant clinical evidence of utility/operability for use as asserted and claimed or -- significantly reducing DHT content in scalps, etc. —as noted above.

Claims 1 to 27 are rejection under 35 U.S.C. § 112, first paragraph, for the reasons set forth in the objection to the specification.

As noted above, these encompass unsupported species of 5a-reductase 2 inhibitors, beyond finasteride, beyond structures I & II of claims 8, 9, allegation that baldness is corrected by all encompassed species of 5-a-reductase 2 inhibitors is incredible and requires clinical evidence commensurate in scope with these claim, or with —significantly reducing DHT content in scalps, etc. --, as noted above.

Serial No. 08/214,905                    -7-

Art Unit   1205

Claims 1 to 27 are rejected under 35 U.S.C. § 112, first paragraph, as the disclosure is enabling only for claims limited as noted above, claims 8, 9, 10 to 17.  See M.P.E.P. §§ 706.03(n) and 706.03(z).

Applicants' parent case responsive remarks have been noted, 214905 but are not found persuasive of any reversible error in the Examiner's stated position.  In addition to citing a long list of U.S. patents, (which argument is not scientific evidence dispositive of the issue), it is said:

The specification was objected to under 35 U.S.C. § 112 as failing to provide an enabling disclosure, and for failing to provide a best mode for baldness; 2) for all encompassed species of $5\alpha$-reductase type 2 inhibitors beyond finasteride; 3) at all dosages under 5mg/day; and 4) by all encompassed routes of administration.  It is alleged that treatment of baldness is an "incredible utility" and that significant clinical evidence of utility and operability is required.  Claims 1-7, and 18-19 were rejected for the same reasons.  Applicants respectfully traverse this objection and rejection.

Serial No. 08/214,905                    -8-

Art Unit   1205

"...The specification adequately enables one of ordinary skill in the art
to make and use all species encompassed.  Applicants' invention is directed to
the administration of a lower dosage of a $5\alpha$-reductase type 2 inhibitor than
what was previously believed to be a therapeutic amount as an effective
means of treating androgenic alopecia.  Androgenic alopecia (all types) may
be effectively treated by lowering DHT levels; therefore it follows that this
invention is not limited to only male pattern baldness.  As to the particular
compounds encompassed by the claims, Applicants maintain that there is no
need to exemplify how to make all such $5\alpha$-reductase type 2 inhibitors, as
these are known in the art, while their new use at lower dosages is novel.
Formulations and specific dosages are disclosed and enabled.  As for the best
mode requirement, Applicants submit that this has been met.  They believe
that the best species of their invention at the time of filing was finasteride
would not afford them rights to that which they have invented, as Applicants
would have no recourse against competitors who could easily avoid their
claims yet take their invention.

Serial No. 08/214,905                    -9-

Art Unit  1205


"...Further, treating of baldness which is the result of excess DHT by administration of a 5α-reductase inhibitor is not an "incredible utility". The art as evidence by the numerous references cited throughout this action, clearly establishes a logical basis for the claim that such enzyme inhibitors are considered effective agents for preventing and/or reducing baldness. Also, the U.S. Patent Office has issued a number of patents which contain claims to the use of some type of 5α-reductase inhibitor to reduce DHT.

It is specifically argued:

Thus, it is clear both the scientific community and the Patent Office recognized that the class of compounds which have 5-alpha reductase inhibitory activity, are useful and it is respectfully requested that this rejection be removed.

The Examiner suggests that -- significantly reducing DHT content in scalps of men having male pattern alopecia-- be clinically substantiated for the scope encompassed, and that expert declarant affidavits evidence any reduced DHT content clinically, as asserted herein.

Serial No. 08/214,905                    -10-

Art Unit   1205


The parent case remarks assert, (without any properly presented evidence of proof) that "androgenic alopecia (all types) may be effectively treated by lowering DHT levels", no authorities have been cited for this assertion, one which the Examiner has specifically challenged, no expert's declaration has been presented either, in support of this contention as how the invention herein is operative and/or effective as assertedly useful.  When, as here, the claims are directed to a method of treatment, the evidence to demonstrate the claimed utility must reasonably establish to those skilled in the art that the scope encompassed of the method is operable as claimed.  The evidence must be associated by those skilled in the art as being predictive of or correlate with, the success of the claimed method of treatment.  The evidentiary standard is: does the evidence provided convince those skilled in the art that the alleged utility is reasonably established?  Is an immediate benefit to the public provided?  Applicants reliance on the expected properties of <u>untested</u> compounds structurally related to finasteride may be misplaced, since, in the art of steroid chemistry, small changes structure in can have an <u>unpredictable effect</u> on the activities of a compound.  The claimed process

Serial No. 08/214,905                    -11-

Art Unit   1205

herein has not been sufficiently developed to the point where, other than with finasteride in male pattern baldness in male humans, it is presently useful to the public, (as opposed to a "hunting license"), Brenner v. Manson,148 USPQ 189 (1986).

Applicants herein have not provided any substantive evidence that (1) the results achieved in "significant reduction in DHT content" in "men with male pattern baldness" with oral finasteride are predictive of the claimed results in the entire scope of the claim (A)(B)(C) as well as (D), as noted above; and that (2) that the encompassed compounds, other than finasteride are so structurally similar to it, that one skilled in the art would expect similar results.   Implied in the claimed term "treating androgenic alopecia" in "a person in need of such treatment" is the incredible or "sufficiently unusual" allegation, given the current state of the art, of hair growth on bald heads.  This is determined by the Examiner to be an implied utility.  One skilled in this art would question that the stated and implied utility herein is in presently useful form.

Serial No. 08/214,905                    -12-

Art Unit   1205

It is further argued in the parent case that the claims were rejected
under 35 U.S.C. § 112 as the disclosure is said to be enabling for claims
limited to 5α-reductase inhibitors of formulas I and II (as in claims 8, 9, and
10-17). Applicants respectfully traverse this rejection.

"....Applicants' invention is not limited to any specific 5α-reductase
type 2 inhibitors. Rather, it is based on the concept that a lower dose of a
5α-reductase inhibitor. Rather, it is based on the concept that a lower dose
of a 5α-reductase inhibitor than was heretofore believed to be therapeutic can
be effective in treating androgenic alopecia in humans. One of ordinary skill
in the art, reading Applicants' specification, which gives detailed teachings of
dosage and formulations, would be able to apply this to any 5α-reductase type
2 inhibitor, as claimed without resorting to any undue experimentation.
Therefore, it is respectfully requested that this rejection be withdrawn...".

The Examiner finds the comment relating to "one of ordinary skill in
the art", etc. to be <u>attorney's argument</u>, which is <u>not evidence.</u>

Serial No. 08/214,905                    -13-

Art Unit   1205

It is noted that applicant's attorney has presented rebuttal arguments. However, the U.S.P.T.O. Solicitor, Fred McKelvey, Esq., in Legal Lecture to the U.S.P.T.O Examining Corps, has pointed out that attorney argument is not evidence unless it is an admission, in which case, an Examiner may use the admission in making a rejection.  Cases which hold that attorney argument is not evidence include:  in re DeBlauve, 222 USPQ 191,196; Meitzner v. Mindick, 193 USPQ 17,22; in re Pearson, 181 USPQ 646; in re Linder, 173 USPQ 356, 358; in re Schulze, 194 USPQ 716, 718; In re Cole, 140 USPQ 233; In re Watters, 77 USPQ 609,610.  The attorney arguments include statements which are not evidence, unless supported by an appropriate affidavit or declaration, including commercial success, unexpected results, and solving long-felt need, as well as that the prior art will not work .  MPEP 716.1, 716-3 and 716-4, (Commercial Success), with respect to the latter, we do not have any appropriate affidavit or declaration, of an expert.  For the above stated reasons, the prior art discussed herein is considered to render the instantly claimed invention obvious to one of ordinary skill in the art at the time the invention was made.

Serial No. 08/214,905                     -14-

Art Unit   1205

35 U.S.C. § 101 reads as follows:

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title".

Claims 1 to 27 are rejected under 35 U.S.C. § 101 because there is no statistically significant clinical evidence of record establishing baldness treating usefulness of all encompassed species of "5a-reductase 2 inhibitors" in all encompassed species of "persons" in all encompassed species of "androgenic alopecia".

Applicants' parent case responsive argument has been carefully considered.

It is argued:

Claims 1-19 were rejected under 35 U.S.C. § 101 because it is alleged that there is no significant clinical evidence that all encompassed species of 5α-reductase 2 inhibitory in all "persons" and all species of androgenic alopecia. Applicants respectfully traverse this rejection.

Serial No. 08/214,905                    -15-

Art Unit  1205

"Androgenic alopecia" is a generic term which refers to conditions

characterized by loss of hair connected with an excess DHT level.  In men

this condition is commonly referred to as male pattern baldness.  In women,

with this condition the baldness takes on a different "pattern" and is typically

a more diffuse, even hair loss.  However, like male pattern baldness, it is

accompanied by an elevated DHT level.  While the male and female

manifestations of the two conditions differ in appearance, the underlying

biochemistry are the same.  Thus, as argued in the previous response to the §

101 rejection, Applicants have satisfied statutory requirements for utility, and

it is respectfully requested that this rejection be removed.

No expert's declaration has been presented herein to support the above

attorney's argument, (which is not evidence).

The following is a quotation of 35 U.S.C. § 103 which forms the basis
for all obviousness rejections set forth in this Office action:

A patent may not be obtained though the invention is not identically
disclosed or described as set forth in section 102 of this title, if the
differences between the subject matter sought to be patented and the
prior art are such that the subject matter as a whole would have been
obvious at the time the invention was made to a person having ordinary

Serial No. 08/214,905                    -16-

Art Unit   1205

skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed. 2nd 545 (1966), 148 USPQ 459, that are applied for establishing a background for determining obviousness under 35 U.S.C. § 103 are summarized as follows:

1.    Determining the scope and contents of the prior art;
2.    Ascertaining the differences between the prior art and the claims at issue; and
3.    Resolving the level of ordinary skill in the pertinent art.

Claims 1 to 27 are rejected under 35 U.S.C. § 103 as clearly motivated by each of: Metcalf, Diani (1992), Sudduth, Rasmussen (I, II), Petrow, and Orentreich (I-II), differing only in the optimum dosage level to obtain the same result, with susceptible balding subjects.  We have only attorney argument.  No Experts' Declaration has been presented to establish the lack

Serial No. 08/214,905                    -17-

Art Unit   1205

of motivation to reduce the dosages described by Rasmussen (I-II) and Petrow

and other of the prior art; difference in an experts' expectations from

Metcalf's findings in rats, that Diani is "a teaching away", or to omit

progesterone and select a type 2 inhibition in Orentreich (I-II), a type 2

inhibition in Orentreich (I-II).

Claims 1 to 27 provisionally rejected under the judicially created

doctrine of obviousness-type double patenting as being unpatentable over

claims 1, 3 to 11, 13 to 19, 20 to 23 of copending application Serial No.

08/138520.  Although the conflicting claims are not identical, they are not

patentably distinct from each other because there is overlap in scope because

the conflicting claims have not in fact been patented..

This is a *provisional* obviousness-type double patenting rejection  The
obviousness-type double patenting rejection is a judicially established doctrine
based upon public policy and is primarily intended to prevent prolongation of
the patent term by prohibiting claims in a second patent not patentably
distinct from claims in a first patent. *In re Vogel*, 164 USPQ 619 (CCPA
1970).  A timely filed terminal disclaimer in compliance with 37 C.F.R.
§ 1.321(b) would overcome an actual or provisional rejection on this ground
provided the conflicting application or patent is shown to be commonly
owned with this application.  See 37 C.F.R. § 1.78(d).

Serial No. 08/214,905                    -18-

Art Unit   1205


A facsimile center has been established in Group 1200, room 3C10. The hours of operation are Monday through Friday, 8:45 AM to 4:45 PM. The telecopier numbers for accessing the facsimile machine is (703) 308-4556 or 305-3592.

Any inquiry concerning this communication should be directed to Examiner Shep Rose at telephone number (703) 308-1235.


SHEP R. ROSE
EXAMINER
ART UNIT 125

ROSE:tcj
December 06, 1994

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP-APART AND...

| FORM PTO-892 (REV. 2-92) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 08/217905 | GROUP ART UNIT 1205 | ATTACHMENT TO PAPER NUMBER |
|---|---|---|---|---|
| | NOTICE OF REFERENCES CITED | APPLICANT(S) GORMLEY et al | | |

### U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| ✓ | A | 5 1 6 2 3 3 2 | 11/92 | STEINBERG et al | 514 | 284 | |
| ✓ | B | 5 1 5 1 4 2 9 | 9/92 | RASMUSSON et al | 514 | 284 | |
| ✓ | C | 5 1 2 0 7 4 2 | 6/92 | RASMUSSON et al | 514 | 284 | |
| ✓ | D | 5 0 9 8 9 0 8 | 3/92 | STEINBERG et al | 514 | 284 | |
| ✓ | E | 5 0 4 9 5 6 2 | 9/91 | RASMUSSON et al | 514 | 284 | |
| ✓ | F | 4 8 5 9 6 8 1 | 8/89 | RASMUSSON et al | 514 | 284 | |
| ✓ | G | 4 7 6 0 0 7 1 | 7/88 | RASMUSSON et al | 514 | 284 | |
| ✓ | H | 4 3 7 7 5 8 4 | 3/83 | RASMUSSON et al | 514 | 284 | |
| ✓ | I | 4 2 2 0 7 7 5 | 9/80 | RASMUSSON et al | 514 | 284 | |
| | J | | | | | | |
| | K | | | | | | |

### FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

### OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | |
| S | |
| T | |
| U | |

| EXAMINER SHEP ROSE | DATE 2/14/96 | |
|---|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

EXHIBIT G

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicants: | G. J. Gormley et al. |
| Serial No.: | 08/214,905  Case No.: 191091A |
| Filed: | March 17, 1994 |
| For: | METHOD OF TREATING ANDROGENIC ALOPECIA WITH 5-ALPHA REDUCTASE INHIBITORS |

Art Unit:
1205

Examiner:
S. Rose

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231, on the date appearing below.

MERCK & CO., INC.

*Catherine D. Fitch* Date 5/4/95

The Honorable Commissioner of Patents and Trademarks
Washington, D.C. 20231

## AMENDMENT

Sir:

This is in response to the Office Action mailed December 8, 1994, having an unextended response date set to expire Wednesday, March 8, 1995. Enclosed herewith is a Petition for a Two-Month Extension of Time and the associated fee, extending the response date to Monday, May 8, 1995.

In the Claims

Cancel Claim 2.

Cancel Claims 9 through 18, inclusive.

Cancel Claims 22 through 27, inclusive.

Amend Claim 1 as shown below:

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 2

1.    (Amended)  A method of treating androgenic alopecia comprising administering to a person in need of such treatment [a 5α-reductase 2 inhibitor] 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one in a dosage amount [under 5.0] from 0.05 to 3.0 mgs/day.

Amend Claim 7 as shown below:

7.    (Amended)  The method of Claim 1 wherein the [5α-reductase 2 inhibitor] 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one is administered orally.

Amend Claim 8 as shown below:

8.    (Amended)  The method of Claim 1 wherein the [5α-reductase 2 inhibitor] 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one is administered topically.

Amend Claim 19 as shown below:

19.    (Amended)  The method of Claim [18] 7 wherein the dosage amount is about 0.2 mg/day.

Amend Claim 20 as shown below:

20.    (Amended)  The method of Claim [18] 7 wherein the dosage amount is about 0.05 mg/day.

Amend Claim 21 as shown below:

21.    (Amended)  A method of arresting and reversing androgenic alopecia comprising administering to a person in need of such treatment [a 5α-reductase 2 inhibitor] 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one in a dosage amount [under 5.0] from 0.05 to 3.0 mgs/day.

Add new Claim 28:

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 3

28. The method of Claim 1 wherein the dosage amount is about 1.0 mg/day.

(Add new Claim 29:)

29. The method of Claim 7 wherein the dosage amount is about 1.0 mg/day.

(Add new Claim 30:)

30. The method of Claim 21 wherein the dosage amount is about 1.0 mg/day.

## REMARKS

Reconsideration of the application is respectfully requested.

Claims 1 through 27 were pending in the present application. Claims 1 through 27 were subject to a restriction requirement. Claims 1 to 27 were rejected. Claims 1, 7, 8, 19, 20 and 21 have been amended. Claims 2, 9 to 18 and 22 to 27 have been canceled, and new Claims 28, 29 and 30 have been added. Currently, Claims 1, 3 to 8, 19 to 21, and 28 to 30 are under consideration.

Claim 1 has been amended to refer to the particular 5α-reductase 2 inhibitor, 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one, otherwise known as finasteride. Support for this amendment is found in Claim 11 as originally filed, and in the present specification at page 4, line 23. Claim 1 has also been amended to specify the dosage range of 0.05 to 3.0 mg/day. Support for this dosage range may be generally found in the present specification at page 5, lines 12 to 23. This amendment has been made without prejudice to filing a continuing application concerning the omitted subject matter.

Claims 7 and 8 have also been amended to refer to the particular 5α-reductase 2 inhibitor, 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one,

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 4

otherwise known as finasteride. Support for this amendment is found in Claim 11 as originally filed, and in the present specification at page 4, line 23.

Claims 19 and 20 have been amended to change their dependency from canceled Claim 18 to Claim 7. This amendment does not alter the breadth or coverage of the patent Claims. Both original Claim 18 and amended Claim 7 refer to methods wherein the 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one is administered orally.

Claim 21 has been amended to refer to the particular 5α-reductase 2 inhibitor, 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one, otherwise known as finasteride. Claim 21 has also been amended to specify the dosage range of 0.05 to 3.0 mg/day. Support for this dosage range may be generally found in the present specification at page 5, lines 12 to 23.

New Claims 28, 29, and 30 have been added, depending from Claims 1, 7, and 21, respectively. New Claims 28, 29, and 30 specify a dosage amount of about 1.0 mg/day. Support for new Claims 28, 29, and 30 may be found in the specification at page 5, line 11 through page 6, line 28, in Example 4, page 14, line 27 and in Example 5, page 14, line 35.

The Examiner required an election of a single disclosed species of (a) active agent, (b) route of administration, (c) alopecia and (d) sex of person under 35 U.S.C. § 121.

Applicants have elected the following:

(a) active agent is finasteride (17β-(N-tert.-butylcarbamoyl)-4-aza-5α-androst-1-ene-3-one) specifically claimed in Claim 10;

(b) route of administration is oral, specifically claimed in Claim 6;

(c) type of alopecia is male pattern baldness, specifically claimed in Claim 5; and

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 5

    (d)    sex of patient is male.

This election reads on Claims 1, 3, 4, 5, 6, 7, 8, 19, 20, 21, 28, 29, and 30.

        Applicants make the above election with the understanding that, if the elected species is found to be allowable, the Examiner will examine the genus claims readable thereon and a reasonable number of disclosed species in addition to the elected species.

        Applicants have canceled Claims 22 to 27, without prejudice to filing a divisional application on the subject matter claimed therein. These canceled claims are drawn to methods of lowering levels of dihydrotestosterone in the scalp. The election above does not read on the canceled claims.

        The specification was objected to and Claims 1 to 27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30, were rejected under 35 U.S.C. § 112, first paragraph. The Examiner stated that the application failed to disclose the best mode. The Examiner further stated that the disclosure was enabling only for claims drawn to finasteride and structures I and II of Claims 8 and 9 and 10 to 17, at all doses under 5 mg/day, and by all encompassed routes of administration. The Examiner alleged that the treatment of baldness is an "incredible utility" and that significant clinical evidence of utility and operability is required.

        Applicants respectfully traverse the objection to the specification and rejection of Claims 1 to 27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30, under 35 U.S.C. § 112, first paragraph as failing to meet the requirements for best mode. The application as filed teaches the best mode of practicing the invention known to Applicants at the time the instant application was filed. Applicants believe that the best species of their invention of the time of filing was finasteride. However, Applicants submit that filing an application directed solely to a method employing finasteride would not afford them rights to the full scope of that which they have invented, as Applicants would have no recourse against competitors who could easily avoid their claims yet take their invention.

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 6

Further, Applicants respectfully assert that the present application describes the process of the present invention in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the invention. Applicants' invention is specifically directed to the administration of a low dosage of a 5α-reductase 2 inhibitor, specifically 0.05 to 3 mg/day, as an effective means of treating androgenic alopecia. Formulations and specific dosages are disclosed and enabled.

Applicants traverse the Examiner's statement that the disclosure is enabling only for claims limited to the 5α-reductase inhibitors of formulas I and II (as in claims 8 and 9 and 10 to 17). Nevertheless, in order to facilitate prosecution of the present application, Applicants have amended independent Claims 1 and 21 to refer to the particular 5α-reductase 2 inhibitor, 17β-(N-tert-butylcarbamoyl)-4-aza-5α- androst-1-ene-3-one, otherwise known as finasteride, and to specify the dosage range of 0.05 to 3.0 mg/day. Support for this dosage range may be generally found in the present specification at page 5, lines 12 to 23. The remaining Claims depend, either directly or indirectly, from either Claim 1 or Claim 21. Applicants respectfully request that the rejection be withdrawn.

Concerning the related objection to the specification and rejection of Claims 1 to 27 for exhibiting an "incredible utility", Applicants respectfully traverse this objection and rejection, referring to the enclosed Declaration under 37 C.F.R. § 1.132 by Dr. Keith Kaufman. Paragraphs 7 through 14 of the enclosed Declaration sets forth the results from a clinical trial demonstrating that the method of the present invention is indeed useful for the treatment of baldness.

In light of the remarks above, Applicants respectfully request reconsideration and withdrawal of the objection to the specification and the rejection of Claims 1 to 27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30.

Claims 1 to 27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30, were rejected under 35 U.S.C. § 101. The Examiner asserted that there is no statistically significant clinical evidence of record establishing the usefulness of all

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 7

encompassed species of 5α-reductase 2 inhibitors in treating baldness in all encompassed species of persons in all encompassed species of androgenic alopecia.

Applicants respectfully traverse this rejection. First, Applicants have amended the Claims of the present application to refer to the particular 5α-reductase 2 inhibitor, finasteride. Secondly Paragraphs 7 to 14 of the enclosed declaration of Dr. Keith Kaufman demonstrate that a 5alpha-reductase 2 inhibitor, finasteride, is useful in growing hair on bald heads at low dosages.

Androgenic alopecia is a generic term which refers to conditions characterized by loss of hair connected with an excess DHT level. In light of the demonstrated success in the clinical trials discussed in the enclosed Declaration by Dr. Keith Kaufman, Applicants submit that the utility of the present invention has been adequately demonstrated for the breadth of subject matter claimed.

Claims 1 through 27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30, were rejected under 35 U.S.C. § 103 as clearly motivated by each of: Metcalf, Diani (1992), Sudduth, Rasmusson (I,II), Petrow and Orentreich (I-II), differing only in the optimum dosage level to obtain the same result, with susceptible balding subjects.

Applicants respectfully traverse the rejection of Claims 1 to 27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30, under 35 U.S.C. § 103 over each of Metcalf, Diani (1992), Sudduth, Rasmusson (I,II), Petrow and Orentreich (I-II).

Metcalf et al. does not render obvious the presently claimed invention, either alone or in combination with the other cited references. Metcalf et al. report that 4-methyl-17-N,N-diethylcarbamoyl-4-aza-androstan-3-one, a 5α-reductase inhibitor, applied topically prevented the spontaneous balding of the stumptailed macaque monkey, stating further, "Such activity for a steroid 5alpha-reductase inhibitor is consistent with the effects predicted from the clinical reports of humans lacking the enzyme." Metcalf et al. at 493. Further, they reason that reports such as that above point to additional indications for 5α-reductase inhibitors in acne,

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 8

male pattern baldness and prostatic cancer. Metcalf et al. also report that MK-906 (finasteride) has been reported to be a $5\alpha$-reductase inhibitor with a $K_i$ of 26 nM for the human prostatic enzyme and 6 nM for the rat enzyme.

However, Metcalf et al. does not suggest or imply or lead one of ordinary skill in the art to expect the surprising result obtained in the instant invention. That is, generally, that low doses of 5alpha-reductase type 2 enzyme inhibitors grow hair in humans as well as higher doses; particularly that at a dose of between 0.05 and 3 mg/day, most particularly at a doses of 0.2 and 1 mg/day, finasteride appeared to grow hair on human subjects based on objective hair counts as well as finasteride grew hair at a dose of 5 mg/day.

Diani et al. does not render obvious the presently claimed invention, either alone or in combination with the other cited references. Taken on its face, Diani et al. report that 0.5 mg/day dose of oral finasteride significantly grew hair in a group of five 9.9 to 14.0 kg balding stumptail macaque monkeys *when the data from one of the monkeys was excluded.* However, the Diani PCT publication, WO 92/02225 reporting the same data, teaches against any significance of the statistical findings of the Diani paper. The PCT patent publication WO 92/02225 did not exclude the fifth monkey. Taking a more careful look at the Diani PCT publication, one notes that Tables I, and V in the PCT publication demonstrate that finasteride (referred to as TBCAA) did not significantly increase hair growth when compared to vehicle alone at 12 and 20 weeks, c.f. pages 9-11 of WO 92/02225. Further Table III in the Diani PCT Publication demonstrates only a marginally significant increase in hair growth compared with vehicle alone at sixteen weeks. These conclusions of the Diani PCT publication, taken with the Diani article's demonstration at page 347, Figure 2, that the rate of hair growth at the 20 week time period slows down and becomes insignificant, even with the exclusion of the fifth monkey, together teach against the use of low doses of finasteride to grow hair in humans suffering from androgenic alopecia.

Sudduth does not render obvious the presently claimed invention, either alone or in combination with the other cited references. Sudduth describes

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 9

the activity of Finasteride and that the finasteride is indicated for the treatment of benign prostatic hyperplasia. Further, Sudduth reports that dosages of 0.5 to 100 mg/day regress prostate enlargement and that the recommended dosage is 5 mg/day. Sudduth also states that "Finasteride may hold promise for other DHT-mediated disorders such as acne, facial hirsutism, frontal lobe alopecia, and prostate cancer, but its use in these conditions remains investigational." Sudduth at 309. Such a proposal of investigational uses of an agent for the treatment of a condition does not render obvious the present invention, that doses of finasteride between 0.05 and 3 mg/day grow hair on bald human heads. Sudduth also states that the phenotypic consequences of male pseudohermaphrodites lacking the 5alpha-reductase enzyme *suggest potential* clinical utility of a 5alpha-reductase inhibitor drug in the treatment of BPH, acne vulgaris, male-pattern baldness and prostate cancer. Again, Applicants submit that such statements are at most indications of what areas should be explored and obvious-to-try is not obviousness under 35 U.S.C. § 103.

That a 5alpha reductase type 2 inhibitor such as finasteride may be useful in growing hair in humans, as Sudduth postulates, does not render the invention of the present application, that is, that finasteride effectively and significantly grow hair at low doses (between 0.05 and 3 mg/day) as effectively and significantly as finasteride promotes hair growth in humans at higher dosages.

On page 317, Sudduth describes the results of a study of the use of finasteride to treat benign prostatic hyperplasia in men. Sudduth states that although there were no differences in prostate volume reduction, urine flow rate improvement or adverse drug effects between the 1-mg and 5-mg doses, it was found that men treated with 5mg had a significantly greater decline in symptom score compared with placebo, whereas those receiving 1 mg did not experience significant improvement. See Sudduth, p. 317. Thus, Sudduth actually teaches against the use of low doses to successfully treat androgenic alopecia.

Sudduth also discusses the results of the Diani paper. "Monkeys treated with finasteride, minoxidil or the combination demonstrated hair growth

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 10

during the 20 week experiment. One of the 5 monkeys treated with finasteride alone did not respond. If data from the nonresponder were deleted, a significant increase in hair growth is seen compared to vehicle alone (p less than 0.05). Results from this study *suggest a role* for finasteride in reversing established baldness. It also appears that the combination of finasteride and minoxidil may be more effective than either agent alone." Sudduth, p. 321. Sudduth's statement that finasteride might be useful in reversing established baldness does not render obvious the present invention, that low doses of finasteride are effective in treating androgenic alopecia. In light of the contrary teaching of the Diani PCT publication, this statement from Sudduth has even less import. At most Sudduth teaches that it is worth trying to determine whether finasteride is useful to treat androgenic alopecia. Obvious-to-try is not the standard for obviousness under 35 U.S.C. § 103.

Rasmusson I and II do not render obvious the invention of the present application. By Rasmusson I, Applicants believe the Examiner is referring to EP 235 382, and by Rasmusson II, Applicants believe the Examiner is referring to Canada 1,302,277, USSN 08/094,815.

Rasmusson I discloses 4-aza-17ß-substituted-5α-androstan-3-ones, including finasteride, useful as 5α-reductase inhibitors for treating a variety of hyperandrogenic conditions, including androgenic alopecia. Rasmusson et al. I state that these 4-aza-17ß-substituted-5α-androstan-3-ones may be useful in treating the hyperandrogenic conditions of androgenic alopecia, including male pattern baldness, acne vulgaris, seborrhea, and female hirsutism by topical administration and in treating the above conditions as well as benign prostatic hypertrophy by parenteral administration. For oral administration, Rasmusson et al. I states that the daily dosage may be varied over a wide range varying from 50 to 2000 mg, and that tablets may be made containing 5, 10, 25, 50, 100, 150, 250 and 500 mgs of the active ingredient. The effective dosage amount is further defined at about 1 to 50 mg/kg of body weight per day. Topical formulations are stated to include 0.1% to 15 % active ingredient, preferably about 5%. This

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 11

reference, alone or in combination with other references does not render obvious the present invention, that finasteride administered in low doses grow hair in humans.

Rasmusson et al. II also describes 17ß-N-monosubstituted carbamoyl-4-aza-5α-androst-1-en-3-ones active as 5α-reductase inhibitors, particularly 17ß-(N-t-butylcarbamoyl)-4-aza-5α-androst-1-en-3-one (otherwise known as finasteride or MK-0906). Rasmusson et al. II state that these 5α-reductase inhibitors are useful in treating the hyperandrogenic conditions of acne vulgaris, seborrhea, and female hirsutism by topical administration and treating all of the above conditions as well as benign prostatic hypertrophy, by parenteral administration. Rasmusson states that the daily dosage of the products may be varied over a wide range varying from 50 to 2000 mg, and may be provided in the form of tablets containing 5, 10, 25, 50, 100, 150, 250 and 500 mg of active ingredient. they state that an effective amount of the drug is ordinarily supplied at a dosage level of from about 1 mg to 50 mg/kg of body weight per day. Preferably the range is from 1 to 7 mg/kg of body weight per day. Further, for topical formulations for the treatment of acne vulgaris seborrhea, female hirsutism, the compounds may be administered in a formulation including about 0.1 to 15%, preferably about 5% of active compound in an admixture with vehicle. This reference, alone or in combination with other references does not render obvious the present invention, that finasteride administered in low doses grow hair in humans.

Petrow et al, US 4,396,615 discloses derivatives of 6-methyleneprogesterone useful in treating androgen-related disorders such as acne, oily skin, seborrhea androgenic alopecia, hirsutism, virilism, androgen-dependent prostatic carcinoma and benign prostatic hypertrophy. These compounds may be administered from 0.1 mg/kg to 50 mg/kg per day, preferably 1 to 30 mg/kg. Unit dosages were stated to contain from 5 to 500 mg of the active ingredient. The compounds are said to be 5α-reductase inhibitors.

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 12

Orentreich et al. I and II do not in any way suggest or disclose the invention of the present application. By Orentreich I, Applicants believe the Examiner is referring to US 4,684,635; by Orentreich II, Applicants believe the Examiner is referring to US 5,053,403.

Orentreich I and II describe synergistic compositions for inhibiting the action of androgens comprising the combination of a single topical preparation of a $5\alpha$-reductase inhibitor and an androgen receptor blocking agent in a pharmaceutically and dermatologically acceptable vehicle. These compositions are stated to be useful for the treatment or prevention of sebaceous gland hypertrophy, hirsuitism and male-pattern baldness in mammals. They experimented with compositions of progesterone ($5\alpha$-reductase inhibitor) and either spironolactone, flutamide, trimethyltirienolone and cyproterone acetate (androgen receptor inhibitors) on hamster ears and observed the change in gland size. Alone, neither of the agents was as effective as the two agents combined in reducing gland size. The $5\alpha$-reductase inhibitor alone was did not significantly reduce the gland size (with one exception, at 0.1 % w/v progesterone). Orentreich I and II do not disclose or suggest the present invention, that a low dose of finasteride alone is useful for treating androgenic alopecia.

None of the references discussed above, either alone or in combination with any of the other references provide motivation, suggestion or teaching to make the claimed compounds of the present invention. In light of the remarks above, Applicant respectfully requests reconsideration and withdrawal of the rejection of Claims 1-27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30, under 35 U.S.C. § 103 over Metcalf, Diani (1992), Sudduth, Rasmusson (I,II), Petrow and Orentreich (I-II).

Claims 1 to 27, presently Claims 1, 3 to 8, 19 to 21, and 28 to 30, were provisionally rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1, 3 to 11, 13 to 19, 20 to 23 of copending application Serial No. 08/138520. The Examiner stated that although the conflicting claims are not identical, they are not patentably distinct

U.S.S.N.: 08/214,905
Case No.: 19109IA
Page No.: 13

from each other because there is overlap in scope. The rejection is provisional because the conflicting claims have not in fact been patented.

Applicants respectfully submit that this provisional rejection has been rendered moot by the abandonment of applications Serial No. 08/138520 in favor of the present application. Application Serial No. 08/138520 has been abandoned for failure to respond to an office action due March 8, 1995, and subsequently has been expressly abandoned by submission of a request for abandonment, mailed April 28, 1995.

Applicants respectfully submit that the claims are in condition for allowance and a favorable action by the Examiner is earnestly solicited.

Respectfully submitted,

By Catherine D. Fitch
Catherine D. Fitch
Reg. No. 36,502
Attorney for Applicants

Merck & Co., Inc.
P.O. Box 2000
Rahway, NJ 07065-0907
(908) 594-4283

Enclosure
Date: May 1, 1995