UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MERCK & CO., INC.,<br><br>    Plaintiff and<br>    Counterclaim Defendant,<br><br>        v.<br><br>DR. REDDY'S LABORATORIES, LTD.<br>and DR. REDDY'S LABORATORIES, INC.,<br><br>    Defendants and<br>    Counterclaim Plaintiffs. | Civil Action No. 04-1313 (GMS) |

## DECLARATION OF DR. DAVID WHITING

1. I am currently a Clinical Professor of Dermatology and Pediatrics at the University of Texas Southwestern Medical Center in Dallas, Texas..

2. I graduated in medicine at the University of the Witwatersrand, Johannesburg, South Africa in 1953. After my internships, I did postgraduate study in England. I spent 8 years in Family Practice before taking up dermatology in 1966. I was Chairman of Dermatology at the Johannesburg General Hospital prior to my appointment as Chief Dermatologist at the Veterans Administration Medical Center in Dallas, Texas in 1977. I have practiced and taught dermatology and dermatopathology at Baylor University Medical Center from 1979 to the present.

3. A copy of my curriculum vitae is attached as Exhibit A.

4. One of my major research interests has been the study of hair abnormalities. I am the Medical Director of the Hair Research and Treatment Center, at Baylor. As a result, I have gained wide experience in the diagnosis and treatment of hair and scalp disorders. I am board certified in Dermatology and Dermatopathology in the United States, and in Internal Medicine in England. I am a Fellow of the American College of Physicians and of the Royal College of Physicians in Edinburgh.

5. As indicated in my C.V., I have written numerous articles, other publications and books/book chapters, many dealing with hair loss and treatment.

6. I have been asked by counsel for plaintiff, Merck & Co., Inc. ("Merck"), to study Merck's U.S. Patent No. 5,547,957 ("the '957 patent") (Exh. B attached), including relevant portions of its prosecution history in the United States Patent and Trademark Office ("USPTO"), and provide my opinion as to how a person of ordinary skill in the art of that patent, as of about October 1993, would have understood the following language that appears in the claims of the patent:

> at least until growth of hair can be detected in the
> balding area by haircount analysis of the balding
> area.

7. The art of the '957 patent is the treatment of the medical condition known as androgenic alopecia; in men, it is more generally known as male pattern baldness, or common baldness in men. In my opinion, a person of ordinary skill in that art, as of about October 1993, would have been a medical doctor with a specialty in dermatology, or similar field, having a few years of experience as a physician. Some of such doctors, including myself, are familiar with the literature in the field, including the various techniques that may be employed to measure or

assess the amount of hair growth that occurs when male pattern baldness is treated using drug therapy.

8.  In particular, the '957 patent describes, and claims, a method for the treatment of male pattern baldness using a compound known as finasteride. I am very familiar with the use of finasteride for that purpose, because of my clinical experience and my participation in a number of clinical studies with finasteride.

9.  Male pattern baldness is a general term for scalp baldness that occurs in genetically predisposed males, usually, although not always, beginning with a "bald spot" at the back of the top of the head (the "vertex"). It is the result of the minaturization of the hair follicles in that area, rendering them smaller, shorter and less visible over time. Minaturized hair is sometimes referred to as "vellus" hair. Regular, thick, non-minaturized (or "terminal") hair follicles are pigmented and normally easily visible to the naked eye. In male pattern baldness, the amount of vellus hair, relative to the amount of terminal hair, increases over time, thus giving the appearance of baldness.

10. Treatment of male pattern baldness with finasteride tends to reverse the minaturization process. As a result, the vellus hair becomes longer, thicker and more pigmented, and thus visible. Unfortunately, as persons skilled in the art know, if finasteride administration is stopped after some period of time, the hairs will revert to vellus status. Thus, doctors practicing in the field know that finasteride must be administered indefinitely to be continually effective.

11. There are a number of techniques that a doctor can use to measure or assess the effectiveness of finasteride treatment for male pattern baldness. For example, a macrophotographic procedure can be employed to actually count the visible hairs on the scalp.

An increase in the number of visible hairs over the course of finasteride administration is an objective indicator of hair growth. Typically, such a procedure involves photographing a closely-clipped balding area of the scalp and counting the number of visible hairs in a defined, small portion of that area. The photographic conditions are selected so as to reasonably exclude the possibility of counting the vellus hairs in that small area. A typical macrophotographic procedure is described in the first part of Example 4 of the '957 patent.

12. Another typical hair growth assessment technique is a global photographic procedure, in which the same area of a balding scalp is photographed at different times during the course of finasteride treatment. Apparatus is employed to secure the patient's head so that the exact same portion of the scalp is photographed each time. In this technique, unlike in the haircount analysis, the hair is not clipped before being photographed, but, instead, is combed or arranged the same way each time to assure consistency. Then, typically, several trained technicians compare each photograph taken during the course of treatment to a baseline photograph ("before" treatment starts), and visually evaluate any change in hair growth, using a rating scale that usually ranges from "greatly decreased" through "no change" to "greatly increased." An example of such a rating scale is shown in Exhibit C attached. Exhibit D attached shows examples of ratings of "greatly decreased" and "greatly increased." Thus, the global photographic procedure evaluates hair growth by visually rating the appearance of hair growth changes over the course of treatment. Although each such evaluation is a subjective rating by the observer, overall global photography provides a fairly reliable assessment of hair growth during treatment because of the precautions taken that tend to assure that the same area is photographed each time and the fact that multiple comparative evaluations are made of each

photograph by trained observers. A typical global photographic technique is described in Example 4 of the '957 patent.

13. Two other hair growth assessment techniques include a patient self-assessment (in which the patient is asked to rate his own status of hair growth during the course of treatment), and an assessment made by a clinical investigator during the course of a treatment trial (in which the investigator, typically a trained physician, may use the same multi-point rating scale employed in the global photographic procedure). Such assessments are described in a 1990 paper by Olsen and Delong in the Journal of the American Academy of Dermatology (Exhibit E attached). That paper is cited in Example 4 of the '957 patent.

14. Example 4 of the '957 patent refers to and illustrates all four of the assessment techniques discussed above, and indicates (at col. 8, lns. 57-62) that any of those methodologies can be employed to demonstrate that finasteride is useful in treating male pattern baldness, and growing hair. Thus, in my opinion, a person of ordinary skill in the art would understand the '957 patent as saying that any conventional hair growth assessment technique, such as any of those four, may be employed to measure or assess hair growth during treatment of male pattern baldness with finasteride.

15. In my experience, when a physician prescribes finasteride for male pattern baldness, he or she will monitor the patient's progress principally by the change in appearance of hair growth over time, and also by asking the patient to self-assess how his hair growth has changed during the course of treatment. Occasionally, in my practice, I will take baseline photographs at the start of treatment, for comparison with photographs taken later during

treatment, in order to have a record of hair growth improvement. I also sometimes periodically measure the size of a patient's bald spot as another assessment of hair growth during treatment.

16. In my experience, if hair growth during treatment can be detected by objective haircount analysis, it also can be detected by visually checking its change in appearance, such as by using global photography or patient self-assessment. I believe persons of ordinary skill in the art would be of the same opinion. Thus, when the '957 patent says, in the claims, that finasteride is administered "at least until growth of hair can be detected in the balding area by haircount analysis of the balding area," in my opinion a person of ordinary skill in the art would understand that to mean at least until growth of hair can be detected in that area by visually assessing the change in appearance of that area by any conventional hair growth assessment technique.

17. My review of the prosecution history of the '957 patent confirms this opinion. I note that Merck submitted evidence, in the Kaufman Declarations, that finasteride grows hair when measured by haircount analysis, global photography, patient self-assessment or investigator assessment. When the examiner questioned whether those different techniques gave statistically significant results, Merck responded that they all did. The examiner then allowed the claims.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: 7/22/05

_____
David Whiting, M.D.

NY_MAIN 512868v1

6

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2005, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

>Richard L. Horwitz, Esquire
>POTTER ANDERSON & CORROON LLP
>Hercules Plaza
>1313 North Market Street
>P.O. Box 951
>Wilmington, DE  19899-1951

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on July 25, 2005 upon the following individuals in the manner indicated:

| BY HAND DELIVERY | BY FIRST CLASS MAIL |
|---|---|
| Richard L. Horwitz, Esquire<br>POTTER ANDERSON & CORROON LLP<br>Hercules Plaza<br>1313 North Market Street<br>P.O. Box 951<br>Wilmington, DE  19899-1951 | Bruce D. Radin<br>BUDD LARNER, P.C.<br>150 John F. Kennedy Parkway<br>CN 1000<br>Short Hills, NJ  07078-0999 |

*/s/ James W. Parrett, Jr.*

James W. Parrett, Jr. (#4292)