IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MERCK & CO., INC., | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | ) |
| | ) C. A. No. 04-1313 (GMS) |
| DR. REDDY'S LABORATORIES, LTD. and | ) |
| DR. REDDY'S LABORATORIES, INC., | ) |
| | ) |
| Defendants and | ) |
| Counterclaim Plaintiffs. | |

**DECLARATION OF DR. CHRISTOPHER FISHER**

OF COUNSEL:

Bruce D. Radin
Stuart D. Sender
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
CN 1000
Short Hills, NJ 07078-0999
(973) 379-4800

Dated: August 22, 2005

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants/Counterclaim Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK & CO., INC. | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | C. A. No. 04-CV-1313 (GMS) |
| DR. REDDY'S LABORATORIES, LTD. and | ) | |
| DR. REDDY'S LABORATORIES, INC., | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

## DECLARATION OF DR. CHRISTOPHER FISHER

1. I am a co-founder and currently the Director of Biology at NanoVir, LLC.

2. I graduated with a doctorate in biomedical science from the University of Connecticut Health Center in Farmington, Connecticut in 1984. Both my Ph.D. and post-graduate studies focused on the biology of differentiation of skin. After postgraduate study and serving on the faculty at the University of Washington School of Medicine, I was recruited to the Hairgrowth Program of The Upjohn Company.

3. I have taught in the fields of biology, embryology, dermatology, anatomy and zoology at the University of South Carolina, the University of Connecticut, the University of Washington and Western Michigan University.

4. Within the Upjohn Company, and within its derivative companies Pharmacia and Upjohn, Pharmacia, and Pfizer, my research expertise and experience lay within the areas of cell and molecular biology, with major work concentrated in areas of novel assay development and the measurement of the effects of pharmaceutical agents

5. A copy of my curriculum vitae is attached as Exhibit A.

1

6. One of my major research interests has been the study of skin development and hair growth. While at The Upjohn Company, I specialized in hair growth research from 1989 to 1991 and, as a result, gained wide experience in pharmaceutical control of hair growth.

7. As indicated in my C.V., I have written numerous articles and other publications, many dealing with the development and biology of the skin and its appendages.

8. I have been asked by counsel for defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively "DRL") to study U.S. Patent No. 5,547,957 ("the '957 patent"), including relevant portions of its prosecution history in the United States Patent and Trademark Office ("USPTO"), and provide my opinion as to how one of ordinary skill in the art of that patent, as of about October 1993, would have understood the following claim term from the '957 patent:

> at least until growth of hair can be detected in the balding area by haircount analysis of the balding area.

9. The art of the '957 patent is the treatment of androgenic alopecia, or male pattern baldness. Prior to the filing of the patent in 1993, hairgrowth treatments (with the exception of minoxidil) were, in general, folk remedies. The '957 patent recognized that clinical experts, using defined, quantitative endpoints, were required to demonstrate and confirm the effectiveness of oral treatments for baldness. A person of ordinary skill in the art was an investigator with some experience in the clinical evaluation of pharmaceutical compounds, who understood the use and value of quantitative endpoints for evaluating efficacy of new pharmaceutical agents. In particular, the '957 patent describes and claims a method of treating male pattern baldness using finasteride until hair growth can be detected using haircount analysis.

10. Male pattern baldness is a general term for scalp baldness that occurs in

2

genetically predisposed males, typically beginning with a "vertex", or bald spot, at the back of the top of the head. Male pattern baldness is caused by the atrophy and loss of pigmentation of the hair follicles at the vertex, so that the follicles produce smaller and less visible hairs. These smaller hairs are also known as "vellus" hairs. The increasing proportion of vellus hair to terminal hair in male pattern baldness gives the appearance of baldness. Finasteride reverses male pattern baldness by restoring length, thickness and pigmentation to vellus hair.

11.  Hair growth resulting from the administration of finasteride may be directly measured by counting visible hairs on the scalp. Example 4 of the '957 patent specification describes performing a "haircount" procedure in conjunction with the use of macrophotography. The macrophotographic procedure set forth in Example 4 is an objective method that enables the determination of any increase in the number of visible hairs during treatment with finasteride. This procedure involves clipping hairs from a one square inch balding area of the scalp, photographing the clipped hairs under magnification and marking visible hairs. Hairs are then counted either manually or using image analysis with computer assistance, and the results at different points in time are compared to baseline measurements.

12.  Other techniques of assessing hair growth do not entail counting individual hairs. Example 4 of the '957 patent and Olsen, E.A. and DeLong, E., *J. American Academy of Dermatology*, Vol. 23, p. 470 (1990) ("the Olsen paper") describe three such methods: global photographic procedure, investigator assessment and patient self-assessment. In each of these methods, an observer (either investigator or patient) assesses the overall appearance of the balding area and provides an opinion as to whether hair growth has occurred. The observer's evaluation is presented as a subjective rating, such as "decreased", "no change" or "increased". In the global photographic procedure, photographs of the balding area are taken at different

points in time and compared to serve as the basis for the subjective rating of hair growth. Photographic records are not usually created and baselines are usually not established for the investigator assessment and patient assessment methods, which are primarily used when a physician or dermatologist prescribes finasteride outside the setting of a clinical study.

13.   The specification and prosecution history of the '957 patent provide data for hair growth measurements using the objective macrophotographic procedure as well as the subjective global photography, investigator assessment and patient assessment methods. In my experience, as confirmed by these data (discussed below), subjective methods are not equivalent to the objective macrophotographic procedure and do not yield results that are reliable or that correlate with the macrophotographic procedure.

14.   The Olsen paper provides results from each of the macrophotographic procedure, patient assessment and investigator assessment methods but states that "[e]fficacy was determined by counting the nonvellus hairs" using "macrophotographs". (Exh. 2 at 470).[1] Using subjective methods, the investigators perceived hair growth for 10% of the patients, while 44% of patients believed that they experienced light to moderate hair growth. (Exh. 2 at 472). In reality, the agents being tested did not grow hair. The macrophotographic procedure consistently showed decreases in hair count. (Exh. 2 at 472).

15.   In the Declaration of Keith Kaufman dated May 3, 1995 ("the first Kaufman declaration"), in subjects receiving 0.01 mg finasteride, global photography showed perceived hair growth in 17% of the subjects, investigator assessment showed perceived hair growth in 19% of the subjects, and patient assessment showed perceived hair growth in 36% of the subjects. (First Kaufman Decl. at exh. 1). In reality, there was no hair growth. The objective macrophotographic procedure showed decreases in haircount for the groups receiving both 0.01

---

[1] Hereinafter, all citations to "Exh. __" refer to the exhibits attached to DRL's Opening Claim Construction Brief.

4

mg finasteride and placebo. (First Kaufman Decl. at exh. 1). For the placebo group, which lost hair when counted, global photography showed perceived hair growth in 14% of the subjects, investigator assessment showed perceived hair growth in 20% of the subjects, and patient assessment showed perceived hair growth in 32% of the subjects. (First Kaufman Decl. at exh. 1).

16. In my experience, much of the measurement error that occurs with the use of subjective methods is attributable to the inherent bias of the observer towards perceiving hair growth. If this inherent error taints a study with greater than 350 participants (as reported in the first Kaufman declaration), then it will be especially detrimental in a clinical setting where finasteride effects are to be measured in a single individual. Therefore, in my opinion, one of ordinary skill in the art would understand from these measurement data that subjective methods of measuring hair growth are of poor predictive value and generally unsuitable for accurately determining whether hair growth has occurred.

17. My review of the '957 patent prosecution history further reveals that, in an August 14, 1995 Office Action, the Examiner rejected the pending claims of the application on grounds of obviousness. To overcome the Examiner's rejection, Merck submitted the Declaration of Keith Kaufman dated November 13, 1995 ("the second Kaufman declaration"), which contained data in support of the argument that a 1 mg dose of finasteride is unexpectedly effective in treating androgenic alopecia. (Exh. 8 at ¶ 6). The data presented in that declaration were obtained using solely the objective macrophotographic hair count procedure – subjective methods used in the first Kaufman declaration were not relied on. (Exh. 7 at 5; Exh. 8 at ¶ 6). In light of the second Kaufman declaration, the Examiner agreed to allow the pending claims, but only if Merck amended the claims to add the claim term requiring "haircount analysis". (Exh.

5

10). In order to obtain the '957 patent, Merck amended the claims to add the haircount analysis limitation. (Exh. 11). In my opinion, this portion of the '957 patent prosecution history further teaches one of ordinary skill in the art that Merck limited the scope of its claims by adding the claim term "at least until growth of hair can be detected in the balding area by haircount analysis of the balding area" and that the method of "haircount analysis" is the objective macrophotographic procedure described in Example 4 of the '957 patent specification and used to the exclusion of any subjective methods in the second Kaufman declaration.

18.  The phrase "haircount analysis" has a plain, unambiguous meaning – i.e., an objective means of measuring hair growth by counting hairs. If one resorts to a dictionary, "count" is defined as "to indicate, name or separate (units out of a body of units) one by one or group by group to find the total number of units involved or concerned." (Webster's Third New International Dictionary of the English Language 518 (Phillip B. Gove ed., 2002)). "Haircount" therefore requires identifying individual hairs one by one in order to determine the total amount of hair.

19.  In my opinion, one of ordinary skill in the art would understand that the act of counting individual hairs to arrive at a total number means that the total or end result of "haircount analysis" must be a quantitative measurement, not a qualitative description. "Haircount analysis" is an objective technique to the extent that it minimizes the role of the subjective impressions of the investigator or patient.

20.  The phrase "at least until growth of hair can be detected in the balding area by haircount analysis of the balding area" refers to the detection of hair growth, not the method of detection, and reflects the fact that finasteride is not effective in stimulating hair growth in all patients – i.e., under the claim terms, finasteride is administered until hair growth can be

detected. The phrase "can be" expresses the contingency that detection of hair growth may not be possible simply because hair growth may not in fact occur. In the event that the patient does exhibit hair growth, the '957 patent claim language specifies that "haircount analysis" is the method of detection to be used.

21. In my opinion, one of ordinary skill in the art in 1993, when the application for the '957 patent was filed, would understand from the claim language, specification and prosecution history of the '957 patent that the claims require the measurement of hair growth, that the method of measurement is the objective macrophotographic procedure and that subjective methods are inappropriate for measuring hair growth.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: 8/22/2005

Christopher Fisher, Ph.D.

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

  I, David E. Moore, hereby certify that on August 22, 2005, the attached document was served via hand delivery and electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Mary B. Graham
James W. Parrett, Jr.
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347


  I hereby certify that on August 22, 2005, I have Federal Expressed the documents to the following non-registered participants:

Robert L. Baechtold
Henry J. Renk
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, NY  10112


            By: */s/ David E. Moore*
               Richard L. Horwitz
               David E. Moore
               Hercules Plaza, 6th Floor
               1313 N. Market Street
               Wilmington, Delaware  19899-0951
               (302) 984-6000
               rhorwitz@potteranderson.com
               dmoore@potteranderson.com

672977