# EXHIBIT A

US005571817A

## United States Patent [19]

### Rasmusson et al.

[11] **Patent Number:** **5,571,817**

[45] **Date of Patent:** **Nov. 5, 1996**

[54] **METHODS OF TREATING ANDROGENIC ALOPECIA WITH FINASTERIDE [17β-N-MONO-SUBSTITUTED-CARBAMOYL-4-AZA-5-α-ANDROST-1-EN-ONES]**

[75] Inventors: **Gary H. Rasmusson**, Watchung; **Glenn F. Reynolds**, Westfield, both of N.J.

[73] Assignee: **Merck & Co., Inc.**, Rahway, N.J.

[21] Appl. No.: **94,815**

[22] Filed: **Jul. 20, 1993**

### Related U.S. Application Data

[63] Continuation of Ser. No. 16,476, Feb. 10, 1993, abandoned, which is a continuation of Ser. No. 927,256, Aug. 7, 1992, abandoned, which is a continuation of Ser. No. 698,374, May 9, 1991, abandoned, which is a continuation of Ser. No. 545,676, Jun. 28, 1990, abandoned, which is a continuation of Ser. No. 370,142, Jun. 21, 1989, abandoned, which is a continuation of Ser. No. 198,708, May 19, 1988, abandoned, which is a continuation of Ser. No. 34,806, Apr. 3, 1987, abandoned, which is a continuation-in-part of Ser. No. 800,623, Nov. 21, 1985, Pat. No. 4,760,071, which is a continuation of Ser. No. 584,062, Feb. 27, 1984, abandoned.

[51] Int. Cl.⁶ ............................................. **A61K 31/44**

[52] U.S. Cl. ........................................ **514/284**; 546/77

[58] Field of Search ............................ 546/77; 514/284

### [56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,227,876 | 1/1941 | Bolt | 260/269 |
| 3,239,417 | 3/1966 | Tullio et al. | 167/65 |
| 3,264,301 | 8/1966 | Doorenbos et al. | 260/286 |
| 3,285,918 | 11/1966 | Doorenbos et al. | 260/251 |
| 4,139,619 | 2/1979 | Chidsey, III | 424/45 |
| 4,220,775 | 9/1980 | Rasmusson et al. | 546/77 |
| 4,317,817 | 3/1982 | Blohm et al. | 424/226 |
| 4,377,584 | 3/1983 | Rasmusson et al. | 424/258 |
| 4,396,615 | 8/1983 | Petrow et al. | 424/242 |
| 4,596,812 | 6/1986 | Chidsey, III et al. | 514/256 |
| 4,689,345 | 8/1987 | Kasha et al. | 514/546 |
| 4,732,897 | 3/1988 | Cainelli et al. | 514/222 |
| 4,760,071 | 7/1988 | Rasmusson et al. | 514/284 |
| 4,845,104 | 7/1989 | Carlin et al. | 514/284 |
| 4,859,681 | 8/1989 | Rasmusson et al. | 514/284 |
| 4,882,319 | 11/1989 | Holt et al. | 514/119 |
| 4,888,336 | 12/1989 | Holt et al. | 514/278 |
| 4,910,226 | 3/1990 | Holt et al. | 514/573 |
| 5,021,575 | 6/1991 | King et al. | 546/77 |
| 5,049,562 | 9/1991 | Rasmusson et al. | 514/284 |
| 5,061,802 | 10/1991 | Steinberg et al. | 546/77 |
| 5,075,450 | 12/1991 | Rasmusson et al. | 546/285 |
| 5,084,574 | 1/1992 | Bhattacharya et al. | 546/77 |
| 5,091,380 | 2/1992 | Rasmusson et al. | 514/169 |
| 5,120,729 | 6/1992 | Chabala et al. | 514/210 |
| 5,120,742 | 6/1992 | Rasmusson et al. | 514/284 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 970692 | 7/1975 | Canada . |
| 0004949 | 10/1979 | European Pat. Off. . |
| 0155096 | 9/1985 | European Pat. Off. . |
| 0277002 | 8/1988 | European Pat. Off. . |
| 0289327 | 11/1988 | European Pat. Off. . |
| 0314199 | 5/1989 | European Pat. Off. . |
| 0343954 | 11/1989 | European Pat. Off. . |
| 0375347 | 6/1990 | European Pat. Off. . |
| 0375349 | 6/1990 | European Pat. Off. . |
| 0375345 | 6/1990 | European Pat. Off. . |
| 0375344 | 6/1990 | European Pat. Off. . |
| 0463638 | 1/1992 | European Pat. Off. . |
| 1465544 | 11/1965 | France . |
| 59-13719 | 1/1984 | Japan . |
| 60-116657 | 6/1985 | Japan . |
| 60-126218 | 7/1988 | Japan . |
| 83/7859 | 11/1984 | South Africa . |
| WO85/05272 | 12/1985 | WIPO . |
| WO85/05270 | 12/1985 | WIPO . |

#### OTHER PUBLICATIONS

Orentreich, Ann. Plast. Surg. (United States), Jan. 1978, pp. 116–118, "Medical treatment of baldness".

Questel. Orbit, JAPIO file (abstract), accession No. 84–013719 (1984).

Derwent WPAT file (abstract), accession No. 85–200306/33 (1985).

Questel. Orbit, JAPIO file (abstract), accession No. 85–116657 (1985).

Neri, et al., "A Biological Profile of Nonsteroidal Antiandrogen, SCH 13521", Endo., vol. 91, No. 2, pp. 427–437 (1972).

Nayfeh, et al., "Metabolism of Progesterone by Rat Testicular Homogenates", Steroids, vol. 14, pp. 269–283 (1969). Voigt, et al., Endo., vol. 92, p. 1216.

Doorenbos, et al., "Synthesis and Antimicrobial Properties of 17 Beta-Isopentyloxy . . . ", J. Pharm. Sci., vol. 62, No. 4 pp. 638–640 (1973).

Doorenbos, et al., "4–17 Alpha–Dimethyl–4–Aza–5 Alpha–Androstan–17 Beta–ol–Acetate . . . ", J. Pharm. Sci., vol. 60, No. 8, pp. 1234–1235 (1971).

(List continued on next page.)

*Primary Examiner*—Peter O'Sullivan
*Attorney, Agent, or Firm*—Carol S. Quagliato; Melvin Winokur; Robert J. North

[57] **ABSTRACT**

17β-N-monosubstituted-carbamoyl-4-5α-androst-1-en-3-ones of the formula



wherein $R^1$ is selected from hydrogen, methyl and ethyl and $R^2$ is a branched chain alkyl of from 3–12 carbons, and R', R'', R''' are hydrogen or methyl are active as testosterone 5α-reductase inhibitors and thus are useful topically for treatment of androgenic alopecia.

**2 Claims, No Drawings**

**5,571,817**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,138,063 | 8/1992 | Rasmusson et al. | 546/77 |
| 5,151,429 | 9/1992 | Rasmusson et al. | 514/284 |
| 5,151,430 | 9/1992 | Steinberg et al. | 514/284 |
| 5,162,332 | 11/1992 | Steinberg et al. | 514/284 |
| 5,175,155 | 12/1992 | Juniewicz et al. | 514/176 |
| 5,196,411 | 3/1993 | Rasmusson et al. | 514/169 |

### OTHER PUBLICATIONS

Doorenbos, et al., "Synthesis and Evaluation of Antimicrobial Properties . . . ", J. Pharm. Sci., vol. 63, No. 4, pp. 620–622 (1974).

Back, et al., "N–Chloroazasteroids: A Novel Class of Reactive Steroid Analogues", J. Org. Chem., vol. 54, pp. 1904–1910 (1989).

Liang, et al., "Inhibition of 5 Alpha–Reductase, Receptor Binding and Nuclear Uptake of Androgens . . . ", Chem. Abs., vol. 95, No. 13, p. 99, AB #109055j (1981).

Brooks, et al., "Prostatic Effects Induced in Dogs by Chronic or Acute Oral Administration . . . ", The Prostate, vol. 9, pp. 65–75 (1986).

Kadohama, et al., "Retardation of Prostate Tumor Progression in Nobel Rat . . .", J NCI, vol. 74, No. 2, pp. 475–486 (1985).

Andriole, et al., "The Effect of 4MA, a Potent Inhibitor of 5 Alpha–Reductase . . . ", The Prostate, vol. 10, pp. 189–197 (1987).

Bingham, et al., "The Metabolism of Testosterone By Human Male Scalp Skin", J. Endocr. (England), vol. 57, pp. 111–121 (1973).

Kedderis, et al., "Studies with Nitrogen–Containing Steroids and Freshly Isolated Rat Hepatocytes", Tox. Appl. Pharm., vol. 93, pp. 403–412 (1988).

Liang, et al. "Species Differences in Prostatic Steroid 5–Alpha Reductases . . . ", Endocrinology, vol. 117, pp. 571–579 (1985).

Stone, et al., "Estrogen Formation in Human Prostatic Tissue from Patients . . .", The Prostate, vol. 9, pp. 311–318 (1986).

Brooks, et al., "5 Alpha Reductase Inhibitory and Anti–Androgenic Activities . . . ", Steroids, vol. 47, pp. 1–19 (1986).

Labrie, et al., "Combination Therapy in Prostate Cancer", Lancet, vol. 2, #8515, pp. 1095–1096 (1986).

Rasmusson, et al., "Azasteroids: Structure–Activity Relationships for Inhibition . . . ", J. Med. Chem., vol. 29, pp. 2298–2315 (1986).

Rasmusson, et al., "Azasteroids as Inhibitors of Rat Prostatic 5–Alpha Reductase", J. Med. Chem., vol. 27, pp. 1690–1701 (1984).

Rittmaster, et al., "The Effects of N,N–Diethyl–4–Methyl–3–Oxo–4–Aza–5–Alpha Androstane . . . " J. Clin. Endo. & Metab., vol. 65, pp. 188–193 (1987).

Metcalf, et al., "Potent Inhibition of Human Steroid 5 Alpha–Reductase . . . ", Bioorganic Chem., vol. 17, pp. 372–376 (1986).

Levy, et al., "Inhibition of Rat Liver Steroid 5 Alpha–Reductase by 3–Androstene . . . ", Biochemistry, vol. 29, pp. 2815–2824 (1990).

Holt, et al., "Steroidal A Ring Aryl Carboxylic Acids . . . ", J. Med. Ch vol. 33, pp. 937–942 (1990).

Levy, et al., "Interaction Between Rat Prostatic Steroid 5 Alpha Reductase . . . ", J. Steroid Biochem, vol., 34, pp. 571–575 (1989).

Holt, et al., "Inhibition of Steroid 5 Alpha–Reductase by Unsaturated.", J. Med. Chem., vol. 33, pp. 943–950 (1990).

Metcalf, et al., "Inhibitors of Steroid 5 Alpha Reductase in Benign . . . ", TIPS, vol. 10, pp. 491–495 (1989).

Murphy, et al., "The Effect of Estradiol on a 25–Hydroxycholecalciferol Binding Protein . . . ", Steroids, vol. 35, pp. 1–7 (1980).

Diani, et al., "Hair Growth Effects of Oral Administration of Finasteride, a Steroid . . . ", J. Clin. Endo. & Metab., vol. 74, pp. 345–350 (1992).

Presti, Jr., et al., "Multicenter, Randomized, Double–Blind, Placebo Controlled Study . . . ", J. Urology.

Gormley, et al., "A Placebo Controlled Study of Finasteride (MK–906) on Stage D Prostate Cancer", Abst. of talk at Amer. Urol. Assoc. Mtg. in Canada (1991).

Gormley, et al., "Role of 5 Alpha Reductase Inhibitors in Treatment of Advanced Prostatic Carcinoma", Urol. Clinics of N. Amer., vol. 18, pp. 93–98 (1991).

Gormley, et al., "Effect of Finasteride on Serum PSA Levels in Men w/Prostate Cancer", 2nd Intnl. (Jan. 18, 1992).

Huggins, et al., "Studies on Prostatic Cancer", Cancer Research, pp. 293–297 (1941).

Rainwater, et al., "Prostate–Specific Antigen Testing in Untreated & Treated . . . ", Mayo Clinic Proc., vol. 65, pp. 1118–1126 (1990).

Arai, et al., "Prognostic Significance of Prostate Specific Antigen in Endocrine . . . ", J. of Urol., vol. 144, pp. 1415–1419 (1990).

Hudson, et al., "Clinical Use of Prostate Specific Antigen in Patients with Prostate Cancer", J. of Urol., vol. 142, pp. 1011–1017 (1989).

Brawer, et al., "Prostate–Specific Antigen in Management of Prostatic Carcinoma", Supp. to Urology, vol. 33, pp. 11–16 (1989).

Stamey, et al., "Prostate–Specific Antigen as a Serum Marker for Adenocarcinoma . . . ", N. E. Jour. Med., vol. 317, pp. 909–916 (1987).

Walsh, et al., "The Value of Prostate–Specific Antigen in the Management . . . ", Ther. Prog. Urol. Can., pp. 27–33 (1989).

Stamey, et al., "Prostate Specific Antigen in the Diagnosis and Treatment of Adenocarcinoma . . . ", J. of Urology, vol. 141, pp. 1070–1075 (1989).

Lange, et al., "The Value of Serum Prostate Specific Antigen Determinations . . . ", J. of Urol., vol. 141, pp. 873–879 (1989).

Hoehn, et al., "Human Prostatic Adenocarcinoma", The Prostate I, pp. 95–104 (1980).

Helliker, "Alopecia Sufferers Seek to Suffer Less . . . ", Wall Street Journal pp. A1–A7 (1991).

Chemical Engineering News, pp. 7–8 (29 Jun. 1992).

Allen & Hanburys Limited (Hayes') Appl (1977) RPC 113.

Television Transcript, News 4 New York Live at Five, WNBC–TV, NY, S. Simmons and M. Gomez (Nov. 29, 1993).

5,571,817

1

# METHODS OF TREATING ANDROGENIC ALOPECIA WITH FINASTERIDE [17β-N-MONO-SUBSTITUTED-CARBAMOYL-4-AZA-5-α-ANDROST-1-EN-ONES]

The instant application is a continuation of Ser. No. 08/016,476, filed Feb. 10, 1993, now abandoned; which was a continuation of Ser. No. 07/927,256, filed Aug. 7, 1992, now abandoned; which was a continuation of Ser. No. 07/698,374, filed May 5, 1991, now abandoned; which was a continuation of Ser. No. 07/545,676, filed Jun. 28, 1990, now abandoned; which was a continuation of Ser. No. 07/370,142, filed Jun. 21, 1989, now abandoned; which was a continuation of Ser. No. 07/198,708, filed May 19, 1988, now abandoned; which was a continuation of Ser. No. 07/034,806, filed Apr. 3, 1987, now abandoned; which was a continuation-in-part of Ser. No. 06/800,623, filed Nov. 21, 1985 now U.S. Pat. No. 4,760,071; which was a continuation of Ser. No. 06/584,062, filed Feb. 27, 1984, now abandoned.

## BACKGROUND OF THE INVENTION

The present invention is concerned with novel 17β-N-monosubstituted-carbamoyl-4-aza-5α-androst-1-ene-3-one compounds and the use of such compounds as testosterone-5α-reductase inhibitors for the treatment of androgenic alopecia, including male pattern alopecia.

## DESCRIPTION OF THE PRIOR ART

It is well known in the an that certain undesirable physiological manifestations, such as acne vulgaris, seborrhea, female hirsutism, male pattern baldness and benign prostatic hypertrophy, are the result of hyperandrogenic stimulation caused by an excessive accumulation of testosterone or similar androgenic hormones in the metabolic system. Early attempts to provide a chemotherapeutic agent to counter the undesirable results of hyperandrogenicity resulted in the discovery of several steroidal antiandrogens having undesirable hormonal activities of their own. The estrogens, for example, not only counteract the effect of the androgens but have a feminizing effect as well. Non-steroidal anti-androgens have also been developed, for example, 4'-nitro-3'-trifluoromethylisobutyranilide. See Neri et al., Endo., Vol. 91, No. 2 (1972). However, these products, though devoid of hormonal effects, are peripherally active, competing with the natural androgens for receptor sites, and hence have a tendency to feminize a male host or the male fetus of a female host.

It more recently became known in the art that the principal mediator of androgenic activity in some target organs is 5α-dihydrotestosterone, and that it is formed locally in the target organ by the action of testosterone-5α-reductase. It therefore has been postulated and demonstrated that inhibitors of testosterone-5α-reductase will serve to prevent or lessen symptoms of hyperandrogenic stimulation. Nayfe et al., Steroids, 14, 269 (1969) demonstrated in vitro that methyl 4-androsten-3-one-17β-carboxylate was a testosterone-5α-reductase inhibitor. Then Voigt and Hsia, Endocrinology, 92, 1216 (1973), Canadian Pat. No. 970,692, demonstrated that the above ester and the parent free acid, 4-androsten-3-one-17β-carboxylic acid are both active inhibitors of testosterone-5α-reductase in vitro. They further demonstrated that topical application of either testosterone or 5α-dihydrotestosterone caused enlargement of the female hamster flank organ, an androgen dependent sebaceous

2

structure. However, concommitant administration of 4-androsten-3-one-17β-carboxylic acid or its methyl ester inhibited the response elicited by testosterone but did not inhibit the response elicited by 5α-dihydrotestosterone. These results were interpreted as indicating that the compounds were antiandrogenic by virtue of their ability to inhibit testosterone-5α-reductase.

A number of 4-aza steroid compounds are known. See, for example, U.S. Pat. Nos. 2,227,876; 3,239,417; 3,264,301; and 3,285,918; French Pat. No. 1,465,544; Doorenbos and Solomons, J. Pharm. Sci. 62, 4, pp. 638–640 (1973); Doorenbos and Brown, J. Pharm. Sci., 60 8, pp. 1234–1235 (1971); and Doorenbos and Kim, J. Pharm. Sci. 63, 4, pp. 620–622 (1974).

In addition U.S. Pat. Nos. 4,377,584 and 4,220,775 of Rasmusson et al. describe a group of 4-aza-17β-substituted-5α-androstan-3-ones which are said to be useful in the treatment of hyperandrogenic conditions. However, none of the cited references suggest that any of the novel 17βN-(monosubstituted) carbamoyl-4-aza-5α-androst-1-en-3-ones of the present invention would have utility as highly potent testosterone-5α-reductase inhibitors.

## DESCRIPTION OF THE INVENTION

The present invention is concerned with novel 17β-N-(monosubstituted)-carbamoyl-4-aza-5α-androsten-1-en-3-one compounds, processes for their preparation, pharmaceutical formulations comprising the novel compounds as active ingredients and methods of inhibiting testosterone-5α-reductase and of treating androgen sensitive conditions with the novel compounds or their pharmaceutical formulations.

The present invention is concerned with compounds of the formula:



wherein $R^1$ is hydrogen, methyl or ethyl.

$R^2$ is a hydrocarbon radical selected from straight and branched chain alkyl of from 1–12 carbons or monocyclic aryl optionally containing 1 or more lower alkyl substituents of from 1–2 carbon atoms and/or 1 or more halogen (Cl, F or Br) substituents.

$R'$ is hydrogen or methyl.

$R''$ is hydrogen or β-methyl.

$R'''$ is hydrogen, α-methyl or β-methyl.

5,571,817

**3**

A preferred embodiment of the novel compounds of our invention is represented by the formula:



wherein $R^1$ is hydrogen, methyl or ethyl, and $R^3$ is branched chain alkyl of from 4–8 carbons.

Representative compounds of the present invention include the following:

17β-(N-tertbutylcarbomoyl)-4-aza-4-methyl-5-α-androst-1-en-3-one,

17β-(N-isobutylcarbamoyl)-4-aza-4-methyl-5-α-androst-1-en-3-one,

17β-(N-tert-octylcarbomoyl)-4-aza-4-methyl-5α-androst-1-en-3-one,

17β-(N-octylcarbamoyl)-4-aza-4-methyl-5α-androst-1-en-3-one,

17β-(n-1,1-diethylbutylcarbamoyl)-4-aza-4-methyl-5-α-androst-1-en-3-one,

17β-(N-neopentylcarbamoyl)-4-aza-4-methyl-5α-androst-1-en-3-one,

17β-(N-tert-amylcarbamoyl)-4-aza-4-methyl-5α-androst-1-en-3-one,

17β-(N-tert-hexylcarbamoyl)-4-aza-4-methyl-5α-androst-1-en-3-one.

and the corresponding compounds wherein the 4-methyl substituent is replaced in each of the above named compounds by a hydrogen or an ethyl radical.

Also included as representative compounds are any of the above indicated compounds having the N-branched chain alkyl substituent replaced by a methyl, ethyl, propyl, i-propyl, butyl, phenyl; 2, 3 or 4 tolyl, xylyl, 2-bromo or 2-chlorophenyl, 2-6-dichloro, or a 2,6-dibromophenyl substituent.

The novel compounds of formula I of the present invention are prepared by a method starting with the known steroid ester of the formula:



17β-(carbomethoxy)-4-aza-5-α-androstan-3-one which includes the stages of 1) dehydrogenating said starting material to produce the corresponding compound containing a double-bond in the 1,2-position of the A-ring, 2) converting the 17-carbomethoxy substituent into an N-monosubstituted carbamoyl substituent and, if desired, 3) alkylating the

**4**

A-ring nitrogen to introduce a N-methyl or 4-ethyl substituent into the A ring. In carrying out the process of the present invention, it is essential that Stage 1 dehydrogenation of the 1,2-position of the steroid A ring be carried out using a 4-aza-5α-androstane-3-one-compound having no substituent other than hydrogen attached to the A-ring nitrogen. Stage 2 may consist of one or more chemical steps and if desired may take place before stage (1) or following stage (1) or stage (3).

In accordance with the process of the present invention, the products of our invention are formed by 1) heating a 17β-alkoxycarbonyl-4-aza-5α-androstan-3-one compound III with a dehydrogenating agent such as benzeneselenic anhydride in refluxing chlorobenzene to form a 17β-alkoxycarbonyl-4-aza-5α-androstan-1-ene-3-one IV, 2) the formed 5α-androst-1-en-3-one compound from Step 1 is reacted with sodium hydride under anhydrous conditions in a neutral solvent such as dimethylformamide, 3) contacting the resulting reaction mixture with an alkyl (methyl or ethyl) iodide to form the corresponding 17-β-alkoxy-carbamoyl-4-alkyl-4-aza-5α-androst-1-en-3-one V, 4) subsequently hydrolyzing said 17β-alkoxycarbonyl-4-alkyl-4-aza-5α-androst-1-en-3-one with a strong base such as aqueous methanolic potassium hydroxide at the reflux temperature, followed by acidification and isolation of the resulting steroidal acid, 17β-carboxy 4-alkyl-4-aza-5α-androst-1-en-3-one VI, 5) said steroidal acid is then converted to its corresponding 2-pyridylthio ester by refluxing with triphenyl phosphine and 2,2'-dipyridyl disulfide in an inert solvent such as toluene and the resulting product 17β-(2-pyridylthiocarbonyl)-4-alkyl-4-aza-5α-androst-1-en-3-one VII is isolated by chromatography on silica gel, 6) said pyridylthio ester is then reacted with ethyl amine in tetrahydrofuran to form the desired products 17β-N-ethylcarbamoyl-4-alkyl-4-aza-5α-androst-1-en-3-one VIII which is isolated by chromatography on silica gel. When the previous reaction is carried out using an amine of formula $R^2NH$ in place of ethyl amine, the corresponding 17β-(N-$R^2$-carbamoyl)-4-alkyl-4-aza-5α-androst-1-en-3-one is prepared.

In accordance with the process of our invention the corresponding 17β-(N-$R^2$-carbamoyl)-4-aza-5α-androst-1-en-3-one XIV is readily prepared from the 17β(alkoxycarbonyl)-4-aza-5α-androstone-3-one IV by repeating the above series of reaction steps but omitting Step 2 herein above i.e. treatment of the 4-aza-5-α-androst-1-en-3-one with sodium amide followed by methyl or ethyl iodide via intermediates XII and XIII.

In accordance with a further alternate process of preparing the compounds of our invention having only hydrogen as the sole substituent on the ring A—nitrogen, the double bond in the A ring is introduced as the last step of the process. Thus, a 17β-alkoxycarbonyl 4-aza-5α-androstan-3-one III is hydrolyzed to the corresponding steroidal acid IX 17β-carboxy-4-aza-5α-androstan-3-one which in turn is converted to the corresponding pyridylthio ester, 17β(2-pyridylthiocarbonyl)-4-aza-5α-androstan-3-one, X followed by treatment of the ester with an amine of formula $R^2$-NH₂ wherein $R^2$ is as defined hereinabove to form a 17β(N-$R^2$-carbamoyl)-4-aza-5α-androstone-3-one XI which is dehydrogenated as previously described to produce compound XIV, 17β-(N-$R^2$-carbamoyl)-4-aza-androst-1-en-3-one.

In another alternate method of introducing the 17β-(N-$R^2$-carbamoyl)substituent into the 17β-carboxy androstane compound of formula VI, XII or IX, each is treated in a manner similar to the procedure described in *Steroids*, Vol. 35 #3, Mar. 1980, p. 1–7 with dicyclohexylcarbodiimide and 1-hydroxybenzotriazole to form the 17β-(1-benzotriaz-

5,571,817

**5**

oloxycarbonyl)-4-aza-5α-androst-1-en-3-one, VII, XIII or X, wherein X is 1-benzotriazoloxy or 17β-(1-benzotriaz-oloxy-carbonyl)-4-aza-5α-androstan-3-one, X.

The above reactions are schematically represented in the following structural formula outline.

**6**

X is pyridylthio or 1-benzotrizoloxy

The compounds of the present invention, prepared in accordance with the method described above, are, as already described, potent anti-androgens by virtue of their ability to specifically inhibit testosterone-5α-reductase.

5,571,817

7

Accordingly, the present invention is particularly concerned with providing a method of treating the hyperandrogenic conditions of androgenic alopecia, including male pattern alopecia, acne vulgaris, seborrhea, and female hirsutism by topical administration, and a method of treating all of the above conditions as well as benign prostatic hypertrophy, by systemic administration, of the novel compounds of the present invention.

The present invention is thus also concerned with providing suitable topical and systemic pharmaceutical formulations for use in the novel methods of treatment of the present invention.

The compositions containing the compounds of the present invention as the active ingredient for use in the treatment of benign prostatic hypertrophy can be administered in a wide variety of therapeutic dosage forms in conventional vehicles for systemic administration, as, for example, by oral administration in the form of tablets, capsules, solutions, or suspensions, or by intravenous injection. The daily dosage of the products may be varied over a wide range varying from 5 to 2,000 mg, preferably from 5 to 200 mg.

The compositions are preferably provided in the form of scored tablets containing 5, 10, 25, 50, 100, 150, 250, and 500 milligrams of the active ingredient for the symptomatic adjustment of the dosage to the patient to be treated. An effective amount of the drug is ordinarily supplied at a dosage level of from about 0.1 mg. to about 50 mg./kg. of body weight per day. Preferably the range is from about 0.1 mg. to 7 mg./kgs. of body weight per day and more preferably from about 0.1 to about 3 mg/kg of body weight per day. These dosages are well below the toxic dose of the product. Capsules containing the product of this invention can be prepared by mixing an active compound of the present invention with lactose and magnesium stearate, calcium stearate, starch, talc, or other carriers, and placing the mixture in gelatin capsule. Tablets may be prepared by mixing the active ingredient with conventional tableting ingredients such as calcium phosphate, lactose, corn starch or magnesium stearate. The liquid forms in suitably flavored suspending or dispersing agents such as the synthetic and natural gums, for example, tragacanth, acacia, methylcellulose and the like. Other dispersing agents which may be employed include glycerin and the like. For parenteral administration, sterile suspensions and solutions are desired. Isotonic preparations which generally contain suitable preservative are employed when intravenous administration is desired.

For the treatment of androgenic alopecia, including male pattern alopecia, acne vulgaris, seborrhea, female hirsutism, the compounds of the present invention are administered in the form of a pharmaceutical composition comprising the active compound in combination with a pharmacologically acceptable carrier adapted for topical administration. These topical pharmaceutical compositions may be in the form of a solution, cream, ointment, gel, lotion, shampoo or aerosol formulation adapted for application to the skin. These topical pharmaceutical compositions containing the compounds of the present invention ordinarily include about 0.1% to 15%, preferably about 0.1 to 5%, and more preferably about 0.1% to. 2%, of the active compound, in admixture with a pharmaceutically acceptable carrier.

The method of preparing the novel compounds and compositions of the present invention, already described above in general terms, may be further illustrated by the following examples.

8

EXAMPLE 1

Methyl
3-oxo-4-aza-5α-androst-1-ene-17β-carboxylate

A suspension of 83.7 g of methyl 3-oxo-4-aza-5α-androstane-17-carboxylate* and 126.5 g of benzeneseleninic anhydride in 2.09 l of chlorobenzene was heated at reflux for 2 hours. The reflux condenser was switched to a distillation head and the mixture was distilled slowly to remove water that had formed in the reaction (2 hours). The solution was evaporated to leave 198 g of wet residue. The residue as a solution in dichloromethane was washed with saturated aqueous NaHCO₃ solution and saturated NaCl solution, then dried and evaporated to leave 172.4 g. This material was chromatographed on 2.56 kg of silica gel eluting first with dichloromethane (5 l) and then with 4:1 dichloromethaneacetone. The desired product eluted after 8 l and amounted to 53.4 g. It was rinsed with diethyl ether and dried to leave 49.5 g, m.p. 278°–280° C. In a similar fashion the following compounds were converted to their corresponding Δ1 derivatives:



| | | m.p. |
|---|---|---|
| 1a | R = CONHC(CH₃)₃ | 252–254° C. |
| 1b | = CONHC(CH₃)₂CH₂C(CH₃)₃ | 224–226° |

*Rasmusson Johnston and Arth. U.S. Pat. No. 4,377,584, Mar. 22, 1983.

EXAMPLE 2

Methyl
4-methyl-3-oxo-4-aza-5α-androst-1-ene-17β-carboxylate

A suspension of 25 g of the product of Example 1 and 2.25 g of sodium hydride in 500 ml of dry dimethylformamide was stirred under nitrogen for 15 minutes. Methyl iodide (15 ml) was added dropwise and the mixture was stirred for 30 minutes at room temperature. Additional (5 ml) methyl iodide was added and the mixture was heated at 50° C. for 2 hours. After cooling the mixture was diluted with water to 2 l. The solid was separated after cooling and amounted to 25.4 g, m.p. 159°–161° C.

5,571,817

**9**

In a similar fashion the following compounds were converted to their corresponding 4-methyl derivatives:



| | | m.p. |
|---|---|---|
| 2a | R = CONHC(CH₃)₂CH₂C(CH₃)₃, androstane | 148–150° C. |
| 2b | = CONHC(CH3)3; Δ1-androstene | 153–155° |
| 2c | = CONHC(CH₃)₂CH₂C(CH₃)₃ Δ1-androstene | 168–170° |

EXAMPLE 3

S-(2-Pyridyl)
4-methyl-3-oxo-4-aza-5α-androst-1-ene-17β-thiocarboxylate

A suspension of 25 g of the product of Step in 125 ml of methanol was treated with a solution of KOH (*12.5 g) in 12.5 ml of water. After refluxing for 4 hours, the solution was acidified with 6 NHCl and then was diluted with water. The crude acid (23.32 g) was separated, dried and had m.p. 300° C.

The crude, dry acid (23 g), triphenylphosphine (36.45 g) and 2,2'-dipyridyldisulfide (30.4 g) were suspended in 138 ml of toluene with stirring for 3 hours at room temperature. The reaction mixture was directly chromatographed on a column of 4.5 kg of silica gel eluting with 9:1 ethyl acetate-acetone to give 20.4 g of the desired product, m.p. 218°–220° C.

Continued elution with acetone gave 5.2 g of the methanol addition product, S-(2-pyridyl) 1α-methoxy-4-methyl-3-oxo-4-aza-5α-androstane-17β-thio-carboxylate, m.p. 221°–223° C. as a by-product.

3A. In a similar fashion the product of Example 1 was converted into S-(2-pyridyl) 3-oxo-4-aza-5α-androst-1-ene-17β-thiocarboxylate, m.p. 230°–232° C.

3B. In a similar manner methyl 3-oxo-4-aza-5α-androstane 17-carboxylate was converted into S-(2-pyridyl) 3-oxo-4-aza-5α-androstane-7β-thiocarboxylate, m.p. 232°–234° C.

EXAMPLE 4

N-t-butyl
4-methyl-3-oxo-4-aza-5α-androst-1-ene-17β-carboxamide, m.p. 152°–154° C.

Anhydrous et-butylamine was bubbled for 30 added into a suspension of 2.5 g of the pyridylthioester of Example 3

**10**

in 70 ml of tetrahydrofuran. After 60 minutes exposure, the resulting solution was evaporated and the residue was chromatographed on 125 g of silica gel. Elution with 20:1 ethyl acetate dichloromethane afforded 1.5 g of the product, m.p. 152°–154° C.

When the example is repeated using an appropriate amine and an appropriate pyridylthioester, the following products were obtained:

4b: N-t-butyl 3-oxo-4-aza-5α-androstane-17β-carboxamide, m.p. 275°–276° C.

4c: N-(2,4,4-trimethyl-2-pentyl) 4-methyl-3-oxo-4-aza-5α-androst-1-ene-17β-carboxamide, m.p. 168°–170° C.

EXAMPLE 5

5-Oxo-3,5-secoetian-3,20-dioic acid

To a solution of 200 g of 3-oxo-4-etien-20-oic acid in 3.5 l of t-butanol at 80° was added a solution of 198.4 g of sodium carbonate in 474 ml of water. A warm (65° C.) solution of 948.5 g of sodium metaperiodate and 6.95 g of permanganate in 3.5 l of water was added at such a rate that the reaction mixture was maintained at 80° C. After addition the mixture was heated at reflux for one hour. The mixture stood at room temperature overnight. The inorganic salts were removed by filtration and the cake was washed with 225 ml of water. A solution of 5% aqueous sodium bisulfite was added to reduce the iodine that was present. The t-butanol was removed under reduced pressure and the aqueous residue was acidified with conc. hydrochloric acid. The separated gum was extracted with dichloromethane and was washed with 5% aqueous sodium bisulfite, saturated sodium chloride solution, then dried and concentrated to an off-white residue (214 g). Crystalline material was obtained by suspending the residue in ether and diluting with hexane to give 152 g, m.p. 189°–192° C.

EXAMPLE 5B

3-Oxo-4-aza-5-etien-20-oic acid

A suspension of 64.7 g of the dioic acid of Step 5 in 350 ml of ethylene glycol was treated with 80 ml of liquid ammonia. The resulting solution was heated at a rate of 3°/min. up to 180° C. and was held at that temperature for 15 minutes. After cooling, 1 liter of water was added and the mixture was acidified with 10% hydrochloric acid to a pH of 1.5. The product was removed and washed with water, then air dried to leave 57.5 g of the product, m.p. 310° C.

EXAMPLE 5C

3-Oxo-4-aza-5α-etian-20-oic acid

A solution of 136 g of the Δ5-acid of Example 5B in 16.32 ml of acetic acid was hydrogenated at 60° C. in the presence of platinum catalyst (from 16.32 g of PtO₂) at 40 psig for 3 hours. The catalyst was removed and the solution concentrated to give 128.2 g of crude product. The material was washed well with 3 l of water then filtered an air dried to leave 125 g of the white solid, m.p. 310°.

This material is also obtained by saponification of methyl 3-oxo-4-aza-5α-androstane-17β-carboxylate (methyl 3-oxo-4-aza-5α-etien-20-oate) in 7% methanolic potassium hydroxide followed by an acidic work-up.

5,571,817

**11**

EXAMPLE 5D

N-(2,4,4-trimethyl-2-pentyl)
3-oxo-4-aza-5α-androstane-17β-carboxamide

A solution of 5.0 g of the product of Example 5C, 3.35 g of dicyclohexylcarbodiimide and 3.18 g of 1-hydroxybenz-triazole in 500 ml of dichloromethane was stirred at room temperature overnight. The solid was separated by filtration and the filtrate was treated with 2,4,4-trimethyl-2-penty-lamine (ι-octylamine). This solution stood at room tempera-ture for 64 hours. A small amount of solid was removed and the solution was washed successively with 10% aqueous sodium hydroxide, water, 10% hydrochloric acid and satu-rated aqueous sodium chloride. After drying and concentra-tion the crude product was eluted through 240 g of silica gel with 3:7 acetone-dichloromethane to give 5.5 g of the product, m.p. 250°–251° C.

EXAMPLE 5E

Example 5D is repeated using t-butylamine in place of 2,2,4-trimethyl-2-pentylamine to obtain N-t-butyl 3-oxo-4-aza-5α-androstane-17β-carboxamide, m.p. 274°–276° C.

EXAMPLE 6
Alcoholic Solution

| | |
|---|---|
| 17β-(N-tertbutylcarbamoyl)-4-aza-5α-androst-1-en-3-one | 15.0% by weight |
| Water | 45 |
| Ethyl Alcohol | 40 |

EXAMPLE 7
Topical Cleanser

| | |
|---|---|
| 17β-(N-tertbutylcarbamoyl)-4-aza-5α-androst-1-en-3-one | 10.00% by weight |
| Water | 70.439 |
| Chamomile | 0.01 |
| Aloe vera gel | 0.01 |
| Allantoin | 0.001 |
| Triethanolomine | 0.02 |
| METHOCEL ® 40-100 (Dow) | 1.50 |
| Glycerine | 3.00 |
| Sodium lauryl sulfate | 15.00 |
| Vitamin A Oil | 0.01 |
| Vitamin E Oil | 0.01 |

EXAMPLE 8
Cleansing Cream

| | |
|---|---|
| 17β-(N-tertbutylcarbamoyl)-4-aza-5α-androst-1-en-3-one | 5.0% by weight |
| Synthetic beeswax | 14.0 |
| PPG2 Myristyl propionate | 5.0 |
| Lanolin Alcohol | 0.5 |
| Mineral Oil | 36.0 |
| Propyl Paraben | 0.15 |
| Sodium Borate | 1.0 |
| Water | 38.35 |

**12**

EXAMPLE 9
Skin Gel

| | |
|---|---|
| 17β-(N-tertbutylcarbamoyl)-4-aza-5α-androst-1-en-3-one | 2.00% by weight |
| PPG2 Myristyl Ether Propionate | 45.00 |
| PPG10 Cetyl Ether | 5.00 |
| C18–C36 Triglyceride | 4.00 |
| Myristyl Myristate | 3.00 |
| Glyceryl Tribebenate | 2.00 |
| Cyclomethicone | 34.00 |
| Polyethylene | 5.00 |

EXAMPLE 10
Skin Lotion

| | |
|---|---|
| 17β-(N-tertbutylcarbamoyl)-4-aza-5α-androst-1-en-3-one | 1.0% by weight |
| DEA Oleth 3 Phosphate | 1.0 |
| Emulsifying Wax | 2.0 |
| C18–C36 Wax Fatty Acids | 1.0 |
| PPG2 Myristyl Propionate | 5.0 |
| Glycerine | 3.0 |
| Triethanolamine | 0.5 |
| Water | 86.5 |

EXAMPLE 11
Shampoo Gel

| | |
|---|---|
| 17β-(N-tertbutylcarbamoyl)-4-aza-5α-androst-1-en-3-one | 2.0% by weight |
| Isopropanolamine Lauryl Sulfate | 81.5 |
| Cocoamide DEA | 8.0 |
| C18–C36 Wax Acid Glyceryl Ester | 4.5 |
| PPG5 Ceteth 10 Phosphate | 4.0 |

EXAMPLE 12
Cream Shampoo

| | |
|---|---|
| 17β-(N-tertbutylcarbamoyl)-4-aza-5α-androst-1-en-3-one | 0.1% by weight |
| Sodium Laureth Sulfate | 65.0 |
| Glyceryl Tribebenate | 2.0 |
| Hydrolysed Collagen | 1.0 |
| Lauric Diethanolamide | 5.0 |
| Water | 26.9 |

What is claimed is:

1. A method of treating androgenic alopecia which com-prises orally administering to a human in need of such treatment a therapeutically effective amount of 17β-(N-tert-butylcarbamoyl)-4-aza-5α-androst-1-en-3-one.

2. The method of claim **1** wherein the androgenic alopecia is male pattern alopecia.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 5,571,817

DATED       : November 5, 1996

INVENTOR(S) : Gary H. Rasmusson et al.

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, item [54] and column 1, the title of the invention should read --METHODS OF TREATING ANDROGENIC ALOPECIA WITH FINASTERIDE--

Signed and Sealed this

Eleventh Day of March, 1997

*Attest:*

BRUCE LEHMAN

*Attesting Officer*                    *Commissioner of Patents and Trademarks*

# EXHIBIT B

# REGULAR UTILITY

Form PTO-436
(Rev. 8/78)

| SERIAL NUMBER (series of 1979) | | PATENT DATE | NUMBER |
|---|---|---|---|
| 584062 | | | PATENT |

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 06/584,062 | 02/27/84 | 424 | | 123 | |

APPLICANTS: GARY H. RASMUSSON, WATCHUNG, NJ; GLENN F. REYNOLDS, WESTFIELD, NJ.

```
**CONTINUING DATA*********************
  VERIFIED

  ---------
```

```
**FOREIGN/PCT APPLICATIONS************
  VERIFIED

  -------
```

N FILING LICENSE GRANTED 03/26/84

| ...ty claimed conditions met | | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| ☐ yes ☐ no ☐ yes ☐ no | | | NJ | 0 | 12 | 4 | $ 330.00 | 16986 |

Verified and Acknowledged    Examiner's Initials

ADDRESS:
THOMAS E. ARTHER
PAT. DEPT., MERCK & CO., INC.
P.O. BOX 2000
RAHWAY, NJ 07065

TITLE: 17BETA-N-MONOSUBSTITUTED CARBAMOYL-4-AZA-5ALPHA-ANDROST-1-EN-3-ONE OF THE FORMULA

U.S. DEPT. of COMM.-Pat. & TM Office — PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | | | | | PREPARED FOR ISSUE | |
|---|---|---|---|---|---|---|
| | | | | | (Assistant Examiner) | (Docket Clerk) |
| AT ALLOWANCE | | | | | EXAMINED AND PASSED FOR ISSUE | |
| SHEETS DRWGS. | FIGURES DRWGS. | CLAIMS | CLASS | SUBCLASS | (Primary Examiner) | (Art Unit) |
| | | | | | Estimate of printed pages | Issue fee due (est |
| | | | | | Drawing(s) Spec(s) | |
| | | | | | Notice of allowance and issue fee due (est.) | |
| | | | | | Date mailed | Date paid |

RETENTION LABEL

2100P/0582

- 1 -                          16986

### TITLE OF THE INVENTION

17β-N-MONOSUBSTITUTED CARBAMOYL-4-AZA-5α-ANDROST-1-EN-3-ONES OF THE FORMULA:

5    ### BACKGROUND OF THE INVENTION

The present invention is concerned with novel 17β-N-monosubstituted carbamoyl-4-aza-5α-androst-1-en-3-one compounds and the use of such compounds as testosterone-5α-reductase inhibitors.

10

### DESCRIPTION OF THE PRIOR ART

It is well known in the art that certain undesirable physiological manifestations, such as acne vulgaris, seborrhea, female hirsutism, and male

15    pattern baldness and benign prostatic hypertrophy, are the result of hyperandrogenic stimulation caused by an excessive accumulation of testosterone or similar androgenic hormones in the metabolic system. Early attempts to provide a chemotherapeutic agent to

20    counter the undesirable results of hyperandrogenicity

- 10 -                16986

The compounds of the present invention, prepared in accordance with the method described above, are, as already described, potent antiandrogens by virtue of their ability to
5   specifically inhibit testosterone-5α-reductase.

Accordingly, the present invention is particularly concerned with providing a method of treating the hyperandrogenic conditions of acne vulgaris, seborrhea, and female hirsutism by topical
10  administration, and a method of treating all of the above conditions as well as benign prostatic hypertrophy, by parenteral administration, of the novel compounds of the present invention.

The present invention is thus also concerned
15  with providing suitable topical and parenteral pharmaceutical formulations for use in the novel methods of treatment of the present invention.

The compositions containing the compounds of the present invention as the active ingredient for
20  use in the treatment of benign prostatic hypertrophy can be administered in a wide variety of therapeutic dosage forms in conventional vehicles for systemic administration, as, for example, by oral administration in the form of tablets, capsules,
25  solutions, or suspensions, of by intravenous injection. The daily dosage of the products may be varied over a wide range varying from 50 to 2,000 mg. The compositions are preferably provided in the form of scored tablets containing 5, 10, 25, 50, 100, 150,
30  250, and 500 milligrams of the active ingredient for the symptomatic adjustment of the dosage to the patient to be treated. An effective amount of the drug is ordinarily supplied at a dosage level of from

- 11 -                16986

about 1 mg. to about 50 mg./kg. of body weight per
day.  Preferably the range is from about 1 mg. to 7
mg./kgs. of body weight per day.  These dosages are
well below the toxic dose of the product.  Capsules
5   containing the product of this invention can be
prepared by mixing an active compound of the present
invention with lactose and magnesium stearate,
calcium stearate, starch, talc, or other carriers,
and placing the mixture in gelatin capsule.  Tablets
10  may be prepared by mixing the active ingredient with
conventional tableting ingredients such as calciuim
phosphate, lactose, corn starch or magnesium
stearate.  The liquid forms in suitably flavored
suspending or dispersing agents such as the synthetic
15  and natural gums, for example, tragacanth, acacia,
methyl-cellulose and the like.  Other dispersing
agents which may be employed include glycerin and the
like.  For parenteral administration, sterile
suspensions and solutions are desired.  Isotonic
20  preparations which generally contain suitable
preservative are employed when intravenous
administration is desired.

For the treatment of acne vulgaris,
seborrhea, female hirsutism, the compounds of the
25  present invention are administered in the formula of
pharmaceutical composition comprising the active
compound in combination with a pharmacologically
acceptable carrier adapted for topical administration.
These topical pharmaceutical compositions may be in
30  the form of a cream, ointment, gel or aerosol
formulation adapted for application to the skin.
These topical pharmaceutical compositions containing

# EXHIBIT C

| SERIAL NUMBER (Series of 1997) 034806 | PATENT DATE | PATENT NUMBER |
|---|---|---|

| SERIAL NUMBER 07/034,806 | FILING DATE 04/03/87 | CLASS 544 | SUBCLASS 77 | GROUP ART UNIT 125 | EXAMINER |
|---|---|---|---|---|---|

**APPLICANTS**

GARY H. RASMUSSON, WATCHING, NJ; GLENN F. REYNOLDS, WESTFIELD, NJ.

```
**CONTINUING DATA********************
   VERIFIED      THIS APPLN IS A CIP OF  06/800,623 11/21/85
                 WHICH IS A CON OF  06/584,062 02/27/84  ABN
   D/R
```

```
**FOREIGN/PCT APPLICATIONS************
   VERIFIED
   D/R
```

FOREIGN FILING LICENSE GRANTED 05/12/87

| Foreign priority claimed ☐ yes ☒ no | AS FILED → | STATE OR COUNTRY NJ | SHEETS DRWGS. 0 | TOTAL CLAIMS 11 | INDEP. CLAIMS 2 | FILING FEE RECEIVED $ 340.00 | ATTORNEY'S DOCKET NO. 16986TA |
|---|---|---|---|---|---|---|---|
| 35 USC 119 conditions met. ☐ yes ☐ no | | | | | | | |
| Verified and Acknowledged   Examiner's initials | | | | | | | |

**ADDRESS**

CHARLES M. CARUSO
PATENT DEPARTMENT
MERCK & CO., INC.
P.O. BOX 2000
RAHWAY, NJ 07065-0907

**TITLE**

TREATMENT OF ANDROGENIC ALOPECIA WITH 17BETA-N-MONOSUBSTITUTED-
CARBAMOYL-4-AZA-5ALPHA-ANDROST-1-EN-3-ONES

U.S. DEPT. of COMM.-Pat. & TM Office — PTO-436L (rev. 10-78)

**PARTS OF APPLICATION FILED SEPARATELY**

| NOTICE OF ALLOWANCE MAILED | PREPARED FOR ISSUE | | CLAIMS ALLOWED | | |
|---|---|---|---|---|---|
| | Assistant Examiner | Docket Clerk | Total Claims | Print Claim | |
| **ISSUE FEE** | | | **DRAWING** | | |
| Amount Due | Date Paid | | Sheets Drwg. | Figs. Drwg. | Print Fig. |
| | | Primary Examiner | | | |
| | **ISSUE CLASSIFICATION** | | ISSUE BATCH NUMBER | | |
| | Class | Subclass | | | |
| Label Area | | | | | |

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436
(Rev. 9/86)

5283P/5021A

– 1 –                    16986IB

TITLE OF THE INVENTION

METHODS OF TREATING ANDROGENIC ALOPECIA WITH
17β-N-MONOSUBSTITUTED-CARBAMOYL-4-AZA-5α-
ANDROST-1-EN-3-ONES

5

BACKGROUND OF THE INVENTION

~~This is a continuation-in-part of application~~
Serial No. 800,623, filed November 21, 1985, which in
turn is a continuation of application Serial No.
10   ~~584,062, filed February 27, 1984.~~

The present invention is concerned with
novel 17β-N-monosubstituted-carbamoyl-4-aza-5α-
androst-1-en-3-one compounds and the use of such
compounds as testosterone-5α-reductase inhibitors
15   for the treatment of androgenic alopecia, including
male pattern alopecia.

DESCRIPTION OF THE PRIOR ART

It is well known in the art that certain
20   undesirable physiological manifestations, such as
acne vulgaris, seborrhea, female hirsutism, male
pattern baldness and benign prostatic hypertrophy,

5283P/5021A                 - 2 -                16986IB

are the result of hyperandrogenic stimulation caused
by an excessive accumulation of testosterone or
similar androgenic hormones in the metabolic system.
Early attempts to provide a chemotherapeutic agent to
5    counter the undesirable results of hyperandrogenicity
resulted in the discovery of several steroidal
antiandrogens having undesirable hormonal activities
of their own.  The estrogens, for example, not only
counteract the effect of the androgens but have a
10   feminizing effect as well.  Non-steroidal anti-
androgens have also been developed, for example,
4'-nitro-3'-trifluoromethylisobutyranilide.  See Neri
et al., Endo., Vol. 91, No. 2 (1972).  However, these
products, though devoid of hormonal effects, are
15   peripherally active, competing with the natural
androgens for receptor sites, and hence have a
tendency to feminize a male host or the male fetus of
a female host.

It more recently became known in the art
20   that the principal mediator of androgenic activity in
some target organs is 5α-dihydrotestosterone, and
that it is formed locally in the target organ by the
action of testosterone-5α-reductase.  It therefore
has been postulated and demonstrated that inhibitors
25   of testosterone-5α-reductase will serve to prevent
or lessen symptoms of hyperandrogenic stimulation.
Nayfe et al., Steroids, 14, 269 (1969) demonstrated
in vitro that methyl 4-androsten-3-one-17β-
carboxylate was a testosterone-5α-reductase
30   inhibitor.  Then Voigt and Hsia, Endocrinology, 92,
1216 (1973), Canadian Pat. No. 970,692, demonstrated
that the above ester and the parent free acid,

5283P/5021A            – 11 –            16986IB

      The compounds of the present invention,
prepared in accordance with the method described
above, are, as already described, potent anti-
androgens by virtue of their ability to specifically
5  inhibit testosterone-5α-reductase.

      Accordingly, the present invention is
particularly concerned with providing a method of
treating the hyperandrogenic conditions of androgenic
alopecia, including male pattern alopecia, acne
10  vulgaris, seborrhea, and female hirsutism by topical
administration, and a method of treating all of the
above conditions as well as benign prostatic
hypertrophy, by systemic administration, of the novel
compounds of the present invention.

15      The present invention is thus also concerned
with providing suitable topical and systemic
pharmaceutical formulations for use in the novel
methods of treatment of the present invention.

      The compositions containing the compounds of
20  the present invention as the active ingredient for
use in the treatment of benign prostatic hypertrophy
can be administered in a wide variety of therapeutic
dosage forms in conventional vehicles for systemic
administration, as, for example, by oral
25  administration in the form of tablets, capsules,
solutions, or suspensions, of by intravenous
injection.  The daily dosage of the products may be
varied over a wide range varying from 5 to 2,000 mg,
preferably from 5 to 200 mg.

30      The compositions are preferably provided in
the form of scored tablets containing 5, 10, 25, 50,
100, 150, 250, and 500 milligrams of the active
ingredient for the symptomatic adjustment of the

5283P/5021A                 - 12 -                16986IB

dosage to the patient to be treated.  An effective
amount of the drug is ordinarily supplied at a dosage
level of from about 0.1 mg. to about 50 mg./kg. of
body weight per day.  Preferably the range is from
5      about 0.1 mg. to 7 mg./kgs. of body weight per day
and more preferably from about 0.1 to about 3 mg/kg
of body weight per day.  These dosages are well below
the toxic dose of the product.  Capsules containing
the product of this invention can be prepared by
10     mixing an active compound of the present invention
with lactose and magnesium stearate, calcium stearate,
starch, talc, or other carriers, and placing the
mixture in gelatin capsule.  Tablets may be prepared
by mixing the active ingredient with conventional
15     tableting ingredients such as calcium phosphate,
lactose, corn starch or magnesium stearate.  The
liquid forms in suitably flavored suspending or
dispersing agents such as the synthetic and natural
gums, for example, tragacanth, acacia, methyl-
20     cellulose and the like.  Other dispersing agents
which may be employed include glycerin and the like.
For parenteral administration, sterile suspensions
and solutions are desired.  Isotonic preparations
which generally contain suitable preservative are
25     employed when intravenous administration is desired.
            For the treatment of androgenic alopecia,
including male pattern alopecia, acne vulgaris,
seborrhea, female hirsutism, the compounds of the
present invention are administered in the form of a
30     pharmaceutical composition comprising the active
compound in combination with a pharmacologically
acceptable carrier adapted for topical administration.

# EXHIBIT D

⑲ Europäisches Patentamt
European Patent Office
Office européen des brevets

⑪ Publication number: **0 155 096**
A2

⑫ **EUROPEAN PATENT APPLICATION**

㉑ Application number: 85301122.9

㉒ Date of filing: 20.02.85

⑤ Int. Cl.⁴: **C 07 J 73/00,** A 61 K 31/435

---

㉚ Priority: **27.02.84 US 584062**
**27.02.84 US 584061**

㊸ Date of publication of application: **18.09.85**
Bulletin 85/38

㉨ Designated Contracting States: **AT BE CH DE FR GB IT LI LU NL SE**

㉛ Applicant: **MERCK & CO. INC., 126, East Lincoln Avenue P.O. Box 2000, Rahway New Jersey 07065 (US)**

㉒ Inventor: **Rasmusson, Gary H., 155 Park Place, Watchung New Jersey 07060 (US)**
Inventor: **Reynolds, Glenn F., 252 Edgewood Avenue, Westfield New Jersey 07090 (US)**

㉙ Representative: **Crampton, Keith John Allen et al, D YOUNG & CO 10 Staple Inn, London WC1V 7RD (GB)**

---

㊹ **17 Beta-Substituted-4-aza-5-alpha-androstenones and their use as 5-alpha-reductase inhibitors.**

㊿ 17β-N-monosubstituted carbamoyl or 17β-acyl-4-aza-5α--androst-1-en-3-ones of the formula:



or

in which R is hydrogen, methyl or ethyl;
$R^2$ is a $C_{1\text{-}12}$ straight or branched alkyl radical or a monocyclic aryl optionally containing one or more methyl or ethyl substituents and/or one or more Cl, F or Br substituents; and in Formula IA $R^2$ may also be benzyl, phenethyl, 2-pyridyl, 4-pyridyl, 2-pyrroIyl, 2-furyl or thiophenyl;
R' is hydrogen or methyl;
R'' is hydrogen or β-methyl and in Formula IA may also be α-methyl; and

R''' is hydrogen, α-methyl or β-methyl and pharmaceutical formulations containing the above compounds are active as testosterone 5α-reductase inhibitors and thus are useful topically for treatment of acne, seborrhoea and female hirsutism, and systemically in the treatment of benign prostatic hypertrophy.

EP 0 155 096 A2

ACTORUM AG

0155096

1

## 17β-substituted-4-aza-5α-androstenones
## and their use as 5α-reductase inhibitors

The present invention is concerned with 17β-substituted-4-aza-5α-androstenones, their preparation, and their use as testosterone-5α-reductase inhibitors.

5      It is well known that certain undesirable physiological manifestations, such as acne vulgaris, seborrhoea, female hirsutism, and male pattern baldness and benign prostatic hypertrophy, are the result of hyperandrogenic stimulation caused by an excessive accumulation of testosterone or similar androgenic hormones in the metabolic system. Early attempts to provide a chemotherapeutic agent to counter the undesirable results of

10     hypernadrogenicity resulted in the discovery of several steroidal antiandrogens having undesirable hormonal activities of their own. The oestrogens, for example, not only counteract the effect of the androgens but have a feminizing effect as well. Non-steroidal antiandrogens have also been developed, for example, 4'-nitro-3'-trifluoromethylisobutyranilide [See

15     Neri et al., Endo., Vol. 91, No. 1 (1972)]. However, these products, though devoid of hormonal effects, are peripherally active, competing with the natural androgens for receptor sites, and hence have a tendency to feminize a male host or the male foetus of a female host.

It more recently become known that the principal mediator of

20     androgenic activity in some target organs is 5α-dihydrotestosterone, and that this is formed locally in the target organ by the action of testosterone-5α-reductase. It was therefore postulated and has been demonstrated that inhibitors of testosterone-5α-reductase serve to prevent or lessen symptoms of hyperandrogenic stimulation. Nayfe at al., [Steroids, 14, 269 (1969)]

25     demonstrated that methyl 4-androsten-3-one-17β-carboxylate was a testosterone-5α-reductase inhibitor in vitro. Then Voigt and Hsia, Endocrinology, 92, 1216 (1973), Canadian Patent No. 970,692, demonstrated that the above ester and the parent free acid, 4-androsten-3-one-17β-carboxylic acid are both active inhibitors of testosterone-5α-reductase in

30     vitro. They further demonstrated that topical application of either

0155096

10

Compounds of the present invention, which may be prepared in accordance with the method described above, have been found to be potent antiandrogens by virtue of their ability to specifically inhibit testosterone-5α-reductase and are therefore suitable for treating the hyperandrogenic conditions of acne vulgaris, seborrhea and female hirsutism by topical administration, and for treating all of the above conditions, as well as benign prostatic hypertrophy, by parenteral administration.

The present invention thus also provides topical and parenteral pharmaceutical formulations for use in administering the active compounds of the present invention.

The compositions containing the compounds of the present invention as the active ingredient for use in the treatment of benign prostatic hypertrophy can be administered in a wide variety of therapeutic dosage forms in conventional vehicles for systemic administration, as, for example, by oral administration in the form of tablets, capsules, solutions or suspensions, or by intravenous injection. The daily dosage of the products may be varied over a wide range varying from 50 to 2,000 mg. The compositions are preferably provided in the form of scored tablets containing 5, 10, 25, 50, 100, 150, 250 and 500 mg. of the active ingredient for the symptomatic adjustment of the dosage to the patient to be treated. An effective amount of the drug is ordinarily supplied at a dosage level of from 1 to 50 mg./kg. of body weight per day. Preferably the range is from 1 to 7 mg./kg. of body weight per day. These dosages are well below the toxic dose of the product. Capsules containing an active compound of this invention can be prepared by mixing it with lactose and magnesium stearate, calcium stearate, starch, talc, or other carriers, and placing the mixture in gelatin capsules. Tablets may be prepared by mixing the active ingredient with conventional tableting ingredients such as calcium phosphate, lactose, corn starch or magnesium stearate. The liquid forms in suitably flavoured suspending or dispersing agents such as the synthetic and natural gums, for example, tragacanth, acacia and methyl cellulose. Other suitable dispersing agents include glycerin. For parenteral administration, sterile suspensions and solutions are desired. Isotonic preparations, which usually contain suitable preservative, are prepared for intravenous administration.

0155096

11

For the treatment of acne vulgaris, seborrhoea and female hirsutism, the compounds of the present invention are administered in the form of pharmaceutical compositions comprising the active compound in combination with a pharmacologically acceptable topically administrable carrier. These topical pharmaceutical compositions may be in the form of a cream, ointment, gel or aerosol formulation suitable for application to the skin. They ordinarily include 0.1% to 15%, preferably about 5%, of the active compound, based on the total composition.

The method of preparing the novel 17ß-N-(monosubstituted carbamoyl) and 17ß-acyl compounds of the present invention, already described above in general terms, is further illustrated by the following Examples.

## EXAMPLE 1

Methyl 3-oxo-4-aza-5α-androst-1-ene-17ß-carboxylate

A suspension of 83.7 g of methyl 3-oxo-4-aza-5α-androstane-17-carboxylate, obtained as in U.S. Patent Specification US-A-4 377 584, and 126.5 g of benzeneseleninic anhydride in 2.09 litres of chlorobenzene was heated at reflux for 2 hours. The reflux condenser was switched to a distillation head and the mixture was distilled slowly to remove water that had formed in the reaction (2 hours). The solution was evaporated to leave 198 g of wet residue. The residue as a solution in dichloromethane was washed with saturated aqueous $NaHCO_3$ solution and saturated NaCl solution, then dried and evaporated to leave 172.4 g. This material was chromatographed on 2.56 kg of silica gel eluting first with dichloromethane (5 litres) and then with 4:1 (v/v) dichloromethane-acetone. The desired product eluted after 8 litres and amounted to 53.4 g. It was rinsed with diethyl ether and dried to leave 49.5 g., m.p. 278-280°C. In a similar fashion the following compounds were converted to their corresponding $\Delta^1$ derivatives:

# EXHIBIT E

# United States Court of Appeals for the Federal Circuit

04-1581

NOVO NORDISK PHARMACEUTICALS, INC.,
and NOVO NORDISK A/S,

Plaintiff-Appellee,

v.

BIO-TECHNOLOGY GENERAL CORP. and
TEVA PHARMACEUTICALS USA, INC.,

Defendants-Appellants.

      Steven E. Lipman, Darby & Darby, P.C., of New York, New York, argued for plaintiffs-appellants.  Of counsel were James Edward Hanft, Paul M. Zagar, Jay P. Lessler, Kevin L. Reiner, Robert Schaffer and Joseph R. Robinson.

      John W. Bateman, Kenyon & Kenyon, of Washington, DC, argued for defendants-appellees.  On the brief was Richard L. DeLucia, of New York, New York. Of counsel were Steven J. Lee, and Thomas J. Meloro, of New York, New York, and Kenneth R. Corsello, of Washington, DC.

Appealed from:  United States District Court for the District of Delaware
.
Chief Judge Sue L. Robinson

# United States Court of Appeals for the Federal Circuit

04-1581

NOVO NORDISK PHARMACEUTICALS, INC.
and NOVO NORDISK A/S,

Plaintiffs-Appellants,

v.

BIO-TECHNOLOGY GENERAL CORP. and
TEVA PHARMACEUTICALS USA, INC.,

Defendants-Appellees.

———————————————

DECIDED:  October 5, 2005

———————————————

Before SCHALL, <u>Circuit Judge</u>, ARCHER, <u>Senior Circuit Judge</u>, and BRYSON, <u>Circuit Judge</u>.

SCHALL, <u>Circuit Judge</u>.

Novo Nordisk Pharmaceuticals, Inc. and Novo Nordisk A/S (collectively, "Novo") appeal from the final judgment of the United States District Court for the District of Delaware in their suit for patent infringement against Bio-Technology General Corp. and Teva Pharmaceuticals USA, Inc.  The district court held the two claims of Novo Nordisk A/S's U.S. Patent No. 5,633,352 ("the '352 patent") invalid by reason of anticipation

under 35 U.S.C. § 102(a).   The court also held the patent unenforceable due to inequitable conduct.   Novo Nordisk Pharms., Inc. v. Bio-Technology Gen. Corp., No. 1:02-CV-00332-SLR (D. Del. Aug. 3, 2004) ("Opinion").   We affirm the judgment of invalidity with respect to claim 1 of the '352 patent, as well as the judgment that the patent is unenforceable.   We vacate the judgment of invalidity with respect to claim 2 of the patent.

BACKGROUND

I.

Novo Nordisk Pharmaceuticals, Inc. and Novo Nordisk A/S are research-based pharmaceutical manufacturers.   Novo Nordisk A/S is the assignee of the '352 patent, which is entitled "Biosynthetic Human Growth Hormone."   The '352 patent is directed to a process for producing "ripe" human growth hormone ("hGH") protein in *E.Coli* bacteria through the use of recombinant DNA techniques.   Novo Nordisk Pharmaceuticals, Inc. is the U.S. healthcare affiliate of Novo Nordisk A/S.

The hGH protein has a specific sequence of 191 amino acids and is secreted by the anterior pituitary gland.   The protein, which plays a central role in cell growth and metabolism, is therapeutically useful to treat, among other conditions, growth hormone deficiencies and infertility.   It also is useful in wound care.   Until the mid-1980's, hGH for therapeutic purposes could be obtained only from the pituitary gland of a human cadaver (known as "pituitary-derived hGH").   However, the use of pituitary-derived hGH carried a high risk of contamination and infection for the patient.

Prior to the '352 patent, numerous attempts were made to produce biosynthetic hGH that would function in vivo in the same manner as pituitary-derived hGH.   One

such attempt, set forth in U.S. Patent No. 4,342,832, resulted in hGH protein with 192 amino acids, instead of the 191 amino acids found in pituitary-derived hGH.  '352 patent col. 1, ll. 20-25.  The additional amino acid residue, methionine, resulted in a hGH protein variant that does not function in the same way in vivo as pituitary-derived hGH. Accordingly, there was a need for a method to produce "pure" hGH, or hGH containing the 191 amino acid sequence identical to that of pituitary-derived hGH.

II.

As noted, the '352 patent discloses the production of ripe hGH protein via recombinant DNA techniques.  Recombinant DNA techniques make it possible to transfer DNA segments (genes) that code for a human protein to bacteria, such as *E. coli*, for the purpose of protein synthesis.

Bacteria such as *E. coli* normally will not recognize a human gene sequence and, thus, will not synthesize the corresponding human protein.  However, transferring the gene sequence for a "fusion protein"[1] into *E. coli*, in effect, "tricks" the bacteria into synthesizing the human protein.  The gene sequence for the fusion protein contains, in a side-by-side relationship: (1) the gene sequence for a bacterial protein and (2) the gene sequence for a human protein, such as hGH.  The *E. coli* recognizes the portion of the gene sequence that encodes the bacterial protein and, as a result, synthesizes the entire fusion protein.  The fusion protein is made up of: (1) the amino acid sequence for the bacterial protein and (2) the amino acid sequence for the human protein.  In order to isolate the desired human protein, the bacterial amino acid sequence, or "pro-sequence," must be removed from the fusion protein.  This process can be

accomplished through the use of a proteolytic enzyme.[2]   The proteolytic enzyme cleaves the bond between the pro-sequence and the amino acid sequence for the human protein.

The '352 patent discloses a process whereby a proteolytic enzyme, preferably the enzyme dipeptidyl aminopeptidase I (DAP I), cleaves a pre-hGH fusion protein in order to produce "ripe" hGH protein.  '352 patent col. 1, l. 56 – col. 2, l. 2.  First, the gene sequence for the hGH protein is combined with the gene sequence for a bacterial protein.  Id. col. 4, ll. 53-67.  This DNA sequence is then introduced into *E. coli*.  Id. col. 5, ll. 1-10.  This results in a pre-hGH fusion protein being produced by the *E. coli* bacteria.  The resulting pre-hGH fusion protein is made up of: (1) the 191-amino-acid sequence for the hGH protein; and (2) a variable amino acid sequence with an even number of amino acids that is formulated to take advantage of the cleavage specificity of DAP I.  When DAP I is then added, it works to cleave, or cut, the fusion protein at the junction of the two amino acid sequences described above.  Id. col. 5, ll. 24-25.  This results in "ripe" hGH protein, or hGH protein containing the correct 191 amino acid sequence.

III.

The '352 patent traces priority back through a series of continuation applications to Application Ser. No. 640,081, filed on December 9, 1983, as PCT Application PCT/DK83/001118 ("the 1983 PCT application").  The 1983 PCT application, in turn,

_____

(Cont'd. . . .)

[1]    A "fusion protein" is coded for by genes that have been combined together in vitro from two or more sources.

traces priority back to a 1982 Danish patent application filed on December 10, 1982. The 1983 PCT application was directed to "A Process for Preparing Ripe Proteins from Fusion Proteins, Synthesized in Pro- or Eukaryotic Cells."  Unlike the '352 patent, which discloses the use of the proteolytic enzyme DAP I, the 1983 PCT application discloses leucine aminopeptidase (LAP) as the preferred cleavage enzyme to produce ripe hGH protein from a pre-hGH fusion protein.

On November 12, 1992, Novo filed U.S. Application No. 07/959,856 ("the '856 application"), directed to "A Process for Preparing a Desired Protein."  The '856 application discloses a process for producing hGH protein from a fusion protein using the DAP I enzyme.  The '856 application was the first in a series of applications that claimed a priority date of December 10, 1982, based on the 1983 PCT application.  The final application in the chain was U.S. Application Ser. No. 402,286 ("the "286 application"), filed on March 10, 1995.  The '352 patent issued from the '286 application on May 27, 1997.

The '352 patent has two claims:

> 1.  Biosynthetic ripe human growth hormone free of contaminants from pituitary derived human growth hormone.

> 2.  Biosynthetic ripe human growth hormone produced by expressing an amino terminal extended human growth hormone fusion protein in a microorganism capable of such expression, enzymatically cleaving the amino terminal extension and recovering the biosynthetically produced ripe human growth hormone.

---

(Cont'd. . . .)

[2]    Proteolytic enzymes are unique proteins that catalyze the cleavage of peptide bonds (the bonds linking the chains of amino acids that make up proteins). Many proteolytic enzymes exhibit specificity with respect to the bonds that they cleave.

IV.

On July 7, 2000, the Board of Patent Appeals and Interferences ("Board") of the United States Patent and Trademark Office ("PTO") declared an interference involving Novo's '352 patent and Bio-Technology General Corp.'s[3] U.S. Application Ser. No. 09/023,248 ("the '248 application"). Blumberg v. Dalbøge, Interference No. 104,422 (Bd. Pat. App. Int. Mar. 12, 2002) ("Board Decision"). The '248 application is directed to a biosynthetic hGH protein produced via recombinant DNA techniques. In declaring the interference, the Board accorded the '352 patent the benefit of priority of the August 8, 1984 filing date of U.S. Patent Application Ser. No. 06/640,081 ("the '081 application").[4]

In due course, Novo filed a preliminary motion in the interference seeking the benefit, for purposes of priority, of the filing date of the 1983 PCT application. Board Opinion, slip op. at 9. Bio-Technology General Corp., in turn, moved to deny Novo the benefit of the filing date of the 1983 PCT application, as well as the benefit of the filing date of the '081 application. It argued that DAP I was not disclosed in the 1983 PCT application, and that the LAP enzyme that was disclosed in the application was not effective to produce ripe hGH protein. Board Decision, slip op. at 11.

On March 12, 2002, the Board issued its final decision, awarding priority to Novo. The Board noted that during prosecution of its applications resulting in the '352 patent, Novo had made contradictory statements regarding whether the 1983 PCT application enabled the production of ripe hGH protein. However, the Board concluded: "[W]e do not find the evidence relied upon by [Bio-Technology General Corp.] . . . to establish

---

[3]     Bio-Technology General Corp. develops, manufactures, and markets biopharmaceutical products.

that pure LAP would not work to produce ripe hGH in the methods described in the '081 and [1983] PCT applications to be convincing." Board Decision, slip op. at 33.

On April 1, 2002, pursuant to 35 U.S.C. § 146, Bio-Technology General Corp. appealed the final decision of the Board to the United States District Court for the District of Delaware. The district court eventually reversed the Board's decision awarding Novo priority with respect to the invention claimed in the '352 patent. Bio-Technology Gen. Corp. v. Novo Nordisk A/S, No. 02-235-SLR, slip op. at 59 (D. Del. Aug. 3, 2004) ("Priority Decision"). In doing so, the court ruled that the 1983 PCT application was not enabled because one of ordinary skill in the art would not have been able to produce ripe hGH protein at the time the application was filed using the information disclosed in the application. Id. at 49. The court based this determination, in part, on a finding that Novo itself had been unable to synthesize ripe hGH protein using the disclosure of the 1983 PCT application. Id. at 56. The court remanded the case to the Board for consideration of two preliminary motions by Novo that the Board had dismissed as moot.[5]

V.

On April 30, 2002, Novo filed a complaint in the District of Delaware against Bio-Technology General Corp. and Teva Pharmaceuticals USA, Inc. (collectively, "Bio-Technology") for infringement of the '352 patent and for injunctive relief to prevent the

---

(Cont'd. . . .)
[4]      The '081 application is the U.S. counterpart of the 1983 PCT application. As far as this appeal is concerned, it is identical in substance to that application.
[5]      As of the time of this appeal, remand proceedings before the Board still are pending.

sale of Tev-Tropin®, a recombinant hGH protein product.[6]  On June 7, 2002, the district court issued a preliminary injunction, which was vacated by this court on November 26, 2002.  Novo Nordisk A/S v. Bio-Technology Gen. Corp., No. 02-1447, 52 Fed. Appx. 142 (Fed. Cir. Nov. 26, 2002).  On June 12, 2002, Bio-Technology filed its answer to the complaint and asserted a counterclaim for a declaratory judgment that the '352 patent is invalid and unenforceable.

Prior to trial, Bio-Technology admitted infringement of claim 1 of the '352 patent. Opinion, slip op. at 5.  Thereafter, from August 4, 2003, to August 8, 2003, the district court construed the claims of the '352 patent and held a bench trial on the issues of: (1) invalidity of claim 1 of the '352 patent by reason of anticipation; and (2) unenforceability of the '352 patent due to inequitable conduct.

Following the trial, the district court found that claim 1 of the '352 patent was anticipated by a December 1981 article by George N. Pavlakis, published in the journal Biochemistry and entitled "Expression of two human growth hormone genes in monkey cells infected by simian virus 40 recombinants" ("the 1981 Pavlakis article").  Opinion, slip op. at 80.  Based upon that finding, the court ruled claims 1 and 2 invalid under 35 U.S.C. § 102(a).  Id.  In addition, the court held that the '352 patent was unenforceable based on inequitable conduct during prosecution of the '856 application and during the interference proceeding before the Board.  Id.

---

[6]    Teva Pharmaceuticals USA, Inc. develops, manufactures and markets generic pharmaceutical products.  It has entered into an agreement with Bio-Technology General Corp. to market and sell Bio-Technology General Corp.'s biosynthetic hGH protein in the United States under the name Tev-Tropin®.

Novo now appeals the district court's decision.  We have jurisdiction pursuant to 35 U.S.C. § 1295(a)(1).

DISCUSSION

I.

We review a district court's decision following a bench trial for errors of law and clearly erroneous findings of fact.  <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 403 F.3d 1331, 1337 (Fed. Cir. 2005) (citing <u>Allen Eng'g Corp. v. Bartell Indus., Inc.</u>, 299 F.3d 1336, 1343-44 (Fed. Cir. 2002)).  "A factual finding is clearly erroneous when, 'although there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  <u>Tegal Corp. v. Tokyo Electron Am., Inc.</u>, 257 F.3d 1331, 1338-39 (Fed. Cir. 2001) (quoting <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948)).  However, "[w]here the record viewed in its entirety renders the district court's account of the evidence plausible or discloses two permissible readings of the evidence, the fact-finder has committed no clear error."  <u>King Instruments Corp. v. Perego</u>, 65 F.3d 941, 943 (Fed. Cir. 1995) (citation omitted).

On appeal, Novo challenges the district court's rulings with respect to both validity and inequitable conduct.  We address its contentions in turn, starting with the validity issue.

II.

A.

As noted above, the district court ruled that the '352 patent was invalid by reason of anticipation based upon the 1981 Pavlakis article.  In the article, Pavlakis describes a

method of producing hGH protein with monkey kidney cells using what is known as the secretion approach.[7]    The article discusses using the secretion approach with two different hGH genes, identified as hGH1 and hGH2.  The hGH1 gene encodes for the 191 amino acid sequence of pituitary-derived hGH.  The hGH2 gene is a variant of the hGH1 gene, containing fourteen amino acid substitutions.   The article describes a variety of tests performed on the two resulting proteins, using (1) gel electrophoresis; (2) isoelectric focusing and nonequilibrium pH gradient electrophoretic gels; and (3) cell surface receptor binding studies involving IM-9 culture human lymphocytes and pregnant rabbit liver membranes.[8]    Based on these tests, Pavlakis comes to the conclusion that the "hGH1 protein, as predicted from the DNA sequence, appears identical in all respects to the major form of pituitary hGH.  In contrast, the hGH2 protein differs from authentic hGH both in its behavior on isoelectric focusing gels and in its low immunoreactivity, yet it binds to hGH receptors quite efficiently."

    In its anticipation analysis, the district court construed the term "ripe" hGH in claim 1 of the '352 patent to mean "a protein produced by recombinant DNA techniques composed of a 191 amino acid sequence identical to that of hGH produced by the human pituitary gland with the full biological activity of hGH produced by the human pituitary gland, and free of the contaminants present in hGH produced by the human

---

[7]    The secretion approach, based on recombinant DNA techniques, involves the steps of transforming a host organism (such as a monkey kidney cell) to express a pre-protein consisting of the desired protein and a "leader" or "signal" sequence.  The leader sequence causes the pre-protein to be transported across the cell membrane.  In the process of transport across the cell membrane, a specialized enzyme clips off the leader sequence.  As a result, the desired protein is secreted from the cell of the host organism.

[8]    An understanding of the details of these tests is not necessary for purposes of this appeal.

pituitary gland." <u>Opinion</u>, slip op. at 45. The court determined that the 1981 Pavlakis article discloses each limitation of claim 1 of the '352 patent. <u>Id.</u> at 64. The court stated:

> First, the Pavlakis article describes a method to produce hGH . . . using . . . recombinant DNA techniques. Second, the Pavlakis 1981 article specifically discusses experimental tests used to characterize the hGH product. Gel electrophoresis, isoelectric focusing, and nonequilibrium pH gradient electrophoresis analyses all revealed that the hGH product was indistinguishable from pituitary-derived hGH. . . . This collective data establishes that the hGH product necessarily must be composed of the same 191 amino acid residues as the pituitary-derived hGH. Third, the Pavlakis 1981 article discloses through receptor binding assay data that the hGH1 product exhibited the same receptor binding affinity as pituitary-derived hGH in both the human lymphocyte line IM-9 and the pregnant rabbit liver membranes. From this, the court concludes that the hGH1 product has the full biological activity of hGH produced by the human pituitary gland. Finally, the aforementioned data inherently establishes that the hGH product is free of contaminants present in hGH produced by the human pituitary gland. Accordingly, the court concludes that the 1981 Pavlakis article clearly and convincingly discloses all of the limitations of claim 1 of the '352 patent.

<u>Id.</u> at 64-65. The court also determined that the Pavlakis article was enabled. <u>Id.</u>

### B.

On appeal, Novo argues that the 1981 Pavlakis article cannot anticipate claim 1 of the '352 patent because the article does not disclose the second and third limitations of the claim (a protein that is composed of a 191-amino acid sequence identical to that of pituitary-derived hGH and that has the full biological activity of pituitary-derived hGH). Novo argues that the test results disclosed in the article do not demonstrate conclusively that the hGH1 protein discussed is identical in these respects to pituitary-derived hGH.

Novo also argues that the district court committed reversible error when it stated that "[p]rior art references are presumed to be enabling," Opinion, slip op. at 66, given that the 1981 Pavlakis article is a non-patent publication.  Novo acknowledges our decision in Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1355 (Fed. Cir. 2003), in which we held that "a presumption arises that both the claimed and unclaimed disclosures in a prior art patent are enabled," but in which we did not decide whether the presumption applies to non-patent publications.  See id. at 1355 n.22 ("We note that by logical extension, our reasoning here might also apply to prior art printed publications as well, but as Sugimoto is a patent we need not and do not so decide today.").  Novo argues that, in the case of a non-patent prior art reference, however, the burden of proving enablement of the prior art reference by clear and convincing evidence should remain on an alleged infringer.

Bio-Technology responds that the district court correctly determined that the 1981 Pavlakis article discloses each limitation of claim 1.  Bio-Technology also argues that the district court correctly held that the 1981 Pavlakis article is presumed to be enabled.  Lastly, Bio-Technology urges that even if the article is not presumptively enabled, the district court held on separate grounds that it enabled the subject matter of claim 1.

C.

A patent claim is invalid by reason of anticipation if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent . . . ."  35 U.S.C. § 102(a).  Anticipation based on a printed publication under section 102(a)

requires the presence in the publication of each and every limitation of the claimed invention.  Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citation omitted).  However, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing feature is necessarily present, or inherent, in the single anticipating reference."  SmithKline Beecham, 403 F.3d at 1343 (quoting Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003)).  "What a prior art reference discloses in an anticipation analysis is a factual determination that we review under the clearly erroneous standard."  Tegal Corp., 257 F.3d at 1345-46 (citing In re Graves, 69 F.3d 1147, 1151 (Fed. Cir. 1995)).

In order to anticipate, a prior art disclosure must also be enabling, such that one of ordinary skill in the art could practice the invention without undue experimentation.  SmithKline Beecham, 403 F.3d at 1342.  The standard for enablement of a prior art reference for purposes of anticipation under section 102 differs from the enablement standard under 35 U.S.C. § 112.  Rasmusson v. SmithKline Beecham Corp., 413 F.3d 1318, 1325 (Fed. Cir. 2005) (citation omitted).  While section 112 "provides that the specification must enable one skilled in the art to 'use' the invention," id. (quoting In re Hafner, 410 F.2d 1403, 1405 (CCPA 1969)), "section 102 makes no such requirement as to an anticipatory disclosure," id.  Significantly, we have stated that "anticipation does not require actual performance of suggestions in a disclosure.  Rather, anticipation only requires that those suggestions be enabled to one of skill in the art."  Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1379 (Fed. Cir. 2001) (citing In re Donhue, 766 F.2d 531, 533 (Fed. Cir. 1985) ("It is not, however, necessary that an invention disclosed in a publication shall have actually been made in order to satisfy the

enablement requirement.")).  "Whether a prior art reference is enabling is a question of law based upon underlying factual findings."  SmithKline Beecham, 403 F.3d at 1342-43 (citation omitted).

D.

We see no error in the district court's finding that the 1981 Pavlakis article discloses the second and third limitations of claim 1 of the '352 patent.  These limitations require that the hGH protein be composed of a 191-amino acid sequence identical to that of pituitary-derived hGH and that the protein have the full biological activity of pituitary-derived hGH.  In that regard, the article states that "[t]he hGH1 protein, as predicted from the DNA sequence, appears identical in all respects to the major form of pituitary hGH." (emphasis added).  Further, the article discusses experimental tests used to characterize the hGH product.  These tests were designed in order to determine whether the hGH1 protein had the same amino acid sequence and biological activity as pituitary-derived hGH.  The article's discussion of the tests provides strong support for the district court's conclusion that the 1981 Pavlakis article discloses the subject matter of claim 1.  Gel electrophoresis tests reported in the article demonstrated that the hGH1 protein co-migrated with pituitary-derived hGH on the gel and that hGH1 thus was of the same overall size as pituitary-derived hGH.  At the same time, the results from tests using isoelectric focusing and nonequilibrium pH gradient electrophoresis gels showed that the hGH1 protein co-migrated with pituitary-derived hGH on a pH gradient and that it thus had the same charge as pituitary-derived hGH.  Finally, the results of radioreceptor assays with both the human lymphocyte IM-9 line and pregnant rabbit liver membranes showed that hGH1 was indistinguishable from

pituitary-derived hGH, indicating that hGH1 had an identical ability to bind to cell surface receptors. Thus, the test results disclosed in the Pavlakis article indicated that the hGH1 protein had the same structure and chemical properties as pituitary-derived hGH. In other words, the test results indicated that the hGH1 protein contained the same 191 amino acid sequence and biological activity as pituitary-derived hGH. Accordingly, we hold that the article discloses a ripe hGH protein.

As far as enablement is concerned, in our view, a fair reading of the district court's opinion is that the court did not rely solely on the Amgen presumption in finding that the 1981 Pavlakis article was enabled. See Koito Mfg. v. Turn Key Tech., 381 F.3d 1142, 1151 (Fed. Cir. 2004) ("At trial, [the declaratory judgment plaintiff (potential infringer)] . . . failed to provide any testimony or other evidence that would demonstrate . . . how that reference [JP '082, a Japanese unexamined application] met the limitations of the claim in the '268 patent or how the reference enabled one of ordinary skill in the art to practice the claimed invention."). In that regard, the court determined that Bio-Technology affirmatively established enablement of the 1981 Pavlakis article. The court stated:

> Moreover, the Pavlakis 1981 article offers particular materials and methodology to produce hGH. The court has no reason to doubt that this information will not lead to the successful production of hGH. Indeed, Dr. Pavlakis actually made the subject matter of claim 1 using the disclosed materials and methodology set forth in the Pavlakis 1981 article.

Opinion, slip op. at 67-68.

The critical inquiry is whether the 1981 Pavlakis article discloses in an enabling manner the production of ripe hGH. See SmithKline, 403 F.3d at 1344 ("Thus, whether

it was actually possible to make pure PCH anhydrate before the critical date of the '723 patent is irrelevant.  The '196 patent suffices as an anticipatory prior art reference if it discloses in an enabling manner the production of PHC hemihydrate."); see also Rasmusson, 413 F.3d at 1326; Bristol-Myers Squibb, 246 F.3d at 1379; In re Donhue, 766 F.2d at 533.  The 1981 Pavlakis article discloses the production of ripe hGH protein in an enabling manner because it discusses particular materials and a particular methodology (the secretion approach) to produce the hGH protein.  In other words, the article relies on standard recombinant DNA techniques that would have been understood by one of ordinary skill in the art at the time of its publication.  We see no reason to disturb the district court's conclusion that the 1981 Pavlakis article is sufficiently enabling to serve as an anticipating reference.  We therefore affirm the district court's ruling that claim 1 of the '352 patent is anticipated by the 1981 Pavlakis article.[9]

The district court's order, dated August 3, 2004, states that "[the '352 patent] is invalid under 35 U.S.C. § 102."  However, as Novo points out, the validity of claim 2 was not litigated at trial.  Accordingly, we vacate the portion of the district court's order relating to claim 2 of the '352 patent.

---

[9]    Because we affirm the district court's ruling that claim 1 of the '352 patent is invalid as anticipated by the 1981 Pavlakis article, we need not address Bio-Technology's alternative arguments that the district court erred in construing claim 1, and that under Bio-Technology's proposed construction, U.S. Patent No. 4,775,622 to Hitzeman would anticipate claim 1.

III.

A.

We turn next to Novo's argument that the district court erred in holding the '352 patent unenforceable due to inequitable conduct during prosecution of the '856 application and during the interference proceedings before the Board.  The following additional facts relating to prosecution of the '856 application are relevant to the inequitable conduct issue:

As noted above, the '352 patent claims priority based on the 1983 PCT application.  The 1983 PCT application, in turn, claims priority to the Danish Patent application filed on December 10, 1982.

The 1983 PCT application discloses the use of the LAP enzyme to produce ripe hGH from a pre-hGH fusion protein.  Example 1 of the application describes the production, purification, and evaluation of a fusion protein.  It also describes treatment of the fusion protein with the LAP enzyme in order to obtain ripe hGH.  Finally, Example 1 states that standard tests indicated that the disclosed methodology produced ripe hGH protein that was 98% pure.  Speaking in the past tense, the example states that "[t]he fusion product was purified from this extract," 1983 PCT application at 10 (emphasis added), that "[t]he purified fusion protein was evaluated to be more than 98% pure," id. (emphasis added), and that "[t]his . . .  product was then treated with leucine aminopeptidase," id. (emphasis added).

The district court found, however, and it is undisputed, that when the 1983 PCT application was filed on December 10, 1983, the inventors had not successfully prepared hGH with LAP using recombinant DNA technology.  Priority Decision, slip op.

at 20. For five months after the 1983 PCT application was filed, Novo's scientists attempted unsuccessfully to use LAP enzyme to synthesize hGH. Finally, on March 7, 1984, Novo successfully synthesized hGH using commercial LAP purchased from a company called Sigma. Id. at 21. However, unbeknownst to Novo at the time, the particular batch of LAP contained the DAP I enzyme. Id. at 22. At a meeting on October 18, 1984, Novo scientists concluded that "the active component in Sigma LAP presumably is not LAP but a 'contaminating' substance." Id. at 23. The discovery that this "contaminating" substance was DAP I led to the filing, on February 6, 1986, of PCT/DK86/00014 ("the 1986 PCT application"). The 1986 PCT application, entitled "A Process for Producing Human Growth Hormone," disclosed a process for producing hGH from a fusion protein using the DAP I enzyme. Id.

On October 3, 1986, Novo filed U.S. Patent Application Ser. No. 06/910,230 ("the '230 application"), entitled "Process for Producing Human Growth Hormone." Priority Decision, slip op. at 24. The '230 application did not claim priority to the 1983 PCT application, but instead claimed priority to the 1986 PCT application. During prosecution of the '230 application, the originally filed claims were rejected under 35 U.S.C. § 103 as obvious over U.S. Patent No. 4,532,207 to Brewer[10] in view of U.S. Patent No. 4,543,329 to Daum.[11] On April 11, 1990, in a response to a final rejection,

---

[10]    The application that resulted in the Brewer '207 patent was filed on March 3, 1983. Its European counterpart was published on September 28, 1983. The examiner read the Brewer patent as disclosing a method of producing a protein using a sequence of charged amino acids and a cleavage enzyme.

[11]    The application that resulted in the Daum '329 patent was filed on July 6, 1982, claiming priority to an application filed on May 29, 1980. The Daum patent discloses the use of LAP enzyme to cleave a fusion protein. '329 patent col. 9, ll. 60-62.

Novo argued that the Daum patent was distinguishable from the invention in the '230 application. Novo stated:

> Daum mentions . . . that with LAP it is possible to "split off N-terminal methionine from foreign proteins[.]"
> Although applicants have tested LAP with bacterially produced HGH, LAP has been shown not to be effective. The effectiveness of LAP seems to disappear as soon as peptides greater than about 50 amino acids are involved.

(emphasis in original).

In addition, on September 12, 1990, Novo filed a declaration on behalf of Jorli Ringsted, John Pendersen, and Thorkild Christensen, all of whom are named inventors on the '352 patent (the "1990 declaration"). The 1990 declaration described the ability of the LAP enzyme to remove a pro-sequence from a fusion protein to produce hGH. After describing an experiment in which the scientists compared LAP preparations from several different suppliers, the inventors stated:

> It is shown that essentially only LAP-preparations from Sigma contain enzymatic activity able to convert Ala-Glu-hGH to mature hGH. LAP-preparations from Merck, Serva, and Worthington did not contain such enzymatic activity at all. It is thus likely that an enzymatic activity different from LAP-activity is contained in the Sigma preparations . . . , which can convert Ala-Glu-hGH to mature hGH.

The Novo scientists went on to conclude:

> The experiments show clearly that a pure LAP-preparation will not convert amino extended hGH to mature hGH. Only LAP-preparations with relevant impurities will have some effect depending upon the nature and amount of the impurity and of course this can lead to misunderstanding about the effect of LAP.

Thus, during prosecution of the '230 application, Novo sought to overcome the prior art rejection based upon Daum by arguing that the LAP enzyme disclosed in Daum was not effective in the production of hGH protein.

Unable to overcome the examiner's rejections under section 103, Novo eventually abandoned the '230 application. Over the next several years, Novo filed a number of U.S. applications describing the use of the DAP I enzyme to produce ripe hGH and claiming priority to the 1986 PCT application. Then, on November 12, 1992, Novo filed the '856 application, directed to "A Process for Preparing a Desired Protein." As seen above, the '856 application disclosed a process for producing hGH from a fusion protein using the DAP I enzyme. In a preliminary amendment, filed on October 13, 1992, Novo amended the specification of the '856 application to indicate that the application was entitled to a priority date of December 10, 1982, based upon the 1983 PCT application claiming priority back to the 1982 Danish application. Novo specifically pointed out that the December 10, 1982 priority date of the 1983 PCT application—based upon that application's claim of priority to the priority date of the 1982 Danish patent application—preceded the 1983 priority date of the Brewer patent.

The examiner did not immediately accept the new priority claim, and on September 22, 1993, rejected the two pending claims as obvious under 35 U.S.C. § 103 in view of several references, including the Brewer patent. On January 7, 1994, the examiner held a personal interview with Cheryl Agris, a Novo in-house patent attorney, Poul Eisten Petterson, a Novo in-house patent advisor, and Thorkild Christensen and Henrik Dalbøge, two of the named inventors on the '856 application. The examiner's interview-summary record indicates that the Brewer patent was one of the prior art

items that was discussed at the conference and states in relevant part: "The priority date should be 1982. [Cheryl Agris] will point out where in priority documents the enablement is present."

Novo followed up the interview with an amendment, on January 20, 1994, which addressed the issue of whether the 1983 PCT application was enabled. The issue of whether the 1983 PCT application was enabled was critical to the prosecution because, if the application was not enabled, Novo would not be able to rely upon the application's priority date to overcome the Brewer patent. Novo pointed to the 1983 PCT application as providing "the general concept of adding an amino-terminal extension with an aminopeptidase, and isolation of mature hGH." Novo also pointed to Example 1 of the 1983 PCT application as being "specifically directed to hGH." Novo was ultimately able to claim priority to the 1983 PCT application. Upon allowance, the examiner stated:

> [T]he amendment of abandoned files to recite additional parent history places the effective filing date of the instant invention to December 9, 1983, and foreign priority to December 10, 1982. Therefore, the Brewer et al. reference, published September 28, 1983, does not appear to be prior art against the invention.

As seen, the '352 patent issued on May 27, 1997 from the '286 application, the final application in the chain of applications that resulted in the patent.

### B.

Inequitable conduct occurs when a patent applicant breaches his or her "duty of candor and good faith" to the PTO. 37 C.F.R. § 1.56(a) (2004); Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1351 (Fed. Cir. 2005). Inequitable conduct includes "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with

an intent to deceive." CFMT, Inc. v. YieldUp Int'l Corp., 349 F.3d 1333, 1340 (Fed. Cir. 2003) (quoting Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995)). Materiality and intent must be established by clear and convincing evidence. Id. Once materiality and intent have been established, the district court must weigh these factors in light of all of the circumstances to determine whether a finding that inequitable conduct occurred is warranted. Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363 (Fed. Cir. 2003) (citing Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1366 (Fed. Cir. 2001)). We have stated that "when balanced against high materiality, the showing of intent can be proportionally less." Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1234 (Fed. Cir. 2003) (citation omitted).

We review the district court's factual findings with respect to materiality and intent for clear error. Perspective Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1319 (Fed. Cir. 2000) (citation omitted). We review the ultimate determination of inequitable conduct, however, under an abuse of discretion standard. Id. (citations omitted). Thus, we may reverse a district court's decision on inequitable conduct only if the decision is based upon "clearly erroneous findings of fact or on a misapplication or misinterpretation of applicable law, or evidences a clear error of judgment on the part of the . . . court." Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.3d 28, 30 (Fed. Cir. 1999) (citation omitted).

The district court based its finding of inequitable conduct with respect to prosecution of the '856 application on Novo's failure to disclose to the PTO that Example 1 of the 1983 PCT application had never actually been performed. Id. at 76.

Referring to Example 1 being worded in the past tense, the court found that "Novo did not alert the examiner that the cleavage and purification steps had not been performed or that the purity result was merely a prediction." Id.  The district court found the requirement of materiality satisfied because the examiner relied upon Example 1 in deciding whether the 1983 PCT application enabled the invention of the '856 application and thus was entitled to a priority date earlier than that of the Brewer patent.  Id.

Next, the court found the inequitable conduct intent requirement satisfied because "Novo, nine years after it first submitted Example 1 to the PTO, knew or should have known that the examiner would have considered the fact that Example 1 contained prophetic data important in evaluating whether the ['081 application, the U.S. counterpart of the 1983 PCT application,] enabled the invention of the '856 application, particularly in light of the fact that Novo never successfully produced ripe hGH using the methodology described in Example 1." Priority Decision, slip op. at 76.

The district court found inequitable conduct with respect to the interference proceedings before the Board based again upon Novo's failure to inform the Board that it was ultimately unable to produce ripe hGH using the methodology described in Example 1 of the 1983 PCT application.  Priority Decision, slip op. at 79.  First, the district court found the materiality element satisfied because the Board "looked to Example 1 and reviewed expert testimony related to . . . whether the steps described therein enabled one of ordinary skill in the art to produce ripe hGH." Id.  With respect to the intent element, the court noted that, before the Board, Novo presented extensive expert testimony from Dr. Villa-Romaroff about Example 1, knowing that Example 1 had never been successfully performed.  The court found that "Novo knew or should have

known that the Board would consider both Example 1 and Dr. Villa Romaroff's expert opinion material to the question of enablement, particularly since this question was the sole focus of the interference." Id. at 80. Moreover, the court found that following the interference proceeding, Novo failed to offer any explanation for its silence, merely asserting that "it was not required to provide the PTO with a running update of its efforts to make hGH." Id.

C.

On appeal, Novo argues that the district court's finding that Novo was unable to make ripe hGH according to the methodology of Example 1 is clearly erroneous. Pointing to the experiment performed on March 7, 1984, during which Novo used commercial grade LAP enzyme purchased from the Sigma company in order to produce ripe hGH, Novo asserts that it was able to produce ripe hGH according to the methodology of Example 1. Thus, Novo argues, because the methodology did work, there can be no culpable failure to say that it did not work.

The district court did not commit clear error in determining that Novo was unable to make ripe hGH according to the methodology of Example 1. It is undisputed that on March 7, 1984, Novo unintentionally used LAP from the Sigma company which happened to be "contaminated" with DAP I. Priority Decision, slip op. at 56-57. Moreover, at oral argument, counsel for Novo conceded that Novo was never able to produce ripe hGH through the use of "pure" LAP enzyme. Example 1 is directed to the production of ripe hGH through the use of LAP enzyme. We are not prepared to accept the proposition that simply because fate interceded and Novo scientists unintentionally

used LAP "contaminated" with DAP I, Novo produced ripe hGH according to the methodology of Example 1.

Novo also assigns error to the district court's finding that Novo acted with deceptive intent in failing to disclose the prophetic nature of Example 1 to the PTO or the Board. According to Novo, the district court never made a finding that anyone had actual knowledge that Example 1 of the PCT application was prophetic and that Novo never successfully produced ripe hGH using the methodology described in Example 1. Specifically, Novo contends that there is no evidence that Dr. Christensen, the co-inventor who wrote Example 1, subsequently learned that the drafting of a prophetic example in the past tense was not a good procedure at the PTO, or that he subsequently told any of Novo's attorneys that Example 1 was prophetic.[12] Thus, Novo asserts, because it is impossible to disclose the unknown, the district court's finding of inequitable conduct is reversible error under FMC Corp. v. Manitowoc Co., Inc., 835 F.2d 1411, 1415 (Fed. Cir. 1987) (stating that an "[a]pplicant must be chargeable with knowledge of the existence of the prior art or information, for it is impossible to disclose the unknown"). Novo also asserts that the district court's finding of inequitable conduct amounts to a finding of misconduct based on an imputation of gross negligence, contrary to our holding in Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) ("We adopt the view that a finding that particular conduct

---

[12]    The district court found that, at the time of filing the '081 application, Dr. Christensen did not intentionally breach his duty of candor and good faith. Rather, the court concluded "that Mr. Christensen's use of past tense was merely an oversight on his part, likely due to the fact that Dr. Christensen is trained as a scientist, not as a patent attorney familiar with the teachings of the MPEP." Priority Decision, slip op. at 75. However, the district court did not extend this finding to actions taken by Dr. Christensen during prosecution of the '856 application and thereafter.

amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.").

Bio-Technology responds that Dr. Christensen was aware that Example 1 was prophetic, and because "knowledge of the law is chargeable to the inventor," and "inventors represented by counsel are presumed to know the law," the district court's inference of deceptive intent was not clearly erroneous.    See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370 (Fed. Cir. 2001).

We agree with Bio-Technology.  It is undisputed that Dr. Christensen was aware that Example 1 was prophetic and that Novo never successfully produced ripe hGH through the use of "pure LAP" enzyme.  It also is undisputed that, during prosecution of the '856 application, Dr. Christensen was one of four Novo representatives present during the January 7, 1994 interview with the examiner, during which one of the issues addressed was enablement of the 1983 PCT application, of which the '081 application was the U.S. counterpart.  As noted, other representatives included Novo's in-house patent attorney and in-house patent advisor.  Thus, Novo asks us to hold, on the one hand, that the failure of Dr. Christensen and his co-inventors to disclose the truth about Example 1 to Novo's attorneys absolves them of their duty to disclose this information to the PTO or the Board, because without their attorney's consultation, they could not have known that this information was material.  At the same time, Novo asks us to hold that its counsel's failure to disclose the truth about Example 1 to the PTO or Board is excused because the inventors failed to fully inform them of the details surrounding Example 1.  As we have done in similar situations in the past, we reject the "circular

logic" of this request.  See Brasseler, 267 F.3d at 1380 ("We refuse to pursue the circular logic of Brasseler's request and decline to carve out an exception to the inequitable conduct law to shield those guilty of inequitable conduct from responsibility for their actions."); see also Molins, 48 F.3d at 1178 (stating that the knowledge and actions of an applicant's representatives are chargeable to the applicant (citing FMC Corp., 835 F.2d at 1415 n.8)).  Accordingly, the district court correctly concluded that Novo knew or should have known that the PTO and the Board would have considered the information relating to Example 1 important in evaluating whether the 1983 PCT application was enabled.

Finally, Novo argues that the withheld information about Example 1 cannot be material as a matter of law because it was cumulative of what was already before the examiner, or because it is less relevant than information about the Example 1 methodology that was disclosed.  See Regents of Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1574-75 (Fed. Cir. 1997) ("[E]ven where an applicant fails to disclose an otherwise material prior art reference, that failure will not support a finding of inequitable conduct if the reference is 'simply cumulative to other references,' i.e., if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO.") (citing Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("A reference that is simply cumulative to other references does not meet the threshold of materiality that is predicate to a holding of inequitable conduct.") (citation omitted)).

In making this argument, Novo points to the 1990 declaration, which it describes as showing that pure LAP enzyme did not work, while commercial LAP from Sigma did

work.  However, the withheld information concerning Example 1 was not merely cumulative of information already before the examiner; nor was the withheld information less relevant than information already before the examiner.  First, the testing conditions in Example 1 of the 1983 PCT application differ from the testing conditions used in the examples in the 1990 declaration.  The 1990 declaration does not indicate that pure LAP enzyme is not effective to produce ripe hGH under the methodology and testing conditions of Example 1 of the 1983 PCT application.  In addition, an inventor's failed attempts to practice an invention are relevant evidence of non-enablement.  See AK Steel Corp. v. Sollac, 344 F.3d 1234, 1244-45 (Fed. Cir. 2003) ("[G]iven the specification's teaching away from the subject matter that was eventually claimed and AK Steel's own failures to make and use the later claimed invention at the time of the application, the district court correctly concluded that there was no genuine issue of material fact relating to undue experimentation as it relates to enablement."); Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1372 (Fed. Cir. 1999) ("The court noted that the record is replete with the inventor's own failed attempts to control the expression of other genes in prokaryotes or eukaryotes using antisense technology.").  We see no error in the district court's finding that the withheld information concerning Example 1 was material.  We therefore affirm the district court's ruling that the '352 patent is unenforceable due to inequitable conduct.

CONCLUSION

In sum, we affirm the district court's holding that claim 1 of the '352 patent is invalid based on anticipation under 35 U.S.C. § 102(a), as well as its holding that the '352 patent is unenforceable due to inequitable conduct.  However, we vacate the

court's ruling that claim 2 of the '352 patent is invalid based on anticipation under 35 U.S.C. § 102(a).

COSTS

Each party shall bear its own costs.

AFFIRMED-IN-PART and VACATED-IN-PART

# EXHIBIT F

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of : G.H. Rasmusson, et al.

Serial No. : 07/698,374   (Case 16986CH)     .    Art Unit:
                                                     122
Filed      : May 9, 1991                       .    Examiner:
                                                     D. Rivers
For        : TREATMENT OF ANDROGENIC
             ALOPECIA WITH 17B-N-MONO-
             SUBSTITUTED-CARBAMOYL-4-
             AZA-5α-ANDROST-1-EN-3-ONES

The Honorable Commissioner of Patents and Trademarks
Washington, D. C. 20231

AMENDMENT UNDER 37 C.F.R. 1.115

Dear Sir:

In response to the Office Action dated July 3, 1991,
please amend the above-identified application as follows and
consider the subsequent remarks.

IN THE SPECIFICATION:

Page 1, lines 7-10, under the heading "BACKGROUND
OF THE INVENTION": Delete the material therein, and insert:

--This is a continuation of application Serial No.
07/545,676, filed June 28, 1990, now abandoned, which is a
continuation of application Serial No. 07/370,142, filed
June 21, 1989, now abandoned, which, in turn, is a continua-
tion of application Serial No. 07/198,708, filed May 19, 1988,
now abandoned, which in turn is a continuation of application
Serial No. 07/034,806, filed April 3, 1987, now abandoned,
which, in turn, is a continuation-in-part of application

I hereby certify that this correspondence is being
deposited with the United States Postal Service as
first class mail in an envelope addressed to:
Commissioner of Patents and Trademarks, Wash-
ington, D.C. 20231, on the date appearing below.

MERCK & CO., INC.

By _____ Date _____

2123H1/ge                                    U.S.S.N. 07/698,374
                                             Case 16986CH
                                             Page 12

        Further, the Examiner contends that applicants are not
entitled to benefit of the filing dates of the parent applica-
tions of November 21, 1985 (Case 16986CA) and February 27, 1984
(Case 16986) which is the priority document for EPO 0 155 096.

        This is respectfully rebutted since these parent appli-
cations teach the novel 17β-N-monosubstituted carbamoyl-4-aza-
5α-androst-1-en-3-one compounds reduce androgen levels and are
thus useful in the treatment of androgen dependent diseases, and
androgenic alopecia, i.e. male pattern baldness is an androgen
dependent disease.  Further, EPO 0 155 096 teaches the topical,
oral and parenteral administration of these compounds which are
the routes of administration for male pattern baldness therapy.
Furthermore, the reference discloses the compounds having the
inherent properties later discovered as anti-male pattern
baldness agents.  Thus, it is argued that the claimed method
is inherently disclosed in the parent application, i.e. EPO
0 155 096, and thus entitled to its respective filing date to
support the claimed methods for treating male pattern baldness.
Thus, Rasmusson EPO Appln. 155,096 is not prior art, and the
Examiner's rejection relying upon it is overcome.

        Further, assuming arguendo that all three of the
references are prior art, and cannot be relied upon for their
respective filing priority dates, then we would argue that none
of them suggest or disclose the method of treating human males
for androgenic alopecia by topical, oral or parenteral adminis-
tration in terms of the specifically claimed compounds, as does
the instant application.

        As Examiner stated in her response, Applicants are
not deemed to have benefit of the filing dates of the parent